## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Pete Castro, Individually and On Behalf of All Others Similarly Situated, ) ) ) | **Case No.** |
| Plaintiffs, ) ) | **CLASS ACTION** |
| v. ) ) | **COMPLAINT** **FOR VIOLATIONS OF** |
| VIROPHARMA INCORPORATED, and VINCENT J. MILANO, ) ) ) | **FEDERAL SECURITIES LAWS** |
| Defendants. ) ) ) | **DEMAND FOR JURY TRIAL** |

### CLASS ACTION COMPLAINT

Plaintiff Pete Castro, individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, U.S. Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding ViroPharma Incorporated ("ViroPharma" or the "Company"), analysts' reports and advisories about the Company, and the Company's complaint against the U.S. Food and Drug Administration ("FDA") and the U.S. Department of Health and Human Services on April 13, 2012 in the District Court for the District of Columbia seeking to stay the FDA's approval of generic versions of ViroPharma's drug, Vancocin, Civil Action No. 1:12-cv-00584 (D. D.C.) all other filings in that action, including the Court's opinion and Order dated April 23, 2012 denying the Company's motion for injunctive relief, and information readily obtainable on the Internet, Plaintiff believes that

substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons other than defendants and related persons who purchased ViroPharma securities between December 14, 2011 and April 9, 2012, inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     ViroPharma develops, licenses, and markets pharmaceutical products that address serious disease. The Company's principal product is Vancocin, an antibiotic which is used for the treatment of Clostridium Difficile Associated Diarrhea ("CDAD").  Vancocin is also used for the treatment of enterocolitis caused by Staphylococcus aureus; (including methicillin-resistant strains).  CDAD is an infection of the gastrointestinal tract which results from toxins produced by bacteria that cause inflammation in the colon.  Hospitalized patients, patients in long-term care centers, patients older than 65 years of age, and patients that have received broad-spectrum antibiotic therapy are of greatest risk for CDAD.  Because Staphylococcus aureus enterocolitis is rare, CDAD accounts for the vast majority of Vancocin's use.

3.     Vancocin, which accounted for more than half of the Company's revenues, and a larger percentage of the Company's income, is the brand name for Vancomycin, an antibiotic which was approved by the FDA in 1958 in intravenous form more than half a century ago.  An oral form of Vancomycin for the treatment of CDAD was approved more than a quarter century ago, in 1985.  The dosing regimen specified in the 1985 Vancocin FDA approved label was 500mg to 2g per day in 3 to 4 doses for 7 to 10 days.

4.     ViroPharma licensed Vancocin in 2004, eight years after the patent for the drug expired in 1996.  By 2006 the FDA had taken the position that generic versions of Vancocin could be approved on the basis of laboratory tests alone, i.e., without clinical trials.  In response the Company filed a Citizen Petition with the FDA, and a complaint against the agency, which was dismissed by the District Court.

5.     On December 14, 2011, at the beginning of the Class Period, ViroPharma issued a press release which announced the "modernization of labeling" for Vancocin made effective through the FDA approval of a supplemental new drug application ("sNDA").  The December 14 press release quoted the statement of ViroPharma's CEO, defendant Milano, that: "This new label provides physicians a better understanding about how to treat and monitor patients suffering from the serious and often life threatening infections that require oral Vancocin therapy".  According to the December 14, 2011 press release this understanding included "a specific dosing regimen for CDAD."

6.     The December 14, 2011 press release further reported that the Company had purchased exclusive rights to data from two clinical trials conducted by Genzyme Corporation, Genzyme's drug, in which that drug, Tolevamer was compared to Vancocin the treatment of patients with CDAD.  The Company stated in the December 14, 2011 press release, that, as a result of the changes in the Vancocin label, which provided physicians with a better understanding about how to treat and monitor patients with CDAD: "ViroPharma believes that Vancocin meets the requirements for, and thus has, three years of [marketing] exclusivity, and that generic Vancomycin capsules will not be approved during this period."  The applicable statute provides that antibiotics such as Vancocin pills which were approved by the FDA before 1997 (old antibiotics), cannot obtain marketing exclusivity for any "condition of use for which

the drug...was approved [by the FDA] before October 8, 2008, the standard for market exclusivity for other antibiotics was the standard the FDA would use to determine whether the changes to the Vancocin label would result in marketing exclusivity. Thus, the dosing regimen could not be a new "condition of use" and that the sNDA did not meet the standards necessary to change the dosing regimen.

7.     As a result of the foregoing representations in the December 14, 2011 press release, the market price of ViroPharma stock rose sharply, increasing 17.9% on heavy volume of approximately 4.8 million shares, increasing $4.21 per share, to close at $27.80 per share on December 14, 2011.. Securities analysts who viewed these representations about market exclusivity positively, increased their price target for ViroPharma stock, while some of them increased their ratings on the Company's stock. Numerous securities analysts, including Piper Jaffray, JP Morgan, Caris & Co., JMP Securities, Maxim Group, Auriga, Oppenheimer, WJB Capital Group and Brean Murray Carret & Co. issued reports indicating that they believed and relied on Defendants' December 14 representations that Vancocin would obtain three years of market exclusivity as a result of the changes in the Vancocin label. Additional securities analysts, including Goldman Sachs, initiated coverage of the Company's stock. Defendant did not disclose that this dosing regimen used in the trials had previously been approved before October 1, 2008.

8.     On April 10, 2012, the Company announced the FDA had told the Company that Vanconcin's new label "would not qualify for three additional years of [market] exclusivity because it was not a "significant new use or indication." In short, the FDA refused to grant three years of market exclusivity for instructions on how to treat and monitor patients and a previously

4

approved dosing regimen.   Further, as the press release disclosed, the FDA simultaneously announced the approval of three applications for generic Vancomycin capsules.

9.   That same day, the Company revealed that the Federal Trade Commission (the "FTC") notified the Company that it was initiating an investigation into whether the Company had engaged in "unfair methods of competition" with respect to Vancocin.

10.   Thus, the Defendants' statements regarding market exclusivity for Vancocin, which recklessly assumed that the FDA would treat its label changes as new "conditions of use," and their failure to disclose these facts, rendered those statements materially false and misleading at all relevant times.  As a result of the Company's April 10 revelations that its claim of market exclusivity was denied by the FDA because it was not a significant new use or indication, and the FDA's approval of competing generic drugs, ViroPharma shares declined $6.17 per share or 22%, to close at $22.44 per share on April 10, 2012.  Securities analysts cut their price targets for ViroPharma stock and downgraded their ratings of the Company's stock, to "neutral" or even "hold."

11.   As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

12.   The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R § 240.10b-5.

13.   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

14.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).  ViroPharma maintains its principal place of business in this District and many of the acts and practices complained of occurred in substantial part herein.

15.    In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

16.    Plaintiff, Pete Castro as set forth in the accompanying certification, incorporated by reference herein, purchased ViroPharma securities at artificially inflated prices during the Class Period and was damaged thereby.

17.    Defendant ViroPharma is a corporation organized under the laws of the state of Delaware, maintaining its principal place of business at 730 Stockton Drive, Exton, PA 19341.

18.    Defendant Vincent J. Milano ("Milano") has served as the President and Chief Executive Officer, and Chairman of the Board of Directors since March 2008. Defendant Milano joined the company in 1996 and served as vice president, chief financial officer, and treasurer from 1997 to 2006. In 2006, he assumed the role of vice president, chief financial officer and chief operating officer.

19.    Defendant Milano referred to herein as the "Individual Defendant."

## SUBSTANTIVE ALLEGATIONS

## BACKGROUND

20.    ViroPharma exclusively licensed the right to market Vancocin in the United States in 2004 from Eli Lilly and Company, several years after the patent for the drug had expired in 1996.

21.    Prior to acquiring the Vancocin license, ViroPharma had no revenues and sustained annual operating losses.

22.    The profitability of the Vancocin license critically depended on how long the Company could forestall FDA approval of generic competition.  As FDA data shows, when more than one generic competitor enters the market, the price for a drug usually falls 50% at the same time that the company with the branded drug loses sales to generic competitors.  Thus, deferring generic competition as long as possible was critical for the Company.

23.    Between 2000 and 2005, the FDA announced that bioequivalence, the prerequisite to FDA approval of generic drugs, could be demonstrated by laboratory testing, *i.e.,* the in vitro method, so that clinical trials would not be needed.  Thereafter, in 2006, ViroPharma filed a Citizen Petition with the FDA asserting that this decision by the FDA that clinical trials would not be needed to prove bioequivalence of generic drugs in appropriate circumstances violated the agency's own regulations and was scientifically infirm.  The Company also sought an injunction in federal court to prevent the FDA from granting approval of a generic drug.  That action was dismissed on grounds of prematurity, in that ViroPharma had as yet sustained no injury.

24.    By 2009 the FDA announced that companies seeking approval of generic forms of Vancocin would be required to include the same ingredients as Vancocin in the same proportions and could prove bioequivalence and obtain approval by laboratory tests only (by the in vitro method), without clinical trials.  In 2009, the FDA convened a meeting of an Advisory Committee of outside experts to review and advise the agency regarding the foregoing procedure for the approval of a generic form of Vancocin.  The Committee unanimously voted that the procedure was appropriate..

25. ViroPharma's position that generic versions of Vancocin could not be approved based on in vitro data, but that clinical trials were required, was dealt a death blow when the FDA, in August 2010, approved generic versions of Lovenox, a complex molecule based on in-vitro data, (without requiring clinical trials), denying the Citizen Petition of the owner of the branded drug, whose motion for a temporary restraining order was denied by the District Court for the District of Columbia in August 2010.

26. The Company's next act in its efforts to defer generic competition was to seek to pursue a claim of three year market exclusivity under a provision of the law applicable only to antibiotics providing that such exclusivity is available only for new "conditions of use," based on data from new clinical trials.  To do so the Company filed an sNDA in 2010 to change the label for Vancocin to add data from two clinical trials conducted by Genzyme in patients with CDAD to compare its drug to Vancocin, and add patient treatment and monitoring instructions.  To this end ViroPharma agreed to purchase the data from Genzyme's clinical trials in which Genzyme sought to establish that its drug, Tolevamer, was equally effective as Vancocin to treat CDAD, in exchange for royalties if an sNDA based on that data was approved by the FDA.

27. The Vancocin dosing regimen selected for testing in the trial was already approved by the FDA.  In other words the Vancocin dosing regimen in the Genzyme trials was **not** a new condition of use as required to obtain three year marketing exclusivity for antibiotics pursuant to Section 35(v)(3)(B) of the Food, Drug and Cosmetic Act.  Genzyme was conducting these clinical trials to obtain the data necessary for approval of its drug as a treatment for CDAD.

28. The study showed that Tolevamer was inferior to both Vancocin as a treatment for CDAD and the other antibiotic tested in the trial.  These results meant that the trials were of no use to Genzyme in its efforts to obtain FDA approval of its drug as a treatment for CDAD.

8

29.   Upon FDA approval of the Vancocin sNDA in December 2011, ViroPharma filed a supplement to its Citizen Petition requesting three years of market exclusivity pursuant to 21 U.S.C. §355(j)(5)(F)(iv).  In order to claim the three years of marketing exclusivity, Defendants necessarily asserted that patient treatment and monitoring instructions together with a dosing regimen (125 mg four times per day), which had previously been approved by the FDA and was included in the earlier Vancocin label, were new "conditions of use" within the meaning of the applicable statute to antibiotics approved before 1997, known as "old antibiotics" because the Company would not otherwise have been entitled to marketing exclusivity.  Four months later on April 10, 2012 the FDA disagreed, stating that the label changes did not constitute significant new uses that qualify for market exclusivity - - a standard which applies to antibiotics but does not apply to other types of drugs.  Simultaneously the FDA approved the applications of three companies to manufacture generic versions of Vancocin.

30.   The district court ruled, in an opinion dated April 23, 2012, that the injunction action brought by the Company was not likely to succeed in its claim that the FDA's ruling was erroneous, noting the legislative history of the provision limiting marketing exclusivity of label changes to those that amount to significant "new conditions of use."

## MATERIALLY FALSE AND MISLEADING
## STATEMENTS MADE DURING THE CLASS PERIOD

31.   On December 14, 2011, in a press release, ViroPharma announced the modernization of labeling for Vancocin Capsules made effective through the FDA's approval of a sNDA.  The December 14 press release stated,

### *Vancocin Labeling Changes*

Through the sNDA approval, Vancocin's label for the first time includes clinical safety and efficacy data for Vancocin in treating currently circulating strains of *Clostridium difficile*, including the BI/NAP1 strain.  Vancocin's labeling now

includes important safety and efficacy data from 260 patients with *C. difficile* associated diarrhea (CDAD) treated with Vancocin in two pivotal studies of Genzyme Corporation's investigational drug, tolevamer. The Vancocin arm of the trials provides important information to help ensure appropriate use of Vancocin. ViroPharma purchased exclusive rights to the two studies from Genzyme for which it will pay Genzyme royalties of 10 percent, 10 percent and 16 percent on net sales of Vancocin for the three year period following the approval of the sNDA.

"This new label provides physicians a better understanding about how to treat and monitor patients suffering from the serious and often life threatening infections that require oral Vancocin therapy," said Vincent Milano, ViroPharma's president and chief executive officer.

### *Exclusivity Incentives for Antibiotic Treatments*

**As a result of today's sNDA approval, ViroPharma believes Vancocin meets the requirements for, and thus has, three years of exclusivity, and that generic vancomycin capsules will not be approved during this period.**

* * *

- **Clinical safety and efficacy data of Vancocin capsules, including efficacy data for the more lethal, epidemic BI/NAP1 strain;**
- **An instruction to monitor renal function in all patients;**
- **An instruction that elderly patients should not be prematurely discontinued from treatment, or switched to other therapies; and**
- **A specific dosing regimen for CDAD.**

32.    As a result of the materially misleading representations about market exclusivity in the December 14 press release, the market price of ViroPharma stock jumped $4.21 per share, from a closing price of $23.59 per share on December 13, 2011 to a closing price of $27.80 on December 14, 2011, on heavy volume of almost five million shares.

33.    The representations about market exclusivity in the December 14, 2011 press release were materially misleading, lacked a reasonable basis due to the fact that the Vancocin dosing regimen 125mg four times/day for 7-10 days in the Genzyme trials falls within the Vancocin label that was approved by the FDA decades ago, and that there was no evidence that

any variance in the dosing regimen as specified by the label approved by the FDA would be less safe or less effective.

34.   On January 11, 2012, at the JP Morgan Healthcare Conference, Defendant Milano represented to investors that:

> [o]n the last product on the product side...is Vancocin.  So I think the last few years that I've stood up here, I've had a slide that would show you that the impact of a generic Vancocin would mean.  **And I'm proud to say today that we believe we've gotten three years of exclusivity by taking advantage of the legislation that provides all the antibiotics three years of exclusivity if you can update the label with meaningful safety and efficacy data, which we did through the licensing of that data from a study that Genzyme had done with Televamer, comparing that drug to Vancocin back in 2008.**
>
> * * *
>
> **But we're in a position now for the first time since March of 2006, frankly to feel confident that we have exclusivity into the future with Vancocin.**  And as a result of that, it's the first time since 2009 that we're actually providing guidance for Vancocin of between $260 million and $310 million in sales.

35.   On February 28, 2012, the Company filed an annual report for the year ended December 31, 2011 on Form 10-K with the SEC, which was signed by, among others, Defendant Milano describing the Company's business and representing the Company's operating and financial results and financial position.  In addition, pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), the Form 10-K contained signed certifications by Defendant Milano and the Company's Chief Financial Officer Charles A. Rowland, stating that the financial information contained in the Form 10-K was accurate, and that they disclosed any material changes to the Company's internal control over financial reporting.

36.   The 10-K represented the following, in relevant part:

On December 14, 2011, we announced the modernization of labeling for Vancocin Capsules made effective through the FDA's approval of a supplemental new drug application (sNDA).

11

Through the sNDA approval, Vancocin's label for the first time includes clinical safety and efficacy data for the use of Vancocin capsules in treating *Clostridium difficile*. Vancocin's labeling now reflects safety and efficacy data from 260 patients with CDAD treated with Vancocin in two pivotal studies of Genzyme Corporation's investigational drug, tolevamer. We purchased exclusive rights to the two studies from Genzyme for which we will pay Genzyme royalties of 10 percent, 10 percent and 16 percent on net sales of Vancocin for the three year period following the approval of the sNDA.

**As a result of the sNDA approval, we believe Vancocin meets the requirements for three years of exclusivity, and that generic vancomycin capsules will not be approved during this period. Under FDA's regulations, labeling changes based on new clinical investigations that are essential to approval of the sNDA and to which the applicant has exclusive rights may be entitled to three years of exclusivity, and generic drug labeling cannot include information protected by such three-year exclusivity. A generic may seek approval by omitting labeling protected by three-year exclusivity; however, if such omissions render the generic drug less safe or effective, it cannot be approved until the three-year exclusivity expires.**

**We believe that attempting to omit Vancocin labeling changes protected by exclusivity would render generic versions of Vancocin less safe and effective.**

37.   The representations in the three preceding paragraphs about the changes in the Vancocin label approved by the sNDA were knowingly or recklessly false or misleading due to the following facts and the failure to disclose the following facts:

(a)   the dosing regimen for CDAD in the new label (125 mg four times per day) was **not new**. Rather it was included in the approved dosing regimen in the old label; indeed the FDA noted in a filing in the District Court that the sNDA did not include the necessary prerequisites for approval of a new dosing regimen;

(b)   the old label included an instruction to monitor renal function. Therefore, the new label merely modified that instruction;

(c)   because the sNDA did not seek approval for a new use of Vancocin, the inclusion of data for the RI/NAP strain in the label was irrelevant to the standards for market exclusivity;

(d)      the representations implied falsely that if the omission of label changes would make generic versions of Vancocin less safe or effective, Vancocin could obtain three years of market exclusivity, when Defendants knew, and failed to disclose the fact that because Vancomycin was an old antibiotic, it could not obtain such exclusivity except for a new "condition of use," and only for the new "condition of use," as provided by 21 U.S.C. §355(v)(3)(B).

38.   The risk disclosures concerning market exclusivity in the Company's 2011 Annual Report on Form 10-K, were materially false and misleading by reason of the failure to disclose the fact that the Company could not obtain three year exclusivity for Vancocin label changes except for new "conditions of use" unlike antibiotics approved by the FDA after 1997 and other drugs.

## THE TRUTH IS REVEALED

39.   Before the market opened on April 10, 2012, the company filed a Form 8-K with the SEC, attaching a press release that stated in relevant part that:

> [T]he U.S. Food and Drug Administration (FDA) denied the citizen petition (Docket # FDA-2006-P-0007) filed by ViroPharma on March 17, 2006 related to the FDA's proposed in vitro method for determining bioequivalence of abbreviated new drug applications (ANDAs) referencing Vancocin® (vancomycin hydrochloride, USP) Capsules. In the FDA's response to the citizen petition, the agency denied ViroPharma's citizen petition and also informed the company that a final guidance for vancomycin bioequivalence consistent with the FDA's citizen petition response is forthcoming.

> The FDA also informed ViroPharma in the same correspondence that the recent supplemental new drug application (sNDA) for Vancocin approved December 14, 2011 would not qualify for three additional years of exclusivity based on the agency's assertion that in order for an sNDA for an old antibiotic such as Vancocin to be eligible for a grant of exclusivity, it must be a significant new use or indication. FDA also indicated that it is approving three ANDA's for generic vancomycin capsules.

40.   Also in this press release, ViroPharma revealed that:  "In addition, the company has received a notification that the Federal Trade Commission is conducting an investigation into whether the company has engaged in unfair methods of competition with respect to Vancocin."

41.   As a result, at the close of trading that day, ViroPharma shares had declined $6.17 per share or 22%, to close at $22.44 per share on extraordinarily high trading volume.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

42.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired ViroPharma securities during the Class Period (the "Class") and were damaged thereby.  Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

43.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, ViroPharma securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by ViroPharma or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

44.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

45.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

46.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of ViroPharma;

- whether the Individual Defendant caused ViroPharma to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of ViroPharma securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

47.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually

redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

48.   Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- ViroPharma securities are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased and/or sold ViroPharma securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

49.   Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## COUNT I

### (Against All Defendants For Violations of
### Section 10(b) And Rule 10b-5 Promulgated Thereunder)

50.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

51.   This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

52.   During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of ViroPharma securities; and (iii) cause Plaintiff and other members of the Class to purchase ViroPharma securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

53.   Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for ViroPharma securities and options.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about ViroPharma's finances and business prospects.

54.   By virtue of their positions at ViroPharma, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose

such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

55.   Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of ViroPharma securities from their personal portfolios.

56.   Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior manager and/or director of ViroPharma, the Individual Defendant had knowledge of the details of ViroPharma internal affairs.

57.   The Individual Defendant is liable both directly and indirectly for the wrongs complained of herein. Because of his position of control and authority, the Individual Defendant was able to and did, directly or indirectly, control the content of the statements of ViroPharma. As an officer and/or director of a publicly-held company, the Individual Defendant had a duty to disseminate timely, accurate, and truthful information with respect to ViroPharma's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of ViroPharma securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning ViroPharma's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased ViroPharma securities at artificially inflated prices and relied upon the price of the securities, the integrity of

the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

58.    During the Class Period, ViroPharma securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased shares of ViroPharma securities at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased said securities or would not have purchased them at the inflated prices that were paid. At the time of the purchases by Plaintiff and the Class, the true value of ViroPharma securities were substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of ViroPharma securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

59.    By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

60.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the
### Exchange Act Against The Individual Defendant)

61.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

62.    During the Class Period, the Individual Defendant participated in the operation and management of ViroPharma, and conducted and participated, directly and indirectly, in the conduct of ViroPharma's business affairs.  Because of his senior position, he knew the adverse non-public information regarding ViroPharma's sNDA submission to the FDA.

63.    As an officer and/or director of a publicly owned company, the Individual Defendant had a duty to disseminate accurate and truthful information with respect to ViroPharma's financial condition and results of operations, and to correct promptly any public statements issued by ViroPharma which had become materially false or misleading.

64.    Because of his position of control and authority as a senior officer, the Individual Defendant was able to, and did, control the contents of the various reports, press releases and public filings which ViroPharma disseminated in the marketplace during the Class Period concerning ViroPharma's financial prospects.  Throughout the Class Period, the Individual Defendant exercised his power and authority to cause ViroPharma to engage in the wrongful acts complained of herein. The Individual Defendant was therefore a "controlling person" of ViroPharma within the meaning of Section 20(a) of the Exchange Act.  In this capacity, he participated in the unlawful conduct alleged which artificially inflated the market price of ViroPharma securities.

65.   The Individual Defendant, therefore, acted as a controlling person of ViroPharma. By reason of his senior management position and/or being a director of ViroPharma, the Individual Defendant had the power to direct the actions of, and exercised the same, to cause ViroPharma to engage in the unlawful acts and conduct complained of herein.   The Individual Defendant exercised control over the general operations of ViroPharma and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

66.   By reason of the above conduct, the Individual Defendant is liable pursuant to Section 20(a) of the Exchange Act for the violations committed by ViroPharma.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.      Requiring defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.


Dated:  May 17, 2012                          **BERGER & MONTAGUE, P.C.**


                                              By:  ___/s/Sherrie R. Savett_____
                                                   Sherrie R. Savett
                                                   Carole A. Broderick
                                                   1622 Locust Street
                                                   Philadelphia, PA  19103
                                                   Telephone: 215-875-300
                                                   Facsimile: 215-875-4604


                                              **POMERANTZ HAUDEK
                                                 GROSSMAN & GROSS LLP**
                                              Marc I. Gross
                                              Jeremy A. Lieberman
                                              100 Park Avenue, 26th Floor
                                              New York, New York 10017
                                              Telephone: 212-661-1100
                                              Facsimile:  212-661-8665

                                              **POMERANTZ HAUDEK
                                                 GROSSMAN & GROSS LLP**
                                              Patrick V. Dahlstrom
                                              10 South LaSalle Street, Suite 3505
                                              Chicago, IL 60603
                                              Telephone: 312-377-1181
                                              Facsimile:  312-377-1184

                                              **BRONSTEIN, GEWITZ
                                                 & GROSSMAN, LLC**
                                              Peretz Bronstein
                                              60 East 42nd Street, Suite 4600
                                              New York, New York 10165
                                              Telephone: 212-697-6484
                                              Facsimile: 212-697-7296

                                              ***Counsel for Plaintiff***

kal1792950_920_32.docx

# Certification of Plaintiff
# Pursuant to Federal Securities Laws

1.   I, Pete Castro, make this declaration pursuant to Section 101 of the Private Securities Litigation Reform Act of 1995 as required by Section 21D (a) (2) of Title I of the Securities Exchange Act of 1934.

2.   I have reviewed a Complaint against ViroPharma Inc. ("ViroPharma"), and authorize a filing of a comparable complaint on my behalf.

3.   I did not purchase my ViroPharma securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under Title I of the Securities Exchange Act of 1934.

4.   I am willing to serve as a representative party on behalf of a class as set forth in the Complaint, including providing testimony at deposition and trial, if necessary.   I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.   To the best of my current knowledge, the attached sheet lists all of my purchases and sales in ViroPharma securities during the Class Period as specified in the Complaint.

6.   During the three-year period preceding the date on which this certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws, except as follows:

7.   I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

8.   The matters stated in this declaration are true to the best of my current knowledge, information and belief.

I declare under penalty or perjury that the foregoing is true and correct.

Executed___**April 18, 2012**___, at _____**Sparks, NV**_____
               **(Date)**                           **(City, State)**

                                            **(Signature)**

                            Pete Castro
                                    **(Type or Print Name)**

<u>Summary of Purchases and Sales</u>

| DATE | TRANSACTION TYPE: PURCHASE OR SALE | NUMBER/ TYPE OF SECURITY | PRICE OF SECURITY |
|---|---|---|---|
| 2/13/12 | Purchase | 100 | 31.40 |
| 4/12/12 | Sold | 100 | 21.8014 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Name: _____Pete Castro_____

Address: ___3624 Desert Fox Drive_____

_____Sparks, NV  89436_____

Phone: _____(775) 626-4490_____