UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re VIROPHARMA INCORPORATED SECURITIES LITIGATION | ) ) ) | Civil Action No. 2:12-cv-02714 |
| | ) | CLASS ACTION |
| This Document Relates To: | ) ) ) | DECLARATION OF JONATHAN GARDNER IN SUPPORT OF LEAD |
| ALL ACTIONS. | ) ) ) ) | PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND AN AWARD OF ATTORNEYS' FEES AND EXPENSES |

I, JONATHAN GARDNER, declare as follows pursuant to 28 U.S.C. § 1746:

1.      I am a member of Labaton Sucharow LLP ("Labaton Sucharow" or "Lead Counsel"), counsel for Lead Plaintiff Carpenters' Local 27 Defined Benefit Trust Fund ("Lead Plaintiff") and the Settlement Class.[1]  I have been actively involved in prosecuting and resolving this action, am familiar with its proceedings, and have personal knowledge of the matters set forth herein based upon my supervision and participation in all material aspects of the action.

2.      Pursuant to Rule 23 of the Federal Rules of Civil Procedure, I submit this declaration in support of Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation of Settlement Proceeds and Lead Counsel's Motion for an Award of Attorneys' Fees and Expenses.  Both motions have the full support of the Lead Plaintiff.  *See* Declaration of Carpenters' Local 27 Defined Benefit Trust Fund in Support of Final Approval of Settlement and Other Relief, dated September 21, 2015, attached hereto as Exhibit 1.[2]

---

[1]      Reference to "Settlement Class" is to the class certified by the Court for settlement purposes only, defined as: "all Persons that purchased or otherwise acquired ViroPharma Securities between December 14, 2011 and April 9, 2012, inclusive, (the "Class Period") and were damaged thereby. Excluded from the Settlement Class are: Defendants; the Company's officers, directors, and employees during the Class Period; the Company's successors, and assigns; any person, entity, firm, trust, corporation or other entity related to, affiliated with, or controlled by any of the Defendants, as well as the Immediate Families of the Individual Defendants.  Also excluded from the Settlement Class are those Persons who submit valid and timely requests for exclusion from the Settlement Class in accordance with the requirements set forth in the Notice."  *See* Order Granting Preliminary Approval of Class Action Settlement and Directing Notice to the Settlement Class (Dkt. No. 88), ¶2.

All capitalized terms not otherwise defined herein have the same meaning as that set forth in the Stipulation and Agreement of Settlement, dated as of April 28, 2015 (the "Settlement Agreement"). Dkt. No. 87-3.

[2]      Citations to "Exhibit" or "Ex.___" herein refer to exhibits to this Declaration.  For clarity, exhibits that themselves have attached exhibits will be referenced as "Ex. __-__."  The first numerical reference refers to the designation of the entire exhibit attached hereto and the second reference refers to the exhibit designation within the exhibit itself.

## I. PRELIMINARY STATEMENT: THE SIGNIFICANT RECOVERY ACHIEVED

3. This case has been vigorously litigated from its commencement in May 2012 through the execution of the Settlement Agreement. The Settlement of $8,000,000 was achieved only after Lead Counsel, *inter alia*: (a) reviewed and analyzed publicly available information concerning ViroPharma; (b) conducted and/or oversaw an exhaustive pre-filing investigation that included interviews of 35 former ViroPharma employees and other persons with relevant knowledge after locating almost 130 potential witnesses and contacting more than 73 of them; (c) prepared and filed a detailed Amended Class Action Complaint for Violations of the Federal Securities Laws ("Complaint"); (d) successfully opposed Defendants' comprehensive motion to dismiss; (e) successfully opposed Defendants' motion to certify for interlocutory appeal the Court's order denying Defendants' motion to dismiss; (f) participated in an expedited discovery process in preparation for mediation, reviewing almost five thousand documents (totaling over 40,000 pages) produced by Defendants and non-parties, such as the Food and Drug Administration ("FDA"); (g) engaged in thorough mediation efforts; and (h) conferred with experts and consultants on damages and regulatory issues. Having done so, Lead Counsel was in a position to fully evaluate the strengths and weaknesses of the claims of Lead Plaintiff and the Settlement Class.

4. The Complaint was brought against ViroPharma and certain of its officers, Vincent J. Milano (CEO), Charles A. Rowland Jr. (CFO), Thomas F. Doyle (VP Strategic Initiatives), and J. Peter Wolf (GC) (collectively, "Defendants"), for violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b), 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. Lead Plaintiff alleged that during the Class Period, Defendants made materially false and misleading statements to the market that contradicted and/or omitted what the FDA had privately told Defendants during numerous discussions concerning efforts

to update the label and gain extended marketing exclusivity for the Company's most lucrative drug, Vancocin.  Lead Plaintiff alleged that Defendants' failure to disclose the substance of these conversations made their public statements concerning extending exclusivity for Vancocin false or misleading when made.  Lead Plaintiff further alleged that Defendants' scienter was bolstered by the fact that during the Class Period, while they were allegedly disseminating these false statements to the public, defendants Doyle and Rowland sold off substantial amounts of their ViroPharma shares.  The Complaint alleged that as a result of Defendants' conduct, ViroPharma securities traded at artificially inflated prices during the Class Period, and that when Defendants revealed that Vancocin did not qualify for extended exclusivity, ViroPharma's Securities' prices suffered, causing damage to investors.

5.      This Settlement is an excellent result for the Settlement Class and the product of hard-fought litigation and tenacious arm's-length negotiations between the parties, facilitated by a respected and experienced mediator, the Honorable Layn R. Phillips (Ret.), formerly of the United States District Court for the Western District of Oklahoma.[3]  Judge Phillips is recognized as one of the premier mediators of complex, multi-party, high-stake cases, both in the United States and abroad.  The negotiations were conducted by experienced counsel with a full understanding of both the strengths and weaknesses of their respective cases.  The Settlement for $8,000,000 represents a substantial recovery in light of the significant risks and delays Lead Plaintiff faced in bringing the action to summary judgment and trial and, ultimately, collecting on any judgment upheld after appeals.

6.      The Settlement Amount is generally greater than the median reported settlement amounts since the passage of the Private Securities Litigation Reform Act of 1995 ("PSLRA"),

---

[3]      Judge Phillips also served as United States Attorney in the Northern District of Oklahoma.

which have ranged from $5.6 million in 1996 (adjusted for inflation) to $6.5 million in 2014. *See* Renzo Comolli & Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2014 Full-Year Review* (NERA Jan. 2015) (Ex. 2 hereto) at 28. Further, Lead Plaintiff retained an expert to analyze the alleged damages suffered by the Settlement Class as a result of the alleged fraud. Lead Plaintiff's expert has estimated that the Settlement Class sustained maximum damages in the range of approximately $78.5 million (for the one day drop following the corrective disclosure) to $90 million (for the two day drop following the corrective disclosure), assuming that liability and loss causation for the alleged corrective disclosures were proven and based on various assumptions and modeling. These damage estimates assume the entire price drops associated with the allegedly corrective disclosures are recoverable and that no part of the price drops are associated with non-fraudulent related news. Measured against this yardstick, the Settlement will compensate Settlement Class Members for approximately 9% to 10% of their estimated maximum losses—a substantial recovery in light of the countervailing legal arguments and litigation risks.

7.      This percentage is well within the range of reasonableness approved by courts. *See, e.g.*, *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1042 (N.D. Cal. 2007) ($13.75 million settlement yielding 6% of potential damages after deducting fees and costs was "higher than the median percentage of investor losses recovered in recent shareholder class action settlements"); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, No. 02 MDL 1484 (JFK), 2007 WL 313474, at *10 (S.D.N.Y. Feb. 1, 2007) (finding that a recovery representing 6.25% of damages was "at the higher end of the range of reasonableness of recovery in class actions securities litigations").

8.      In choosing to reach a settlement, Lead Plaintiff and Lead Counsel took into consideration the significant risks associated with advancing the claims alleged in the Complaint. As discussed in more detail in §VI, *infra*, there were risks that the Court would find as a matter of

law that Lead Plaintiff's evidence in support of falsity, materiality, loss causation and/or scienter did not create a genuine issue of material fact. Further, Lead Plaintiff faced additional trial-related risks. For example, there was a substantial risk that, despite the use of testimony from respected experts, a jury might not accept Lead Plaintiff's arguments regarding the causal relationship between Defendants' alleged corrective disclosures and the drop in price of ViroPharma Securities at the end of the Class Period. Issues relating to loss causation and damages, in addition to Vancocin's prospects, would likely have come down to an inherently unpredictable and hotly disputed "battle of the experts," with Defendants' experts focusing heavily on confounding news or events and the difficulties of disaggregation. Furthermore, there was a significant risk that a jury could find that during the Class Period Defendants did not act with the required state of mind, *i.e.*, with scienter. Indeed, Defendants would likely argue that the FDA had never advised them that it would deny extended exclusivity to Vancocin and that the FDA was interpreting a new statute for the first time. Further, Defendants would argue that they adequately warned the market that the ultimate determination of whether to extend exclusivity under the statute resided with the FDA and there was no guarantee that the FDA would rule in the Company's favor. Accordingly, in the absence of a settlement, there was a very real risk that the Settlement Class could have recovered nothing or an amount significantly less than the negotiated Settlement.

9. Lead Plaintiff and Lead Counsel carefully considered all of these issues in deciding to settle the Action for $8,000,000. On balance, considering all the circumstances and risks both sides faced if the parties had continued to trial, both Lead Plaintiff, for itself and the Settlement Class, and Defendants concluded that settlement on the terms agreed upon was in their respective best interests.

10. The Settlement confers a substantial benefit on the Settlement Class and eliminates the significant costs of full-blown merits discovery and the significant risks of an adverse result at

class certification, summary judgment, trial, or appeal. Lead Counsel also respectfully submit that the Settlement should be approved as fair, reasonable, and adequate; the Plan of Allocation for the settlement proceeds, which was developed with the assistance of Lead Plaintiff's damages consultant, should be approved.

11.     Lead Counsel, with the assistance of additional plaintiff's counsel, Robbins Geller Rudman & Dowd LLP ("Robbins Geller"), and local counsel, Goldman Scarlato & Penny, P.C. (formerly Goldman Scarlato Karon & Penny, P.C.) (collectively, "Plaintiff's Counsel"), prosecuted this Action on a wholly contingent basis and advanced and incurred significant litigation expenses. By doing so, Lead Counsel shouldered the risk of an unfavorable result. Plaintiff's Counsel have not received any compensation for their efforts, nor have they been paid for their substantial expenses incurred to date. The complex nature and unusual scope of the facts and law underlying the securities violations alleged, the intense litigation proceedings, and the added complication of pursuing recovery from a company that was purchased by and subsumed under another company, increased substantially the expenditures to this otherwise costly prosecution, resulting in expenses of $155,197.23, as well as the investment of more than 4,500 hours of attorney and other professional and paraprofessional time. *See* Section X., *infra*.

12.     Lead Counsel's fee application for 30% of the Settlement Fund is fair both to the Settlement Class and to Lead Counsel, and warrants the Court's approval. This fee request is within the range of fee percentages frequently awarded in this type of action and, under the particular facts of this case, is fully justified in light of the substantial benefits that Lead Counsel conferred on the Settlement Class, the risks it undertook, the quality of its representation, the nature and extent of the legal services, and the fact that counsel pursued the case at financial risk.

## II.    FACTUAL BACKGROUND

### A.    Summary of Lead Plaintiff's Claims

13.    This securities-fraud class action was brought on behalf of investors who purchased or acquired ViroPharma Securities between December 14, 2011 and April 9, 2012, inclusive (the Class Period).[4]

14.    Founded in 1994, ViroPharma was a global biotechnology company that marketed and sold Vancocin HCl capsules in the U.S. and its territories.  Vancocin is the oral capsule formulation of vancomycin hydrochloride, and is indicated for the treatment of CDAD, a severe and deadly gastrointestinal infection.  ViroPharma acquired Vancocin, which the FDA first approved in 1986, from Lilly Research Laboratories ("Lilly") in 2004.  The patent protection on Vancocin expired in 1996.

15.    Lead Plaintiff alleged that Vancocin was tremendously important to ViroPharma's business.  Prior to acquiring Vancocin in 2004, ViroPharma had limited sales revenue and posted annual operating losses.  From 2005 through 2008, Vancocin sales accounted for nearly 100% of the Company's revenues.  Vancocin was very profitable to ViroPharma during that time and accounted for hundreds of millions of dollars in sales.  Due to the success of Vancocin, ViroPharma was able to expand its portfolio of drugs over the next few years.  Nonetheless, Vancocin remained vital to the Company, with net sales totaling over $288 million and accounting for over half of ViroPharma's total net sales in 2011.

16.    Lead Plaintiff's Complaint alleged that Defendants' exclusive monopoly on selling Vancocin was being threatened by a change to FDA regulations which would substantially lower the barrier for generic manufacturers to sell generic versions of the drug.  Lead Plaintiff alleged that

---

[4]    "ViroPharma Securities" refers to ViroPharma's publicly traded common stock, its 2.0% Senior Convertible Notes due 2017, and its exchange-traded call and put options.

Defendants were desperate to keep their hold on the Vancocin market, and their hopes were seemingly answered in 2008 when a new statute called the QI Program Supplemental Funding Act of 2008 (the "QI Act") was passed, which would grant an additional three years of marketing exclusivity for an old antibiotic drug like Vancocin if the company that owned it could demonstrate the drug could be used to treat a "new condition of use." Lead Plaintiff alleged that ViroPharma subsequently set out to amend the label for Vancocin to add new information from a study it licensed from Genzyme (the "Genzyme Study") and then attempted to use the new label to convince the FDA that the Genzyme Study supported a new condition of use for Vancocin.

17. Lead Plaintiff further alleged that, unbeknownst to investors, on several occasions prior to December 14, 2011 (the start of the Class Period) the FDA privately informed ViroPharma that the Genzyme Study was not an adequate and well-controlled trial as to Vancocin. As an example, Lead Plaintiff alleged that the FDA forced ViroPharma to remove all comparison data from the Genzyme Study from the new label for the very reason that the Genzyme Study was not an adequate and well-controlled trial as to Vancocin and thus no valid comparison could be made. Lead Plaintiff alleged that this was highly significant because an adequate and well-controlled trial was a prerequisite to establishing that Vancocin could be used to treat a new condition of use – a requirement admittedly known by Defendants and set out plainly in the governing statute.

18. Lead Plaintiff further alleged that despite this knowledge, after the FDA approved ViroPharma's supplemental New Drug Application ("sNDA") on December 14, 2011, which simply allowed the Company to update the package labeling for Vancocin, Defendants told the market that ViroPharma had now met the QI Act qualifications (*i.e.*, Vancocin had been approved to treat a new condition of use) such that it was entitled to an additional three years of marketing exclusivity. Lead Plaintiff alleged that Defendants further told the market that they expected the FDA to both approve

its pending Citizen Petition formally requesting extended exclusivity and deny the applications of several generic makers of the drug to enter the market.

19.     Lead Plaintiff alleged Defendants failed to disclose in pertinent part the substance of ViroPharma's prior communications with the FDA, and violated the securities laws by failing to tell the market the whole truth so that market participants could form their own informed opinion.

20.     Lead Plaintiff further alleged that Defendants' fraudulent behavior was finally revealed on April 9, 2012 when the FDA denied ViroPharma's request for exclusivity, informing investors for the first time what Defendants had known all along – the Genzyme Study could not support a new condition of use for Vancocin.  Lead Plaintiff alleged that this announcement and the end of ViroPharma's monopoly on Vancocin caused the prices of the Company's securities to drop over the next two days, with the common stock declining $6.17 or 22% on April 10, 2012 and another 2.58% on April 11, 2012.

## III.    PROCEDURAL HISTORY

21.     The Action was commenced on May 17, 2012, by Pete Castro by the filing of an initial complaint in this Court against Defendants, alleging violations of the federal securities laws. Dkt. No. 1.

### A.    Appointment of Lead Plaintiff

22.     On July 23, 2012, Pete Castro moved for appointment as lead plaintiff and further moved the Court to appoint Pomerantz Haudek Grossman & Gross LLP and Berger & Montague, P.C. as co-lead counsel.  Dkt. No. 17.  Also on July 23, 2012, Carpenters' Local 27 Defined Benefit Trust Fund moved for appointment as lead counsel and further moved the Court to appoint Labaton Sucharow LLP as lead counsel and Goldman Scarlato Karon & Penny, P.C. as liaison counsel.  Dkt. No. 20.  On August 8, 2012, Pete Castro submitted his non-opposition to Carpenters' Local 27 Defined Benefit Trust Fund's motion for appointment as lead plaintiff.  Dkt. No. 22.  On August 10,

2012, the Court appointed Carpenters' Local 27 Defined Benefit Trust as Lead Plaintiff and approved its selection as Lead Counsel. Dkt. No. 24.

**B.      Defense Counsel in the Action**

23.      Defendants retained a formidable team of highly experienced attorneys from the nationally recognized law firm of Morgan, Lewis & Bockius LLP ("Morgan Lewis") to vigorously oppose the claims asserted by Lead Plaintiff and the putative class. As detailed more fully herein, Morgan Lewis pursued an aggressive, well-executed, and relentless defense of its clients.

**C.      The Amended Complaint Is Filed and Defendants Move to Dismiss**

24.      On October 19, 2012, after Lead Counsel conducted a well-developed pre-filing factual investigation, Lead Plaintiff filed the Complaint. *See* Dkt. No. 35. The Complaint was the result of a significant effort by Lead Counsel, with the assistance of other Plaintiff's Counsel, that included, among other things: (i) review and analysis of documents filed by ViroPharma with the U.S. Securities and Exchange Commission ("SEC"); (ii) review and analysis of press releases, news articles, and other public statements issued by or concerning ViroPharma; (iii) review and analysis of research reports issued by financial analysts concerning ViroPharma's securities and business; (iv) interviews of 35 former ViroPharma employees and other persons with relevant knowledge after locating almost 130 potential witnesses and contacting more than 73 of them, the accounts of six of whom were included in the Complaint as confidential witness ("CW") accounts; and (v) review and analysis of news articles, media reports, and other publications concerning Vancocin, the Citizen's Petition, and related statements from the FDA and generic competitors.

25.      Additionally, in its effort to prepare the Complaint, Lead Counsel consulted with an expert with extensive training and experience in federal regulation of drug development and approval. *See* Section V.B. *infra*.

26. The Complaint asserted claims under §§10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder, and named as Defendants ViroPharma, Vincent J. Milano, Charles A. Rowland Jr., Thomas F. Doyle, and J. Peter Wolf. Dkt. No. 35. The Complaint alleged that Defendants made false and misleading statements and concealed material facts regarding ViroPharma's prospects of achieving extended exclusivity for Vancocin, including Defendants' knowledge of the QI Act's requirements and the deficiencies of the Genzyme Study to meet those requirements.

27. On December 20, 2012, Defendants moved to dismiss the Complaint. Dkt. No. 41. Defendants' complex memoranda of law accompanying their motion spanned over 40 pages, citing dozens of cases and raising numerous legal issues and sub-issues aimed at undermining Lead Plaintiff's claims and allegations. Defendants argued that: (a) Lead Plaintiff failed to allege any false or misleading statements; (b) Lead Plaintiff failed to adequately allege scienter on the part of any Defendant; (c) the statements challenged in the Complaint were immaterial as a matter of law; and (d) the statements challenged in the Complaint were protected by the PSLRA safe harbor provision. They also argued that Lead Plaintiff failed to establish scheme liability under §§10b-5(a) and 10b-5(c) as well as control-person liability under §20(a).

28. On February 4, 2013, Lead Plaintiff filed an opposition to Defendants' motion. Dkt. No. 42. Lead Plaintiff's comprehensive and thoroughly-researched brief that was 43 pages long and argued that the Complaint adequately stated a claim for relief under the applicable statutes. Lead Plaintiff argued, *inter alia*, that: (a) the statements regarding Vancocin's new label and the drug's prospects for extended exclusivity were false and misleading because they omitted the fact that the FDA repeatedly informed ViroPharma that the Genzyme Study upon which the sNDA and Citizen's Petition were based was not adequate and well controlled as to Vancocin; (b) the information

Defendants withheld from the market was material and Defendants had a duty to disclose the withheld information to the market; (c) the statements Lead Plaintiff alleged were false were not protected by the statutory safe harbor; (d) the Complaint alleged facts that raised a strong inference of scienter; and (e) the Complaint alleged facts establishing control-person liability against all Defendants.

29. On February 25, 2013, Defendants lodged with the Court a reply in support of their motion to dismiss. Dkt. Nos. 43; 46. Lead Plaintiff filed a surreply in response to Defendants' reply on March 11, 2013, addressing both novel legal arguments presented therein as well as certain factual inaccuracies related to the characterization of the FDA's reasons for denying exclusivity to Vancocin. Dkt. Nos. 44; 47. On June 10, 2013, the Court heard oral argument on Defendants' motion to dismiss, which lasted approximately three hours. Dkt. No. 51.

30. On June 24, 2013, by leave of Court, Defendants filed a supplemental memorandum in further support of their motion to dismiss. Dkt. Nos. 54; 55. On June 28, 2013, Lead Plaintiff submitted a response to Defendants' supplemental memorandum. Dkt. Nos. 56-58. By the close of briefing, Defendants had submitted over 65 pages of briefing and over 200 pages of exhibits in support of their motion, which Lead Counsel was tasked with reviewing and analyzing in order to adequately respond to Defendants' arguments.

### D. The Court Denies Defendants' Motion to Dismiss the Complaint

31. On May 15, 2014, the Court issued a Memorandum denying the Defendants' motion to dismiss in its entirety. Dkt. No. 60 (The Court's Order was entered on the following day, May 16, 2014, Dkt. No. 61). The Court concluded: (a) Lead Plaintiff's allegations of falsity were sufficient to withstand a motion to dismiss; (b) the challenged statements were material, as Lead Plaintiff had adequately alleged that "the FDA's conclusions regarding deficiencies in the Genzyme Study . . . bore directly on the exclusivity issue, and thus Defendants had a corresponding duty to reveal that

information;" (c) Lead Plaintiff's claims of material omissions of current fact were not protected by the safe harbor; and (d) the Complaint stated facts giving rise to a strong inference of scienter, especially considering Defendants' communications with the FDA and their class-period stock sales, as well as Vancocin's importance to the Company. Dkt. No. 60. The Court also allowed the §20(a) claims to proceed, as Lead Plaintiff had adequately pled a predicate violation of §10(b). *Id.*

E.    **Defendants Move for Certification of Interlocutory Appeal of the Court's May 16 Order Denying Defendants' Motion to Dismiss**

32.    On May 30, 2014, Defendants moved for certification of interlocutory appeal of the Court's May 16 Order, claiming that the Court's application of the safe harbor provision was inconsistent with the plain language of the statute. Dkt. No. 63. Concurrent with their motion for certification of interlocutory appeal, Defendants filed a motion to stay discovery during the pendency of their motion and any appellate proceedings. Dkt. No. 64. Lead Plaintiff opposed both motions on June 16, 2016. Dkt. No. 69. On July 16, 2014, Defendants filed a reply in support of their motion for certification of interlocutory appeal. Dkt. Nos. 73; 74. On the same day, Lead Plaintiff filed a surreply in opposition to Defendants' motion for certification. Dkt. Nos. 75; 76. While the Court initially granted a discovery stay on July 25, 2014 (Dkt. No. 77), on September 5, 2014, it refused to certify its previous Order for interlocutory appeal and declared that litigation and discovery should proceed without further delay. Dkt. No. 78. The Court found that Defendants' arguments under the safe harbor, even if credited, would not end or substantially narrow the case since the Complaint "alleges numerous misstatements and omissions, made on seven different dates during that class period that fall outside of the PSLRA's safe harbor." *Id.*

33.    While Defendants' motion for certification of interlocutory appeal was still pending, Defendants separately answered the Complaint on July 15, 2014, substantially denying the Complaint's allegations and raising twenty-one affirmative defenses. Dkt. No. 72.

### F. Joint Rule 26(f) Report, Scheduling Order, and Rule 16 Conference

34.     Following Defendants' failed efforts to secure a dismissal of the Action and certification for interlocutory appeal, on October 2, 2014, the parties filed a Report of Rule 26(f) Meeting pursuant to Federal Rule of Civil Procedure 26(f). Dkt. No. 80. The Report of Rule 26(f) Meeting followed an extended meet-and-confer process and outlined the parties' respective positions on the claims and defenses remaining in the Action, as well as a discovery plan centered on targeted document discovery on the core issues in dispute in anticipation of a mediation. The parties presented the proposed discovery plan to the Court on October 9, 2014 during the Federal Rule of Civil Procedure 16 Conference. On October 14, 2014, the Court authorized targeted document discovery to proceed and ordered that, in the absence of settlement, the parties file an updated Report of Rule 26(f) Conference no later than January 30, 2015. Dkt. No. 81. Once the discovery stay imposed by the Court pending consideration of Defendants' motion for interlocutory appeal was lifted by virtue of the Court's September 9, 2014 Order, and following additional conferences and negotiation, the parties filed a Proposed Stipulated Order Re: Confidential and Protected Information and a Proposed Federal Rule of Evidence 502(d) Order, which the Court subsequently granted. Dkt. Nos. 82; 83.

## IV. TARGETED DOCUMENT DISCOVERY AND PRODUCTION IN ANTICIPATION OF MEDIATION

### A. Discovery Propounded on Defendants

35.     In accordance with the Report of Rule 26(f) Conference, Lead Counsel and counsel for Defendants conferred over several dates between September 5 and October 1, 2014 and agreed to participate in a mediation to be scheduled for January 2015. In preparation for mediation, the parties agreed to an expedited, targeted document discovery plan concerning the core issues in dispute in the matter.

36.     As part of the expedited discovery plan, beginning on November 10, 2014, Defendants produced approximately five thousand core documents (over 39,000 pages) to Lead Plaintiff, including: (a) documents regarding the acquisition and use of the Genzyme Study and use of the Genzyme Study to seek to obtain exclusivity for Vancocin; (b) documents regarding the use of studies pursuant to the Pediatric Research Equity Act ("PREA") to seek to obtain exclusivity for Vancocin; (c) documents analyzing the use of the QI Act to seek to obtain exclusivity for Vancocin; (d) communications and documents provided by or to the FDA regarding ViroPharma's April 23, 2010 sNDA; (e) internal communications and documents regarding ViroPharma's April 23, 2010 sNDA; (f) communications and documents provided by or to the FDA regarding ViroPharma's December 22, 2011 Citizen's Petition; (g) internal communications and documents regarding ViroPharma's December 22, 2011 Citizen's Petition; (h) documents supporting Defendants' statements made on December 14, 2011 that "ViroPharma believes Vancocin meets the requirements for, and thus has, three years of exclusivity;" (i) documents concerning analysis of the effect on ViroPharma if generic manufacturers were allowed to enter the market and sell vancomycin; and (j) board minutes and packages relating to categories (a) through (i) above. Lead Plaintiff reviewed, analyzed and incorporated these documents into its mediation statement, submitted to Judge Phillips just over a month after Defendants' rolling production began.

37.     To perform an initial review of Defendants' document production, a focused team of attorneys was assembled by Plaintiff's Counsel. The attorneys working on the review possessed considerable experience reviewing documents in complex cases, including cases of a technical nature. These attorneys focused on reviewing Defendants' document production for the purpose of preparing for the mediation and gathering evidence to prove Lead Plaintiff's allegations.

38.     All aspects of the document review were carefully supervised to eliminate inefficiencies and to ensure a high quality work-product.  This supervision included in-person training sessions, the creation of a set of relevant materials and protocols, including a coding sheet, presentations regarding the key legal and factual issues in the case, and in-person instruction from more senior attorneys.  The attorneys performing document review were instrumental in uncovering documents that could be used to advance Lead Plaintiff's case during mediation and thereby helped to achieve the successful result:  securing a settlement of $8,000,000 on behalf of the Settlement Class.

39.     Throughout the discovery process, Plaintiff's Counsel analyzed not only what was produced, but also monitored and reviewed developments in collateral litigation between ViroPharma and the FDA and generic manufacturers of Vancocin.

**B.     Discovery Propounded on Third Parties**

40.     Lead Counsel served document subpoenas on the FDA and ANI Pharmaceuticals, Inc. ("ANI"), the current owner of Vancocin, and reviewed thousands of pages of documents and data produced in response to the subpoenas.  The subpoenas were tailored to documents concerning Vancocin, the sNDA, and the Citizen's Petition.

41.     Lead Counsel negotiated the expedited production of documents in response to its subpoena from ANI.  Through the diligent efforts of Lead Counsel, ANI agreed to produce almost 3,500 pages in response to the subpoena, revealing previously unavailable documents and information that Lead Counsel reviewed, digested, and incorporated into its mediation efforts.

## V. LEAD COUNSEL'S UTILIZATION OF EXPERTS

### A. Damages Expert

42.     Damages are an element of each and every class action brought under the federal securities laws. Accordingly, Lead Counsel worked extensively with Forensic Economics Inc. ("Forensic Economics"), a reputable firm specializing in market damages and loss causation. Forensic Economics assisted Lead Counsel with determining the economic materiality of Defendants' alleged misrepresentations and omissions, tying Defendants' alleged fraud to the losses suffered by the Settlement Class, and evaluating the artificial inflation (or true value) of ViroPharma securities during the Class Period – all in an effort to arrive at a value for aggregate damages. These efforts included conducting a thorough analysis of voluminous ViroPharma trading data, and developing an event study analysis.

43.     This collaboration with Forensic Economics greatly assisted Lead Counsel in the mediation process. Had the case advanced to the class certification, summary judgment, and trial stages, this analysis would have been the foundation for Lead Plaintiff's theories of market efficiency, loss causation, and damages, made all the more important given the Supreme Court's recent jurisprudence on the issue of reliance. *See Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S.Ct. 2398 (2014).[5]

---

[5]     One critical factor in the viability of a class action brought under the federal securities laws is the issue of reliance. Courts have long held that securities actions are particularly suitable to treatment as a class action but, very recently, have increased scrutiny in connection with motions for class certification. The increased scrutiny has resulted in large part from the United States Supreme Court's decision in *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011), where it held that courts are required to conduct a "rigorous analysis" before certifying a class. One of the important hurdles to certification facing plaintiffs is the element of reliance, which Supreme Court precedent permits a plaintiff to satisfy by establishing that the security in question traded in an efficient market. *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988). However, complicating a plaintiff's burden at class certification, the Supreme Court recently ruled that a defendant may rebut a plaintiff's showing of market efficiency by establishing that any alleged misstatements or omissions had no actual price impact on the value of defendant's stock. *Halliburton*, 134 S.Ct. at 2398.

## B. Regulatory Expert

44. ViroPharma operates in a complex regulatory environment. Accordingly, Lead Plaintiff's allegations concerning the Company's misrepresentations and omissions related to the FDA's approval of exclusivity for Vancocin were refined through exhaustive consultations with regulatory expert David B. Ross, M.D., Ph.D., who was responsible for regulatory oversight of Vancocin at the FDA from 1996-2004. Dr. Ross's work on Vancocin, as well as his considerable training and experience in federal regulation of drug development and approval proved invaluable in framing Lead Plaintiff's allegations related to Defendants' knowledge of the FDA's position with respect to the approval of exclusivity for Vancocin, as well in rebutting Defendants' truth-on-the-market argument related to the market's awareness of the FDA's position on exclusivity for Vancocin. *See, e.g.*, Dkt. Nos. 42; 42-3.

45. Dr. Ross further assisted Lead Plaintiff in addressing Defendants' supplemental memorandum in further support of their motion to dismiss, which addressed "technical and complex" statutory arguments surrounding PREA and the QI Act. Dkt. Nos. 42-3; 57; 58. Finally, Dr. Ross assisted Lead Plaintiff throughout the mediation by addressing novel statutory arguments related to the QI Act and its requirement that exclusivity be based on a "new condition of use." Had the case advanced through the expert discovery, summary judgment, and trial stages, Dr. Ross would have been required to devote substantial time to the Action by drafting and submitting an exert report, defending his expert report at deposition, and testifying at trial.

## VI. RISKS FACED BY LEAD PLAINTIFF IN THE ACTION

46. Based on available documents and Lead Counsel's consultation with investigators and experts, Lead Plaintiff believed that it had adduced and would continue to adduce substantial evidence to support its claims. Lead Plaintiff also realized, however, that it faced considerable risks as the case proceeded in establishing falsity, materiality, scienter, and loss causation. These risks

were carefully considered in evaluating whether a settlement was in the Settlement Class's best interests.

### A. Risks Concerning a Contested Class Certification Motion

47. As an initial matter, at the time of settlement, Lead Plaintiff had not yet moved for class certification. While Lead Plaintiff believes it would prevail in a contested class certification proceeding, given *Halliburton Co.*, 134 S. Ct. at 2398, Defendants would likely have tenaciously argued and presented expert testimony seeking to demonstrate a lack of price impact on ViroPharma's securities' prices on relevant days during the Class Period. This would have resulted in a protracted battle of experts. If Lead Plaintiff prevailed at class certification, Defendants would likely have sought reconsideration of such a ruling (similar to the relief they sought following the Court's Order denying their motion to dismiss) or sought permission pursuant to Federal Rule of Civil Procedure 23(f) to appeal the class certification decision to the Third Circuit. This dispute could have taken years to resolve.

### B. Risks Concerning Scienter, the Safe Harbor, and Falsity

48. There was a risk that at trial Lead Plaintiff would not be able to prove scienter, *i.e.*, that Defendants acted with knowledge of or with recklessness as to the alleged falsity of their statements and omissions. A defendant's state of mind in a securities case is often the most difficult element of proof and one which is rarely supported by direct evidence or an admission.

49. To prove scienter, Plaintiff would have relied in part on the large volume of insider sales by two individual defendants (Doyle and Rowland) during the Class Period as evidence, showing that these sales were unusual both in timing and amount compared to prior sales. Defendants, however, would have argued that Defendants Doyle and Rowland still retained significant stock and option holdings after their Class Period sales, and that had they truly known the declining situation as Lead Plaintiff contended, they would have sold more. Defendants also would

have pointed to the fact that only two of the four individual defendants sold stock, neither of whom were ViroPharma's CEO who made a number of the challenged statements. It did not make economic sense, as Defendants would have argued, for the CEO to commit fraud to purportedly inflate prices while at the same time holding all of his shares and directing a massive repurchase program on behalf of the Company. Clearly, the question of scienter was not without risk and a jury could have decided the issue against Lead Plaintiff.

50. Lead Plaintiff also argued that Defendants had knowledge based on communications with the FDA that Vancocin would not receive exclusivity. Defendants, however, could have convincingly argued that: (a) the communications between ViroPharma and the FDA did not disclose the FDA's intent to deny exclusivity to Vancocin; (b) by law, interim communications from the FDA are not binding as agency action; (c) the FDA's own documents establish that the FDA had not decided on exclusivity at the time of any of Defendants' misrepresentations; (d) the issue of exclusivity was a matter of first impression involving highly ambiguous statutory language; (e) Lead Plaintiff's allegations concerning the Genzyme Study were not the reason the FDA denied exclusivity for Vancocin; and (f) contemporaneous communications demonstrate that Defendants genuinely believed they would obtain exclusivity for Vancocin. These facts, if proven, would also have undermined Lead Plaintiff's ability to establish the falsity of the alleged misrepresentations.

51. Defendants would have further argued that all of the challenged statements involved predictions about a future decision by the FDA, thus triggering the safe harbor provisions of the PSLRA, 15 U.S.C. §78u-5(c). Therefore, under the statute, Lead Plaintiff would have been required to prove actual knowledge, which is a significantly more demanding standard of scienter than applies to statements of current fact.

52.     Given these arguments, Defendants may have made a persuasive case that they had a good faith belief that Vancocin would in fact be approved for an additional three years of exclusivity under the QI Act, thereby defeating Lead Plaintiff's proof of scienter.

### C.     Risks in Proceeding to Summary Judgment and Trial

53.     In terms of proceeding to a summary adjudication or trial, Lead Plaintiff faced evidentiary risks that could have developed during the course of discovery.  For example, there was a risk that documents produced by Defendants and the testimony of current and former ViroPharma employees, including Defendants, could significantly undermine the Complaint's allegations or would not ultimately be viewed by the Court or jury as sufficient to satisfy every element of Lead Plaintiff's claims.

54.     In order for the Settlement Class to ultimately prevail on its claims, it would first have to survive Defendants' motion – or motions – for summary judgment.  Summary judgment would pose a number of risks for the Settlement Class.  Lead Plaintiff would have to demonstrate to the Court based on the evidentiary record and testimony adduced that a genuine issue of material fact existed with regard to each element of its securities claims.  Defendants would undoubtedly bolster their motion for summary judgment with any exculpatory evidence that arose during merits discovery, including the testimony of current employees who may appear more sympathetic than former employees and likely expert testimony.

55.     Defendants would have been expected to argue at summary judgment and/or trial that they made no material false or misleading statements or omissions regarding their efforts to update the label and gain extended marketing exclusivity for Vancocin, that they did not trade on the basis of non-public material information, and/or that Lead Plaintiff could not establish loss causation as a matter of law.  The Court would have been permitted to weigh evidence at these later stages of the Action and could have ruled in Defendants' favor.

### D. Risks Concerning Loss Causation

56.     A private plaintiff alleging securities fraud must prove that the defendants' fraud caused an economic loss.  Lead Plaintiff believes that at trial, and through expert testimony, it would be able to demonstrate loss causation as to Defendants' challenged statements throughout the Class Period, and their corrective disclosure at the end of the Class Period.  However, Lead Plaintiff recognizes that Defendants would present expert testimony purportedly demonstrating the absence of a causal link between the price declines and Defendants' disclosures.  As a result, Defendants would no doubt argue that Lead Plaintiff could not prove the loss causation and damage elements of the case.

57.     Specifically, Defendants would be expected to argue at summary judgment and trial that the end of the Class Period was marked by three related but separate disclosures pertaining to Vancocin and its bid for a new label and extended exclusivity, only one of which allegedly pertained to the fraud.  Thus, even if Lead Plaintiff were able to prove that Defendants' alleged fraud caused harm to investors upon disclosure, Lead Plaintiff would also have to disaggregate the amount of harm caused by Defendants' fraud as opposed to the other, non-fraud disclosures regarding ViroPharma. Defendants' anticipated arguments regarding loss causation presented a palpable risk that Lead Plaintiff would not prevail on the element of loss causation.

### E. Risks Concerning Appeals

58.     Finally, even if Lead Plaintiff prevailed on liability on any or all of its claims and was awarded some or all of its damages, there was the high likelihood that Defendants would appeal the verdict and award.  The appeals process would likely span several years, during which time the Settlement Class would receive no distribution on any damage award.  In addition, an appeal would carry with it the risk of reversal, in which case the Settlement Class would receive no distribution despite having prevailed on the claims at trial.

59.     In summary, there are multiple procedural hurdles, as well as significant merit-based risks involved in proceeding with the Action, each of which was carefully considered by Lead Counsel and Lead Plaintiff in making the determination to settle with Defendants on the agreed terms.

## VII.    NEGOTIATION OF THE SETTLEMENT

60.     In an effort to explore whether the case could be resolved before trial, the parties agreed to mediate before Judge Phillips.  On January 5, 2015, they participated in an all-day mediation session in New York.  Pursuant to Judge Phillips' instructions, the parties submitted and exchanged detailed mediation statements in advance of the session, which afforded them the opportunity to synthesize and further analyze and assess their respective positions.  Lead Counsel prepared a detailed mediation statement, including significant evidentiary support, as well as responses to questions Judge Phillips had posed to both sides following his review of the mediation statements.

61.     While Lead Plaintiff and Defendants were unable to reach an agreement at the January 5, 2015 mediation, with Judge Phillips' assistance, the parties continued to negotiate over the course of the next few weeks.  They finally agreed in principle to settle the Action on February 5, 2015, through their mutual acceptance of a mediator's proposal.

62.     Lead Plaintiff and Defendants memorialized the final terms of settlement in the Settlement Agreement, which was filed with the Court on April 29, 2015. Dkt. No. 87-3.

63.     On April 29, 2015, Lead Plaintiff moved for preliminary approval of the Settlement and the Court granted preliminary approval by Order entered May 7, 2015. Dkt. Nos. 87; 88.

## VIII. LEAD PLAINTIFF'S COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER

64.     Pursuant to the Preliminary Approval Order, the Court appointed the Garden City Group, LLC ("GCG" or the "Garden City Group") as Claims Administrator in the Action and instructed GCG to disseminate copies of the Notice of Pendency of Class Action and Proposed Settlement and Motion for Attorneys' Fees and Expenses and the Proof of Claim (collectively "Claim Packet") by mail and to publish the Summary Notice of Pendency of Class Action and Proposed Settlement and Motion for Attorneys' Fees and Expenses.

65.     The Notice, attached as Ex. A to the Affidavit Regarding (A) Mailing of the Notice and Proof of Claim Form; (B) Publication of Summary Notice; (C) Website and Telephone Helpline; and (D) Report on Requests for Exclusions Received to Date, dated September 22, 2015, ("Mailing Declaration" or "Mailing Decl.") (attached as Ex. 3) provides potential Settlement Class Members with information about the terms of the Settlement and, among other things: their right to exclude themselves from the Settlement Class; their right to object to any aspect of the Settlement, the Plan of Allocation, or the Fee and Expense Application; and the manner for submitting a Proof of Claim in order to be eligible for a payment from the proceeds of the Settlement.  The Notice also informs Settlement Class Members of Lead Counsel's intention to apply for an award of attorneys' fees of no more than 30% of the Settlement Fund and for payment of litigation expenses in an amount not to exceed $275,000.

66.     As detailed in the Mailing Declaration, on May 22, 2015, the Garden City Group began mailing Claim Packets to potential Settlement Class Members as well as banks, brokerage firms, and other third party nominees.  Mailing Decl. ¶¶3-6.  In total, to date, GCG has mailed 18,618 Claim Packets to potential nominees and Settlement Class Members by first-class mail, postage prepaid.  *Id.* ¶6.  To disseminate the Notice, GCG obtained the names and addresses of

potential Settlement Class Members from listings provided by ViroPharma and its transfer agent and from banks, brokers, and other nominees. *Id.* ¶¶3-5.

67.     On June 3, 2015, the Garden City Group caused the Summary Notice to be published in *Investor's Business Daily* and to be transmitted over *PR Newswire* on June 5, 2015 *Id.* ¶7.

68.     GCG also maintains and posts information regarding the Settlement on a dedicated website established for the Action, www.viropharmasecuritieslitigation.com, to provide Settlement Class Members with information concerning the Settlement, as well as downloadable copies of the Claim Packet and the Settlement Agreement. *Id.* ¶8. In addition, Lead Counsel has made available relevant documents concerning the Settlement on its firm website.

69.     Pursuant to the terms of the Preliminary Approval Order, the deadline for Settlement Class Members to submit objections to the Settlement, the Plan of Allocation, or the Fee and Expense Application, or to request exclusion from the Settlement Class is October 8, 2015. To date, Lead Counsel has not received any objections and has received only two invalid requests for exclusion from the Settlement Class (one was not submitted by a member of the Settlement Class and the other contained no transactional information to show membership in the Settlement Class, as required by the Preliminary Approval Order). Should any objections or additional requests for exclusion be received, Lead Plaintiff will address them in its reply papers, which are due October 22, 2015.

## IX.     THE PLAN OF ALLOCATION

70.     Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Settlement Class Members who wish to participate in the distribution of the Settlement proceeds must submit a valid Proof of Claim including all required information postmarked no later than September 21, 2015. As provided in the Notice, after deduction of Court-awarded attorneys' fees and expenses, notice and administration costs, banking fees, and all applicable Taxes, the balance of

the Settlement Fund (the "Net Settlement Fund") will be distributed according to the plan of allocation approved by the Court (the "Plan of Allocation").

71.     The proposed Plan of Allocation, which was set forth in full in the Notice (Ex. 3 – A at 10-14) is designed to achieve an equitable and rational distribution of the Net Settlement Fund, but it is not a formal damages analysis that would be submitted at trial.  Lead Counsel developed the Plan of Allocation in close consultation with Lead Plaintiff's consulting damages expert and believes that the plan provides a fair and reasonable method to equitably distribute the Net Settlement Fund among Authorized Claimants.

72.     The Plan of Allocation provides for distribution of the Net Settlement Fund among Authorized Claimants on a *pro rata* basis based on "Recognized Loss" formulas tied to liability and damages.  These formulas are tied to the amount of alleged artificial inflation in the prices of ViroPharma's Securities, as quantified by Lead Plaintiff's expert.  Lead Plaintiff's consulting damages expert analyzed the movement in the prices of ViroPharma's securities and took into account the portion of the price drops allegedly attributable to the alleged fraud.

73.     The Garden City Group, under Lead Counsel's direction, will determine each Authorized Claimant's *pro rata* share of the Net Settlement Fund based upon each Authorized Claimant's total Recognized Loss compared to the aggregate Recognized Losses of all Authorized Claimants.  Calculation of Recognized Loss will depend upon several factors, including the type of ViroPharma Security purchased, when the claimants purchased ViroPharma securities, whether the securities were sold during the Class Period, and if so, when.

74.     In sum, the proposed Plan of Allocation, developed in consultation with Lead Plaintiff's consulting damages expert, was designed to fairly and rationally allocate the Net Settlement Fund among Authorized Claimants based on the amount of alleged artificial inflation

present in the ViroPharma Securities they traded in during the Class Period. Accordingly, Lead

Counsel respectfully submits that the proposed Plan of Allocation is fair, reasonable, and adequate

and should be approved.

## X. LEAD COUNSEL'S APPLICATION FOR ATTORNEYS' FEES AND EXPENSES IS REASONABLE

### A. Consideration of Relevant Factors Justify an Award of a 30% Fee in This Case

75.     For its diligent efforts on behalf of the Settlement Class, Lead Counsel is applying for

compensation from the Settlement Fund on a percentage basis. As explained in Lead Counsel's

Memorandum of Law in Support of Motion for Award of Attorneys' Fees and Expenses ("Fee

Brief"), courts recognize that the percentage method is the appropriate method of fee recovery

because, among other things, it aligns the lawyers' interest in being paid a fair fee with the interest of

the Settlement Class in achieving the maximum recovery.

76.     Consistent with the Notice to the Settlement Class, Lead Counsel seeks a fee award of

30% of the Settlement Fund. Lead Counsel also requests payment of expenses incurred in

connection with the prosecution of the Action from the Settlement Fund in the amount of

$155,197.23, plus accrued interest at the same rate as is earned by the Settlement Fund. Lead

Counsel submits that, for the reasons discussed below and in the accompanying memorandum of

law, such awards would be reasonable and appropriate under the circumstances before the Court.

#### 1. Lead Plaintiff Supports the Fee and Expense Application

77.     Lead Plaintiff, Carpenters' Local 27 Defined Benefit Trust Fund, manages a fund

established for the benefit of more than 9,000 current and retired fund participants. *See* Ex. 1. Lead

Plaintiff manages more than $400 million in retirement fund assets. *Id.*

78.     Lead Plaintiff has evaluated and fully supports the Fee and Expense Application.

*See id.* ¶6. In coming to this conclusion, Lead Plaintiff—which was substantially involved in the

prosecution of the Action and negotiation of the Settlement—considered the recovery obtained as well as Lead Counsel's substantial effort in obtaining the recovery and, particularly in light of the considerable risks of litigation, agreed to allow Lead Counsel to apply for 30% of the Settlement Fund. *See id.* Carpenters' Local 27 Defined Benefit Trust Fund takes its role as Lead Plaintiff seriously to ensure that Lead Counsel's fee request is fair in light of work performed and the result achieved for the Settlement Class. *Id.*

## 2. The Favorable Settlement Achieved

79. Courts have consistently recognized that the result achieved is a major factor to be considered in making a fee award. *See* Fee Brief, Section III.A. Here, the $8,000,000 settlement is a very good result, particularly when considered in view of the substantial risks and obstacles to recovery if the Action was to continue through summary judgment, to trial, and through likely post-trial motions and appeals.

80. As discussed above, Lead Plaintiff's expert has estimated that the Settlement Class sustained maximum damages in the range of approximately $78.5 million (for the one day drop following the corrective disclosure) to $90 million (for the two day drop following the corrective disclosure), assuming that liability and loss causation were proven. Against this yardstick, the Settlement will compensate Settlement Class Members for approximately 9% to 10% of their estimated maximum losses.

81. This recovery was achieved as a result of very thorough and creative prosecutorial and investigative efforts, contentious and complicated motion practice, and arduous settlement negotiations. As a result of this Settlement, thousands of Settlement Class Members will benefit and receive compensation for their losses and avoid the very substantial risk of no recovery in the absence of a settlement.

### 3. The Risk of Contingent Class Action Litigation

82.     This Action presented substantial challenges from the outset of the case. The specific risks Lead Plaintiff faced in proving Defendants' liability and damages are detailed above, as well as in the memoranda in support of the Settlement and fee request. These case-specific risks are in addition to the more typical risks accompanying securities class action litigation, such as the fact that this Action was undertaken on a contingent basis.

83.     From the outset, Lead Counsel understood that it was embarking on a complex, expensive, and lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require. In undertaking that responsibility, Lead Counsel was obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, and that funds were available to compensate staff and to cover the considerable costs that a case such as this requires. With an average lag time of several years for these cases to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis. Indeed, Plaintiff's Counsel have received no compensation during the course of the Action but have incurred 4,517.25 hours of time for a total lodestar of $2,660,617.50 and have incurred $155,197.23 in expenses in prosecuting the Action for the benefit of the Settlement Class. *See* Section 4, *infra*.

84.     Courts have recognized that risk is an important factor in determining an appropriate fee award. *See* Fee Brief, Sections III. C – D. There are numerous cases where class counsel in contingent fee cases such as this, after expenditures of thousands of hours and significant resources, have received no compensation whatsoever. *See, e.g.*, *In re BankAtlantic Bancorp, Inc.*, 688 F.3d 713 (11th Cir. 2012) (affirming judgment as a matter of law to nullify jury verdict for plaintiffs after four week trial conducted by Labaton Sucharow). Class counsel who litigate cases in good faith and receive no fees are often the most tenacious members of the plaintiffs' bar. The fact that Defendants

and their counsel know that the leading members of the plaintiffs' bar are actually able to, and will, go to trial even in high-risk cases gives rise to meaningful settlements in actions such as this. The losses suffered by class counsel in other actions where insubstantial settlement offers are rejected, and class counsel ultimately receives little or no fee, should not be ignored. Lead Counsel knows from personal experience that despite the most vigorous and competent of efforts, attorneys' success in contingent litigation, such as this, is never assured.

85.     Moreover, courts have repeatedly recognized that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies. If this important public policy is to be carried out, courts should award fees that adequately compensate plaintiff's counsel, taking into account the risks undertaken in prosecuting a securities class action.

86.     As discussed in greater detail above, this case was fraught with significant risk factors concerning liability and damages. Lead Plaintiff's success was by no means assured. Defendants disputed whether Lead Plaintiff could even establish liability and would no doubt contend, as the case proceeded to trial, that even if liability existed, the amount of damages was substantially lower than Lead Plaintiff alleged. Were this Settlement not achieved, and even if Lead Plaintiff prevailed at trial, Lead Plaintiff and Lead Counsel faced potentially years of costly and risky appellate litigation against Defendants, with ultimate success far from certain and the prospect of no recovery likely. It is also possible that a jury could have found no liability or no damages. Lead Counsel therefore respectfully submits that based upon the substantial risk factors present that an award of attorneys' fees of 30% of the Settlement Fund would be reasonable.

### 4.     The Work and Experience of Lead Counsel

87.     The work undertaken by Lead Counsel in investigating and prosecuting this case and arriving at the present Settlement in the face of serious hurdles has been time-consuming and

challenging. As more fully set forth above, the Action was prosecuted for just shy of three years and settled only after Lead Counsel overcame multiple legal and factual challenges. Among other efforts, Lead Counsel conducted a comprehensive investigation into the class's claims; researched and prepared a detailed Complaint; briefed a thorough opposition to Defendants' motions to dismiss and to certify an appeal; obtained and reviewed, on an expedited basis, over 40,000 pages of documents from Defendants and third parties; consulted with experts and consultants; and engaged in a hard-fought settlement process with experienced defense counsel.

88. At all times throughout the pendency of the Action, Lead Counsel's efforts were driven and focused on advancing the litigation to bring about the most successful outcome for the Settlement Class, whether through settlement or trial, by the most efficient means necessary.

89. Attached hereto are declarations from Plaintiff's Counsel, which are submitted in support of the request for an award of attorneys' fees and payment of litigation expenses. *See* Declaration of Jonathan Gardner Filed on Behalf of Labaton Sucharow LLP in Support of Application for Award of Attorneys' Fees and Expenses (attached as Ex. 4 hereto), Declaration of Paul J. Scarlato Filed on Behalf of Goldman Scarlato & Penny, P.C. in Support of Application for Award of Attorneys' Fees and Expenses (attached as Ex. 5 hereto) and the Declaration of David W. Mitchell Filed on Behalf of Robbins Geller Rudman & Dowd LLP in Support of Application for Award of Attorneys' Fees and Expenses (attached as Ex. 6 hereto).

90. Included with these declarations are schedules that summarize the lodestar of each firm, as well as the expenses incurred by category (the "Fee and Expense Schedules").[6] The attached declarations and the Fee and Expense Schedules report the amount of time spent by each attorney and professional support staff employed by Plaintiff's Counsel and the lodestar calculations

---

[6] Attached hereto as Exhibit 7 is a summary table of the lodestars and expenses of Plaintiff's Counsel.

based on their billing rates. As set forth in each declaration, they were prepared from contemporaneous daily time records regularly prepared and maintained by the respective firms, which are available at the request of the Court.

91. The hourly billing rates of Plaintiff's Counsel here range from $610 to $925 for partners, $475 to $750 for of counsels, and $350 to $700 for other attorneys. *See* Exs. 4 - B, 5 - B, 6 - B. It is respectfully submitted that the hourly rates for attorneys and professional support staff included in these schedules are reasonable and customary. Exhibit 8, attached hereto, is a table of billing rates for defense firms compiled by Labaton Sucharow from fee applications submitted by such firms nationwide in bankruptcy proceedings in 2014. The analysis shows that across all types of attorneys, plaintiffs' counsel's rates here are consistent with, or lower than, the firms surveyed.

92. Plaintiff's Counsel have collectively expended more than 4,500 hours in the prosecution and investigation of the Action. *See* Ex. 7. Lead Counsel allocated work to other Plaintiff's Counsel and worked closely with them to avoid duplication of effort and to ensure efficient prosecution of the Action. The resulting collective lodestar is $2,660,617.50. *Id.* Pursuant to a lodestar "cross-check," the requested fee of 30% of the Settlement Fund ($2,400,000) results in a *negative* "multiplier" of 0.90 on the lodestar and does not include any time that will necessarily be spent from this date forward administering the Settlement, assisting class members, and moving for a distribution order.

93. Labaton Sucharow has served as lead counsel in a number of high profile matters, for example: *In re Am. Int'l Grp., Inc. Sec. Litig.*, No. 04-8141 (S.D.N.Y.) (representing the Ohio Public Employees Retirement System, State Teachers Retirement System of Ohio, and Ohio Police & Fire Pension Fund and reaching settlements of $1 billion); *In re HealthSouth Corp. Sec. Litig.*, No. 03-1501 (N.D. Ala.) (representing the State of Michigan Retirement System, New Mexico State

Investment Council, and the New Mexico Educational Retirement Board and securing settlements of more than $600 million); and *In re Countrywide Sec. Litig.*, No. 07-5295 (C.D. Cal.) (representing the New York State and New York City Pension Funds and reaching settlements of more than $600 million). *See* Labaton Fee Decl., Ex. 4 – A hereto.

### 5. Standing and Caliber of Defense Counsel

94. The quality of the work performed by Lead Counsel in attaining the Settlement should also be evaluated in light of the quality of the opposition. Defendants are represented by one of the country's most prestigious law firms—Morgan, Lewis & Bockius LLP. This firm vigorously represented the interests of its clients. In the face of this experienced, formidable, and well-financed opposition, Lead Counsel was nonetheless able to settle the Action on terms favorable to the Settlement Class.

### 6. The Reaction of the Settlement Class to the Fee and Expense Application

95. As mentioned above, consistent with the Preliminary Approval Order, a total of 18,618 Notices have been mailed to potential Settlement Class Members advising them that Lead Counsel would seek an award of attorneys' fees not to exceed 30% of the Settlement Fund, and payment of expenses in an amount not greater than $275,000. *See* Mailing Aff. Ex. 3 ¶6. Additionally, the Summary Notice was published in *Investor's Business Daily*, and disseminated over *PR Newswire*. Ex. 3 ¶7. The Notice and the Settlement Agreement have also been available on the settlement website maintained by the Garden City Group. *Id.* ¶8. While the deadline set by the Court for Settlement Class Members to object to the requested fees and expenses has not yet passed, to date Lead Plaintiff has received no objections. Lead Counsel will respond to any objections received in its reply papers, which are due October 22, 2015.

### 7. The Complexity of this Action's Factual and Legal Questions

96. Numerous cases have recognized that risk, as well as the novelty and difficulty of the issues presented, are important factors in determining a fee award.

97. There is no question that from the outset, the Action presented a number of sharply contested issues of both fact and law and that Lead Plaintiff faced formidable defenses to liability and damages. The substantial complexities in this case, ranging from the regulatory landscape underpinning the claims to loss causation, made it far from certain that any recovery, let alone $8 million, would ultimately be obtained. In apparent recognition of the difficulties in this case, only one person other than Lead Plaintiff moved for appointment as the lead plaintiff in this action. Although the entirety of Lead Plaintiff's claims ultimately survived the pleading stage against Defendants, very difficult issues of proof remained at summary judgment and trial as to key elements of the claims.

## XI. REQUEST FOR LITIGATION EXPENSES

98. Lead Counsel seeks payment from the Settlement Fund of $155,197.23 in litigation expenses reasonably and necessarily incurred by Plaintiff's Counsel in connection with commencing and prosecuting the claims against Defendants.

99. From the beginning of the case, Lead Counsel was aware that it might not recover any of its expenses, and, at the very least, would not recover anything until the Action was successfully resolved. Thus, Lead Counsel was motivated to, and did, take steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the case.

100. As set forth in the Fee and Expense Schedules, Plaintiff's Counsel have incurred a total of $155,197.23 in litigation expenses in connection with the prosecution of the Action. *See* Exs. 4 - 6. As attested to, these expenses are reflected on the books and records maintained by each firm. These books and records are prepared from expense vouchers, check records, and other source

materials and are an accurate record of the expenses incurred. These expenses are set forth in detail in Plaintiff's Counsel's declarations, which identify the specific category of expense—*e.g.*, online/computer research, experts' fees, travel costs, costs related to discovery, photocopying, telephone, fax and postage expenses.

101. Lead Counsel maintained strict control over the litigation expenses. Indeed, many of the litigation expenses were paid out of a litigation fund created and maintained by Lead Counsel. *See* Ex. 4 ¶ 10.

102. More specifically, Plaintiff's Counsel incurred expenses in connection with the investigation of the claims and expert analysis, resulting in costs totaling $72,468 or approximately 45% of the total expenses. As described above, Lead Plaintiff received over 40,000 pages of documents from Defendants and non-parties during discovery and closely consulted with key experts. Additionally, Plaintiff's Counsel paid $31,208.33 in mediation fees assessed by the mediator in this matter, Judge Phillips. *See* Ex. 4 ¶ 10.

103. The other expenses for which Lead Counsel seeks payment are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour. These expenses include, among others, travel costs, legal and factual research, duplicating costs, long distance telephone and facsimile charges, and postage and delivery expenses.

104. All of the litigation expenses incurred, which total $155,197.23, were necessary to the successful prosecution and resolution of the claims against Defendants.

## XII. MISCELLANEOUS EXHIBITS

105. Attached hereto as Exhibit 9 is a compendium of unreported cases, in alphabetical order, cited in the accompanying Fee Brief.

## XIII.  CONCLUSION

106.    In view of the significant recovery to the Settlement Class and the substantial risks of this litigation, as described above and in the accompanying memorandum of law, Lead Plaintiff and Lead Counsel respectfully submit that the Settlement should be approved as fair, reasonable, and adequate and that the proposed Plan of Allocation should likewise be approved as fair, reasonable, and adequate.  In view of the significant recovery in the face of substantial risks, the quality of work performed, the contingent nature of the fee, and the standing and experience of Lead Counsel, as described above and in the accompanying memorandum of law, Lead Counsel respectfully submits that a fee in the amount of 30% of the Settlement Fund be awarded and that litigation expenses in the amount of $155,197.23 be paid in full.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this 24th day of September, 2015.

*/s/ Jonathan Gardner*
JONATHAN GARDNER

## CERTIFICATE OF SERVICE

I hereby certify that on September 24, 2015,  I caused the foregoing Declaration of Jonathan Gardner In Support of Lead Plaintiff's Motion for Final Approval of Class Action Settlement and An Award of Attorneys' Fees and Expenses to be served electronically on all ECF participants. The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing).


**CAROLE A. BRODERICK**
Berger & Montague P.C.
1622 Locust Street
Philadelphia, PA 19103-6365

/s/ *Jonathan Gardner*
Jonathan Gardner