UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re VIROPHARMA INCORPORATED SECURITIES LITIGATION | ) ) ) | Civil Action No. 2:12-cv-02714 |
| | ) | <u>CLASS ACTION</u> |
| This Document Relates To: | ) ) | MEMORANDUM OF LAW IN SUPPORT |
| ALL ACTIONS. | ) ) ) ) | OF LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND EXPENSES |

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................1

ARGUMENT ............................................................................................................3

I.   THE STANDARDS GOVERNING THE AWARD OF ATTORNEYS' FEES IN COMMON FUND CASES WITHIN THE THIRD CIRCUIT ..........................................3

 A.   Lead Counsel Is Entitled to a Fee From the Common Fund Created ......................3

 B.   The Court Should Award Attorneys' Fees Using the Percentage Approach ...........5

II.   THE REQUESTED FEE ENJOYS A PRESUMPTION OF REASONABLENESS BECAUSE IT HAS BEEN APPROVED BY THE COURT-APPOINTED LEAD PLAINTIFF .......................................................7

III.   THE REQUESTED 30% FEE IS FAIR AND REASONABLE UNDER THE THIRD CIRCUIT *GUNTER* FACTORS ...........................................................7

 A.   The Size and Nature of the Common Fund Created and the Number of Persons Benefited by the Settlement .........................................................8

 B.   The Skill and Efficiency of Lead Counsel ...........................................................10

 C.   The Complexity and Duration of the Litigation ...................................................12

 D.   The Risk of Non-Payment ......................................................................................15

 E.   The Time Devoted by Plaintiff's Counsel Was Significant ..................................18

 F.   Awards in Similar Cases ........................................................................................18

IV.   THE REQUESTED FEE IS REASONABLE UNDER A LODESTAR CROSS-CHECK ..........................................................................................20

 A.   Hours Reasonably Expended by Counsel ..............................................................20

 B.   Calculating the "Base" Lodestar ...........................................................................21

 C.   The Lodestar "Multiplier" ......................................................................................22

 D.   Performing the Lodestar Cross-Check ...................................................................22

V.   LEAD COUNSEL'S APPLICATION FOR REASONABLY INCURRED LITIGATION EXPENSES SHOULD BE APPROVED ..................................................23

CONCLUSION.................................................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aetna Inc. Sec. Litig.*,
  No. MDL 1219, 2001 WL 20928 (E.D. Pa. Jan. 4, 2001) ................................................18, 22

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
  572 F.3d 221 (5th Cir. 2009) ..................................................................................................2

*In re Alstom SA Sec. Litig.*,
  741 F. Supp. 2d 469 (S.D.N.Y. 2010) ...................................................................................17

*Anixter v. Home-Stake Prod. Co.*,
  77 F.3d 1215 (10th Cir. 1996) ...............................................................................................17

*In re Apple Computer Sec. Litig.*,
  No. C-84-20148(A)-JW, 1991 WL 238298 (N.D. Cal. Sept. 6, 1991)...................................17

*In re AremisSoft Corp. Sec. Litig.*,
  210 F.R.D. 109 (D.N.J. 2002)........................................................................................4, 5, 10

*In re AT&T Corp. Sec. Litig.*,
  455 F.3d 160 (3d Cir. 2006)............................................................................................5, 14

*In re Auto. Refinishing Paint Antitrust Litig.*,
  No. 1426, 2008 WL 63269 (E.D. Pa. Jan. 3, 2008) ...............................................................22

*Bateman Eichler, Hill Richards, Inc. v. Berner*,
  472 U.S. 299 (1985)..................................................................................................................4

*In re Bear Stearns Cos. Sec. Derivative & ERISA Litig.*,
  909 F. Supp. 2d 259 (S.D.N.Y. 2012)....................................................................................22

*Behrens v. Wometco Enters., Inc.*,
  118 F.R.D. 534 (S.D. Fla. 1988), *aff'd*, 899 F.2d 21 (11th Cir. 1990) ....................................8

*Blum v. Stenson*,
  465 U.S. 886 (1984)...........................................................................................................6, 21

*Boeing Co. v. Van Gemert*,
  444 U.S. 472 (1980)..................................................................................................................3

*Bryant v. Avado Brands, Inc.*,
   100 F. Supp. 2d 1368 (M.D. Ga. 2000), *rev'd on other grounds sub nom.*
   *Bryant v. Dupree*, 252 F.3d 1161 (11th Cir. 2001)...................................................12

*Camden I Condo. Ass'n Inc. v. Dunkle*,
   946 F.2d 768 (11th Cir. 1991) ......................................................................................6

*In re Cendant Corp. PRIDES Litig.*,
   243 F.3d 722 (3d Cir. 2001)......................................................................................5, 7

*In re Cendant Corp. Sec. Litig.*,
   404 F.3d 173 (3d Cir. 2005)..........................................................................................6

*In re Computron Software, Inc. Sec. Litig.*,
   6 F. Supp. 2d 313 (D.N.J. 1998) ...............................................................................4, 5

*In re Corel Corp. Inc. Sec. Litig.*,
   293 F. Supp. 2d 484 (E.D. Pa. 2003) ..........................................................................11

*In re Datatec Sys., Inc. Sec. Litig.*,
   No. 04-CV-525, 2007 WL 4225828 (D.N.J. Nov. 28, 2007) ......................................11

*In re Diet Drugs Prod. Liab. Litig.*,
   582 F.3d 524 (3d Cir. 2009)...........................................................................................8

*In re Fine Paper Antitrust Litig.*,
   751 F.2d 562 (3d Cir. 1984)...................................................................................21, 22

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
   55 F.3d 768 (3d Cir. 1995)...........................................................................4, 5, 7, 18

*Goldstein v. MCI WorldCom*,
   340 F.3d 238 (5th Cir. 2003) .......................................................................................12

*In re Greenwich Pharm. Sec. Litig.*,
   No. 92-3701, 1995 WL 251293 (E.D. Pa. Apr. 26, 1995)...........................................9

*Gunter v. Ridgewood Energy Corp.*,
   223 F.3d 190 (3d Cir. 2000)................................................................................ *passim*

*Hall v. AT&T Mobility LLC*,
   No. 07-5325, 2010 WL 4053547 (D.N.J. Oct. 13, 2010) .............................10, 11, 23

*Hensley v. Eckerhart*,
   461 U.S. 424 (1983).................................................................................................8, 20

*Hubbard v. BankAtlantic Bancorp, Inc.*,
   688 F.3d 713 (11th Cir. 2012) ...............................................................................15, 16

*In re Ikon Office Sols., Inc., Sec. Litig.*,
194 F.R.D. 166 (E.D. Pa. 2000)..................................................................*passim*

*Lindy Bros. Builders, Inc. v. Am. Radiator & Standard Sanitary Corp.*,
487 F.2d 161 (3d Cir. 1973)...........................................................................6, 20

*Lindy Bros. Builders v. Am. Radiator & Standard Sanitary Corp.*,
540 F.2d 102 (3d Cir. 1976)...........................................................................6, 20

*Louisiana Mun. Police Emps. Ret. Sys. v. Sealed Air Corp.*
No. 03-4372, 2009 WL 4730185 (D.N.J. Dec. 4, 2009).........................................16

*In re Lucent Tech. Inc. Sec. Litig.*,
327 F. Supp. 2d 426 (D.N.J. 2004) .......................................................................7

*In re Merck & Co., Inc. Vytorin ERISA Litig.*,
No. 08-CV-285, 2010 WL 547613 (D.N.J. Feb. 9, 2010) .....................................16

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
No. 02 MDL 1484 (JFK), 2007 WL 313474 (S.D.N.Y. Feb. 1, 2007)......................9

*Missouri v. Jenkins*,
491 U.S. 274 (1989)..........................................................................................21

*Morrison v. Nat'l Austl. Bank Ltd.*,
561 U.S. 247 (2010)..........................................................................................17

*In re Omnivision Techs., Inc.*,
559 F. Supp. 2d 1036 (N.D. Cal. 2008) ..................................................................9

*In re Oracle Corp. Sec. Litig.*,
No. C 01-00988 SI, 2009 WL 1709050 (N.D. Cal. June 19, 2009), *aff'd*, 627
F.3d 376 (9th Cir. 2010) .....................................................................................17

*In re PAR Pharm. Sec. Litig.*,
No. 06-3226, 2013 U.S. Dist. LEXIS 106150 (D.N.J. July 29, 2013) ...................19

*In re Prudential Ins. Co. of Am. Sales Practices Litig. Agent Actions*,
148 F.3d 283 (3d Cir. 1998).............................................................................5, 22

*In re Prudential-Bache Energy Income P'ships Sec. Litig.*,
No. 888, 1994 WL 202394 (E.D. La. May 18, 1994)............................................15

*In re Rite Aid Corp. Sec. Litig.*,
362 F. Supp. 2d 587 (E.D. Pa. 2005) ...................................................................22

*In re Rite Aid Corp. Sec. Litig.*,
396 F.3d 294 (3d Cir. 2005)...............................................................*passim*

*Robbins v. Koger Props., Inc.*,
  116 F.3d 1441 (11th Cir. 1997) ............................................16

*In re Safety Components, Inc. Sec. Litig.*,
  166 F. Supp. 2d 72 (D.N.J. 2001) ..........................................23

*In re Schering-Plough Enhance Erisa Litig.*,
  No. 08-1432, 2012 WL 1964451 (D.N.J. May 31, 2012) ......................16

*In re Sterling Fin. Corp. Sec. Class Action*,
  No. MDL 1879, 2009 WL 2914363 (E.D. Pa. Sept. 10, 2009) ................19

*Sullivan v. DB Invs. Inc.*
  667 F.3d 273 (3d Cir. 2011) ................................................5

*In re Suprema Specialties, Inc. Sec. Litig.*,
  No. 02-168, 2008 WL 906254 (D.N.J. Mar. 31, 2008) ......................16

*Swedish Hosp. Corp. v. Shalala*,
  1 F.3d 1261 (D.C. Cir. 1993) ...............................................6

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ........................................................4

*In re Veritas Software Corp. Sec. Litig.*,
  396 Fed. App'x. 815 (3d Cir. 2010) .......................................19

*In re Warner Commc'ns Sec. Litig.*
  618 F. Supp. 735 (S.D.N.Y. 1985) *aff'd*, 798 F.2d 35 (2d Cir. 1986) ..............15, 22

*In re Xcel Energy, Inc., Sec. Derivative & Erisa Litig.*
  364 F. Supp. 2d 980 (D. Minn. 2005) .....................................17

**Slip Opinions**

*In re Advanta Corp. ERISA Litig*,
  No. 2:09-cv-04974-CMR, slip op. (E.D. Pa. Jan. 9, 2014) ................19

*Esslinger v. HSBC Bank Nev., N.A.*,
  No. 10-3213, slip op. (E.D. Pa. Nov. 20, 2012) .........................18, 22

*Western P.A. Elec. Emps. Pension Fund  v. Alter*,
  No. 2:09-cv-04730-CMR, slip op. (E.D. Pa. Aug. 4, 2014) ................19

**Statutes**

15 U.S.C. §77z-1(a)(6)............................................................................................6

15.U.S.C. § 78u-4(a)(6) .........................................................................................6

15 U.S.C. §78u-5(c) ..............................................................................................13

**Other Authorities**

H.R. Conf. Rep. No. 104-369, 1995 WL 709276, 104th Cong. (1995)..........................................7

Report of the Third Cir. Task Force, *Court Awarded Atty's Fees*,
   108 F.R.D. 237 (Oct. 8, 1985) ...........................................................................6

Third Circuit Task Force Report, *Selection of Class Counsel*, 208 F.R.D. 340 (Jan.
   15, 2002) ............................................................................................................6

## PRELIMINARY STATEMENT

Lead Counsel has succeeded in obtaining an $8,000,000 cash settlement for the benefit of the Settlement Class.[1]  This is a very good result in the face of substantial challenges and is a credit to Lead Counsel's vigorous, persistent, and skilled efforts.  Lead Counsel respectfully moves this Court for an award of attorneys' fees in the amount of 30% of the Settlement Fund and payment of litigation expenses in the amount of $155,197.23, plus interest on both amounts at the same rate as is earned by the Settlement Fund.

The requested fee is within the range of percentages awarded in class actions in this District and Circuit, as well as numerous cases throughout the country, and the percentage approach is the appropriate method of compensating class counsel.  The amount requested is especially warranted in light of the amount of the recovery obtained for the Settlement Class, the comprehensive efforts of counsel in obtaining this result, and the significant risks in bringing and prosecuting this Action.[2]  Absent this Settlement, continued litigation through summary judgment, trial and appeals would have likely taken several more years at considerable expense, without the Settlement Class receiving any benefits and leading to the very real risk that the Settlement Class would ultimately receive less, or even no recovery.

---

[1]     All terms used herein are defined in the Stipulation and Agreement of Settlement, dated as of April 28, 2015 (the "Settlement Agreement") (Dkt. No. 87-3), unless otherwise indicated.

[2]     Submitted herewith in support of approval of the Settlement is the Memorandum of Law in Support of Lead Plaintiff's Uncontested Motion for Final Approval of Class Action Settlement and Plan of Allocation (the "Settlement Brief").  In addition, the Court is respectfully referred to the Declaration of Jonathan Gardner in Support of Lead Plaintiff's Motion for Final Approval of Class Action Settlement and an Award of Attorneys' Fees and Expenses, dated September 24, 2015 and submitted herewith ("Gardner Declaration" or "Gardner Decl.") for a more detailed description of the history of the Action, an overview of the claims asserted, the investigation undertaken, the efforts of counsel, the negotiation of the Settlement and the substantial risks of the Action.

Citations to "Exhibit" or "Ex.___" herein refer to exhibits to the Gardner Declaration.  For clarity, exhibits that themselves have attached exhibits will be referenced as "Ex. __-__."  The first numerical reference refers to the designation of the entire exhibit attached hereto and the second reference refers to the exhibit designation within the exhibit itself.

This Action has been vigorously litigated for nearly three years.  Prosecution of the claims was undertaken by Lead Counsel on a wholly contingent basis and was difficult from the outset. Among other things, the litigation is subject to the provisions of the Private Securities Litigation Reform Act of 1995 ("PSLRA").  The effect of the PSLRA has been to make it harder for investors to bring and successfully resolve securities class actions.  Lead Counsel and Lead Plaintiff were mindful of the fact that in this post-PSLRA environment, a greater percentage of cases are being dismissed than ever before, amid defendants' constant attempts to push the requirements of the PSLRA.  As retired Supreme Court Justice Sandra Day O'Connor recognized:  "To be successful, a securities class-action plaintiff must thread the eye of a needle made smaller and smaller over the years by judicial decree and congressional action."  *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 235 (5th Cir. 2009).

As set forth in more detail in the Gardner Declaration and the Settlement Brief, the Settlement was achieved only after Lead Counsel, together with other Plaintiff's Counsel, *inter alia,* had: (i) conducted an exhaustive pre-filing investigation that included interviews of 35 former ViroPharma employees and other persons with relevant knowledge after locating almost 130 potential witnesses and contacting more than 73 of them; (ii) prepared and filed a detailed Amended Class Action Complaint for Violations of the Federal Securities Laws ("Complaint"); (iii) successfully opposed Defendants' comprehensive motion to dismiss the Complaint; (iv) successfully opposed Defendants' motion to certify for interlocutory appeal the Court's Order denying the motion to dismiss; (v) participated in expedited discovery in preparation for mediation, reviewing approximately 40,000 pages of core case documents; (vi) reviewed documents obtained from the Food and Drug Administration ("FDA"), pursuant to a Freedom of Information Act request and subpoena; (vii) consulted with experts on loss causation, damages, and regulatory issues; and (viii)

engaged in extensive settlement negotiations, including an all-day mediation with the Honorable

Layn R. Phillips (Ret.). Gardner Decl. ¶¶22-45, 60-62. Plaintiff's Counsel have expended 4,517.25

hours in the prosecution and resolution of this Action with a resulting lodestar of $2,660,617.50. In

fact, the fee award requested by Lead Counsel represents less than counsel's lodestar.

Importantly, the requested fees and expenses have been approved by the Court-appointed

Lead Plaintiff. *See* Declaration of Carpenters' Local 27 Defined Benefit Trust Fund in Support of

Final Approval of Settlement and Other Relief, dated September 21, 2015, submitted herewith as

Exhibit 1. Lead Plaintiff has evaluated the request for fees and expenses and has come to the

conclusion that they are warranted based on its substantial involvement in the prosecution of the

Action, including the negotiation of the Settlement. Lead Plaintiff considered Lead Counsel's efforts

in obtaining the recovery and the substantial risks of litigation. As a result, and as discussed below,

the fee request is entitled to a "presumption of reasonableness."

For all the reasons set forth herein, in the Gardner Declaration and the Settlement Brief, Lead

Counsel respectfully submits that the requested attorneys' fees are fair and reasonable under the

applicable legal standards and, therefore, should be awarded by the Court. Moreover, the expenses

requested are reasonable in amount and were necessarily incurred for the successful prosecution of

the Action and, therefore, should be approved.

## ARGUMENT

## I.   THE STANDARDS GOVERNING THE AWARD OF ATTORNEYS' FEES IN COMMON FUND CASES WITHIN THE THIRD CIRCUIT

### A.   Lead Counsel Is Entitled to a Fee From the Common Fund Created

It is well-settled that an attorney who maintains a suit that results in the creation of a fund or

benefit in which others have a common interest may obtain fees from that common fund. *Boeing*

*Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) ("a litigant or a lawyer who recovers a common fund

for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole") (citation omitted); *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 820 n. 39 (3d Cir. 1995) ("*GMC Trucks*"); *In re Computron Software, Inc. Sec. Litig.*, 6 F. Supp. 2d 313, 321 (D.N.J. 1998).

Courts have recognized that, in addition to providing just compensation, awards of attorneys' fees from a common fund should also serve to encourage skilled counsel to represent those who seek redress for damages inflicted on entire classes of persons, and to discourage future alleged misconduct of a similar nature. *See Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 198 (3d Cir. 2000) (goal of percentage fee awards is to "ensur[e] that competent counsel continue to be willing to undertake risky, complex, and novel litigation") (citation omitted). Indeed, the Supreme Court has repeatedly emphasized that private securities actions, such as the instant Action, are "an essential supplement to criminal prosecutions and civil enforcement actions," brought by the U.S. Securities and Exchange Commission ("SEC"). *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007); *accord Bateman Eichler, Hill Richards, Inc. v. Berner,* 472 U.S. 299, 310 (1985) (private securities actions provided "a most effective weapon in the enforcement' of the securities laws and are a necessary supplement to [SEC] action.") (citation and internal quotations omitted).

Courts in this Circuit and District have consistently adhered to these teachings. *See, e.g., In re AremisSoft Corp. Sec. Litig.*, 210 F.R.D. 109, 128 (D.N.J. 2002) ("Attorneys who represent a class and aid in the creation of a settlement fund are entitled to compensation for legal services offered to the settlement fund under the common fund doctrine.") (citing *GMC Trucks*, 55 F.3d at 820 n. 39; *In re Ikon Office Sols., Inc., Sec. Litig.,* 194 F.R.D. 166, 192 (E.D. Pa. 2000) ("[T]here is no doubt that attorneys may properly be given a portion of the settlement fund in recognition of the benefit they

have bestowed on class members.") (citation omitted); *In re Computron Software Inc. Sec. Litig.* 6 F. Supp. 2d 313, 321 (D.N.J. 1998) (same).

The ultimate determination of the proper amount of attorneys' fees, of course, rests within the sound discretion of the district court. *Gunter,* 223 F.3d at 195; *GMC Trucks*, 55 F.3d at 821; *In re AT&T Corp. Sec. Litig.*, 455 F.3d 160, 168-69 (3d Cir. 2006); *AremisSoft*, 210 F.R.D. at 128.

**B.     The Court Should Award Attorneys' Fees Using the Percentage Approach**

In the Third Circuit, the percentage-of-recovery method is "generally favored" in cases involving a settlement that creates a common fund. *See Sullivan v. DB Invs. Inc.* 667 F.3d 273, 330 (3d Cir. 2011) (the percentage of recovery method "'is generally favored in common fund cases because it allows courts to award fees from the fund 'in a manner that rewards counsel for success and penalizes it for failure.'") (citation omitted); *In re AT&T Corp. Sec. Litig.*, 455 F.3d 160, 164 (3d Cir. 2006); *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 300 (3d Cir. 2005); *In re Prudential Ins. Co. of Am. Sales Practices Litig. Agent Actions*, 148 F.3d 283, 333 (3d Cir. 1998). The percentage-of-recovery method is almost universally preferred for determining attorneys' fees in common fund cases because it most closely aligns the interests of counsel and the class. *See Rite Aid*, 396 F.3d at 300; *Prudential*, 148 F.3d at 333.

The Third Circuit has "several times reaffirmed that the application of a percentage-of-recovery method is appropriate in common-fund cases." *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 734 (3d Cir. 2001) (citing *Gunter*, 223 F.3d at 195 n.1). While the Third Circuit recommends that the percentage award be "cross-checked" against the lodestar method to ensure its reasonableness (*Sullivan*, 667 F.3d at 330), "[t]he lodestar cross-check, while useful, should not displace a district court's primary reliance on the percentage-of-recovery method." *AT&T*, 455 F.3d at 164.

The Supreme Court has also specifically endorsed the percentage method, stating that "under the 'common fund doctrine' . . .a reasonable fee is based on a percentage of the fund bestowed on the class." *Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984).  Additionally, the PSLRA, which governs this Action, specifies that "[t]otal attorneys' fees and expenses awarded . . . not exceed a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class," thus also supporting the use of the percentage-of-recovery method. PSLRA, 15 U.S.C. §77z-1(a)(6) and § 78u-4(a)(6) (emphasis added).  Courts have concluded that, in using this language, Congress expressed a preference for the percentage method, rather than the lodestar method, in determining attorneys' fees in securities class actions. *See In re Cendant Corp. Sec. Litig.*, 404 F.3d 173, 188 n.7 (3d Cir. 2005); *Rite Aid*, 396 F.3d at 300.[3]

---

[3]     A second method for calculating attorneys' fee awards, the lodestar/multiplier method, by which courts multiply the number of hours spent on the case by each attorney's reasonable hourly rate and then adjust that figure (by applying a multiplier) to reflect such factors as risk, the contingent nature of the litigation, the result obtained, and the quality of the attorney's work (*see, e.g., Lindy Bros. Builders, Inc. v. Am. Radiator & Standard Sanitary Corp.*, 487 F.2d 161, 167-69 (3d Cir. 1973) ("*Lindy I*"), subsequently refined in *Lindy Bros. Builders v. Am. Radiator & Standard Sanitary Corp.*, 540 F.2d 102, 116-18 (3d Cir. 1976) (*en banc*) ("*Lindy II*")), has been discredited by two different task forces of prominent judges and practitioners convened to consider fees in class action cases by the United States Court of Appeals for the Third Circuit, first in 1985, and again in 2002.  *See* Report of the Third Cir. Task Force, *Court Awarded Atty's Fees*, 108 F.R.D. 237, 238; (Oct. 8, 1985) Third Circuit Task Force Report, Selection of *Class Counsel*, 208 F.R.D. 340 (Jan. 15, 2002).

        Since the issuance of the Task Force Report in 1985, virtually every circuit court has joined this Circuit and the United States Supreme Court in approving use of the percentage-of-the-fund method in common fund cases.  In fact, two Circuit Courts of Appeals have held that the percentage method is mandatory in common fund cases.  *See Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1271 (D.C. Cir. 1993) ("a percentage-of-the-fund method is the appropriate mechanism for determining the attorney fees award in common fund cases"); *Camden I Condo. Ass'n Inc. v. Dunkle*, 946 F.2d 768, 774 (11th Cir. 1991) (rejecting the lodestar approach in all common fund cases and holding that the percentage method is mandatory).

## II.   THE REQUESTED FEE ENJOYS A PRESUMPTION OF REASONABLENESS BECAUSE IT HAS BEEN APPROVED BY THE COURT-APPOINTED LEAD PLAINTIFF

The 30% fee requested here has been approved by the Court-appointed Lead Plaintiff.  *See* the accompanying Declaration of Carpenters' Local 27 Defined Benefit Trust Fund in Support of Final Approval of Settlement and Other Relief, Ex. 1.  Lead Plaintiff, an institutional investor established for the benefit of more than 9,000 current and retired fund participants, which manages more than $400 million in retirement fund assets, is precisely the type of fiduciary for the Settlement Class envisioned by Congress when it enacted the PSLRA.[4]  The Third Circuit has explained that "courts should afford a presumption of reasonableness to fee requests submitted pursuant to an agreement between a properly-selected lead plaintiff and properly-selected lead counsel."  *Cendant*, 264 F.3d at 220.  Here, the Lead Plaintiff has approved the requested fees after its diligent involvement in the Action and this fact should be given significant weight.  *See In re Lucent Tech. Inc. Sec. Litig.,* 327 F. Supp. 2d 426, 442 (D.N.J. 2004) ("Significantly, the Lead Plaintiffs, both of whom are institutional investors with great financial stakes in the outcome of the litigation, have reviewed and approved Lead Counsel's fees and expenses request.").

## III.   THE REQUESTED 30% FEE IS FAIR AND REASONABLE UNDER THE THIRD CIRCUIT *GUNTER* FACTORS

Under Third Circuit law, district courts have considerable discretion in setting an appropriate percentage-based fee award in traditional common fund cases.  *See, e.g., Gunter*, 223 F.3d at 195 ("We give [a] great deal of deference to a district court's decision to set fees."); *GMC Trucks*, 55

---

[4]      Congress enacted the PSLRA in large part to encourage investors with a significant financial stake in the outcome of a securities class action to assume control of securities class actions and "increase the likelihood that parties with significant holdings in issuers, whose interests are more strongly aligned with the class of shareholders, will participate in the litigation and exercise control over the selection and actions of plaintiff's counsel."  *See* H.R. Conf. Rep. No. 104-369, at 32 (1995), 1995 WL 709276, at *32.

F.3d at 821.  In exercising that discretion, the Third Circuit has also noted that a district court should consider "among other things," the following factors in determining a fee award:

> (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the Class to the settlement terms and/or fees requested by counsel;[5] (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases.

*Gunter*, 223 F.3d at 195, n.1.  A court may also consider whether counsel was aided by investigations conducted by the government or others, what a contingent fee in a comparable private case might be, and any "innovative terms" in the settlement.  *See In re Diet Drugs Prod. Liab. Litig.*, 582 F.3d 524, 541 (3d Cir. 2009).  The fee factors "need not be applied in a formulaic way . . . and in certain cases, one factor may outweigh the rest."  *Id.*

Applying these factors to the present case, a 30% fee award to Lead Counsel for achieving this highly favorable settlement is both justified and appropriate.

### A.    The Size and Nature of the Common Fund Created and the Number of Persons Benefited by the Settlement

Courts have consistently recognized that the result achieved is a major factor to be considered in making a fee award.  *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983) ("most critical factor is the degree of success obtained"); *see also Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 547-48 (S.D. Fla. 1988) ("The quality of work performed in a case that settles before trial is best measured by the benefit obtained."), *aff'd*, 899 F.2d 21 (11th Cir. 1990).

---

[5]    As explained in the Gardner Declaration, ¶¶64-68, the Claims Administrator has to date mailed 18,618 Notices to potential Settlement Class Members.  Ex. 3 ¶6.  The Court-ordered deadline for objections to any aspect of the Settlement or request for attorneys' fees and expenses is October 8, 2015.  To date, no objections have been received. Gardner Decl. ¶69.  At the time of Lead Counsel's reply papers, which are due October 22, 2015, counsel will report on the Settlement Class's reaction to the Fee and Expense Application.

Lead Counsel has secured a settlement that provides for a substantial and certain cash payment of $8,000,000, plus any accrued interest, for the direct benefit of the Settlement Class. The number of persons that will benefit from the Settlement is undeniably large, since the Settlement Class includes all persons that purchased or otherwise acquired ViroPharma Securities between December 14, 2011 and April 9, 2012. In this case, there were millions of shares of ViroPharma common stock traded during the Class Period and approximately 70 million shares outstanding. *See* Complaint, ¶172. The Claims Administrator has mailed more than 18,000 Notices as part of the settlement notification process. Ex. 3. It is therefore reasonable to conclude that thousands of Settlement Class Members will participate in and benefit from this Settlement.

Lead Plaintiff's consulting damages expert has estimated that the Settlement Class sustained maximum damages in the range of approximately $78.5 million (for the one day drop following the corrective disclosure) to $90 million (for the two day drop following the corrective disclosure), assuming that liability and loss causation for the alleged corrective disclosure was proven and based on various assumptions and modeling. The Settlement, therefore, represents approximately 9% to 10% of estimated maximum losses – an excellent recovery in light of the risks of continued litigation. *See, e.g.*, *In re Greenwich Pharm. Sec. Litig.*, No. 92-3701, 1995 WL 251293, at *5 (E.D. Pa. Apr. 26, 1995) (approving $4.375 million settlement that obtained 4.4% of estimated maximum damages); *see also In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1042 (N.D. Cal. 2008) (approving $13.75 million settlement yielding 6% of potential damages, which was "higher than the median percentage of investor losses recovered in recent shareholder class action settlements"); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, No. 02 MDL 1484 (JFK), 2007 WL 313474, at *10 (S.D.N.Y. Feb. 1, 2007) (finding that a recovery representing 6.25%

of damages was "at the higher end of the range of reasonableness of recovery in class actions securities litigations") (citation omitted).

The Settlement Amount is also greater than the median reported settlement amounts since the passage of the PSLRA, which have ranged from $5.6 million in 1996 (adjusted for inflation) to $6.5 million in 2014.  *See* Renzo Comolli & Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2014 Full-Year Review* (NERA Jan. 2015), Ex. 2 at 28.

The Settlement was achieved as a direct result of the skill and tenacity of Lead Counsel, who overcame numerous obstacles and took significant financial risks in obtaining this favorable result for the Settlement Class.  Accordingly, the size and nature of the common fund created here support the fee request.

**B.      The Skill and Efficiency of Lead Counsel**

The skill and efficiency of counsel is "'measured by the quality of the result achieved, the difficulties faced, the speed and efficiency of the recovery, the standing, experience and expertise of the counsel, the skill and professionalism with which counsel prosecuted the case and the performance and quality of opposing counsel.'"  *Hall v. AT&T Mobility LLC*, No. 07-5325, 2010 WL 4053547, at *19 (D.N.J. Oct. 13, 2010) (citation omitted).  Indeed, courts in this district have found that "the single clearest factor reflecting the quality of class counsels' services to the class are the results obtained."  *In re Aremisoft*, 210 F.R.D. at 132.  Here, as discussed above, the $8 million Settlement is a very favorable result for the Settlement Class that was obtained through Lead Counsel's hard work, persistence, efficiency, and skill.  It was achieved only after Lead Counsel overcame multiple difficult and novel legal challenges, and the parties vetted their positions before the nation's most prominent mediator.

Lead Counsel was required to contend with, among other things, unusual and highly technical issues of falsity and materiality, complex and novel regulatory issues, and intricate loss

causation and damages issues.  In particular, there were substantial risks to establishing falsity and scienter.  Lead Counsel combatted arguments that the FDA had never advised Defendants that it would deny extended exclusivity to Vancocin and that the FDA was interpreting a new statute for the first time.  Further, Defendants argued that they adequately warned the market that the ultimate determination of whether to extend exclusivity under the statute resided with the FDA and there was no guarantee that the FDA would rule in the Company's favor.  Lead Plaintiff's scienter arguments rested on highly complex, scientifically based facts and relying on circumstantial evidence presented through adverse witnesses and highly technical expert testimony.  *See* Gardner Decl. ¶¶50-51.

Lead Counsel's reputation as attorneys who will zealously carry a meritorious case through the trial and appellate levels as well as their demonstrable ability to vigorously develop the evidence in this litigation enabled them to negotiate this landscape and to achieve a significant recovery for the benefit of the Settlement Class.[6]  *See* Declaration of Jonathan Gardner Filed on Behalf of Labaton Sucharow LLP in Support of Application for Award of Attorneys' Fees and Expenses, submitted herewith as Ex. 4 – A.

'"The quality of opposing counsel is also important in evaluating the quality of … counsel's work.'"  *Hall*, 2010 WL 4053547, at *19 (citation omitted); *In re Datatec Sys., Inc. Sec. Litig.*, No. 04-CV-525, 2007 WL 4225828, at *7 (D.N.J. Nov. 28, 2007).  Defendants were represented by attorneys from Morgan Lewis & Bockius LLP, a prominent law firm with undeniable experience and skill.  The fact that Lead Counsel achieved this Settlement "in the face of formidable legal opposition further evidences the quality of their work."  *In re Corel Corp. Inc. Sec. Litig.*, 293 F.

---

[6]     The experience of the other law firms that represent Lead Plaintiff in this Action are set forth in the accompanying declarations of counsel.  Exs. 5 – A, 6 – A.  As these submissions show, Plaintiff's Counsel are highly regarded and practice extensively in the highly complex field of shareholder securities litigation.

Supp. 2d 484, 496 (E.D. Pa. 2003).   Accordingly, this *Gunter* factor supports an award of the requested fee.

### C.       The Complexity and Duration of the Litigation

While securities cases have always been complex and difficult to prosecute, the PSLRA has only increased the difficulty of successfully prosecuting a securities class action.   Lead Counsel addressed numerous difficult issues in opposing Defendants' motion to dismiss and motion to certify an appeal, without the assistance of any governmental investigation or enforcement action concerning the alleged wrongdoing.   As one court has noted: "An unfortunate byproduct of the PSLRA is that potentially meritorious suits will be short-circuited by the heightened pleading standard."   *Bryant v. Avado Brands, Inc.*, 100 F. Supp. 2d 1368, 1377 (M.D. Ga. 2000), *rev'd on other grounds sub nom. Bryant v. Dupree*, 252 F.3d 1161 (11th Cir. 2001).[7]   In *Ikon*, the court noted: "the legal obstacles of establishing scienter, damages, [and] causation . . . .   The court also acknowledges that securities actions have become more difficult from a plaintiff's perspective in the wake of the PSLRA. . . .   The Act imposes many new procedural hurdles . . . .   It also substantially alters the legal standards applied to securities fraud claims in ways that generally benefit defendants rather than plaintiffs."   194 F.R.D. at 194-95.   The court's statement in *Ikon* is certainly applicable here.

As discussed in the Gardner Declaration, this Action has been vigorously prosecuted and defended for almost three years.   At nearly every stage of the litigation, counsel for Defendants have aggressively defended against the claims, challenging each element and particularly focusing on falsity, scienter, and loss causation.   Gardner Decl. ¶¶46-57.

---

[7]       Even strong cases that ultimately have been widely recognized as meritorious have been dismissed.   *See Goldstein v. MCI WorldCom*, 340 F.3d 238 (5th Cir. 2003).

To prove scienter, Lead Counsel sought to marshal evidence concerning an allegedly large volume of insider sales by two individual defendants (Doyle and Rowland) during the Class Period, showing that these sales were unusual both in timing and amount compared to prior sales. Defendants, however, argued that Doyle and Rowland still retained significant stock and option holdings after their Class Period sales, and that had they truly known the declining situation as Lead Plaintiff contended, they would have sold more. Defendants also pointed to the fact that only two of four individual defendants sold stock, neither of whom were ViroPharma's CEO who made a number of the challenged statements. It did not make economic sense, as Defendants argued, for the CEO to commit fraud to purportedly inflate prices while at the same time holding all of his shares and directing a massive repurchase program on behalf of the Company. Gardner Decl. ¶49.

Lead Counsel also subpoenaed the FDA and other non-parties in order to gather evidence that Defendants had knowledge, based on communications with the FDA, that Vancocin would not receive exclusivity. Defendants, however, maintained that (1) the communications between ViroPharma and the FDA did not disclose the FDA's intent to deny exclusivity to Vancocin; (2) by law, interim communications from the FDA are not binding as agency action; (3) the FDA's own documents establish that the FDA had not decided on exclusivity at the time of any of Defendants' alleged misrepresentations; (4) the issue of exclusivity was a matter of first impression involving highly ambiguous statutory language; (5) Lead Plaintiff's allegations concerning the Genzyme Study were not the reason the FDA denied exclusivity for Vancocin; and (6) contemporaneous communications demonstrate that Defendants genuinely believed they would obtain exclusivity for Vancocin. Gardner Decl. ¶50.

Defendants further argued that all of the challenged statements involved predictions about a future decision by the FDA, thus triggering the safe harbor provisions of the PSLRA. 15 U.S.C.

§78u-5(c). Therefore, under the statute, Lead Plaintiff would have been required to prove actual knowledge, which is a significantly more demanding standard of scienter than applies to statements of current fact.   Given these arguments, Defendants may have made a persuasive case that they had a good faith belief that Vancocin would in fact be approved for an additional three years of exclusivity under the QI Act, thereby defeating Lead Plaintiff's proof of scienter.   Gardner Decl. ¶51; *See also AT&T*, 455 F.3d at 170 (re-emphasizing that "the difficulty of proving actual knowledge under §10(b) of the Securities Exchange Act . . . weighed in favor of approval of the fee request").

Additionally, a private plaintiff alleging securities fraud must prove that the defendants' fraud caused an economic loss.   Lead Counsel worked closely with a damages expert to analyze Lead Plaintiff's claims for damages and marshal proof that could withstand a summary judgment challenge and prevail at trial.   Defendants were expected to argue at summary judgment, and trial, that the end of the Class Period was marked by three related but separate disclosures pertaining to Vancocin and its bid for a new label and extended exclusivity, only one of which pertained to the alleged fraud.   Thus, Lead Plaintiff would also have to disaggregate the amount of harm caused by Defendants' alleged  fraud as opposed to other, non-fraud disclosures regarding ViroPharma. Defendants' arguments regarding loss causation presented a very technical and intricate "battle of the experts."  Gardner Decl. ¶¶56-57.

Even if Lead Plaintiff got past summary judgment after completion of discovery and was successful against Defendants at trial, Lead Plaintiff's efforts to establish liability and damages in the Action in all likelihood would not end with a judgment here, but would continue through one or more levels of appellate review.  In complex and substantial cases such as this, it must be recognized that even a victory at the trial stage does not guarantee ultimate success.  Unfortunately, this fact is

well-known to Lead Counsel here, which prosecuted the claims in *Hubbard v. BankAtlantic Bancorp, Inc.* to a successful verdict for the plaintiffs after a four-week trial, only to have the district court grant the defendants' post-trial motion for judgment as a matter of law on loss causation grounds and to have that judgment affirmed by the Eleventh Circuit. *See Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713 (11th Cir. 2012). Both trial and judicial review are unpredictable and could seriously and adversely affect the scope of an ultimate recovery, if not the recovery itself. Indeed, as the court observed in *In re Warner Commc'ns Sec. Litig.*:

> Even a victory at trial is not a guarantee of ultimate success. If plaintiffs were successful at trial and obtained a judgment for substantially more than the amount of the proposed settlement, the defendants would appeal such judgment. An appeal could seriously and adversely affect the scope of an ultimate recovery, if not the recovery itself.

618 F. Supp. 735,747-48 (S.D.N.Y. 1985) *aff'd,* 798 F.2d 35 (2d Cir. 1986) (citing numerous examples).

In sum, this highly complex case has been extensively litigated and vigorously contested. Despite the difficulty of the issues raised, counsel secured a highly favorable result for the Settlement Class. As a result, this factor strongly supports the requested award.

### D.     The Risk of Non-Payment

Lead Counsel undertook this Action on a contingent fee basis, assuming a significant financial risk that the litigation would yield no recovery and leave them uncompensated. Unlike counsel for Defendants, who are paid an hourly rate and paid their expenses on a regular basis, Lead Counsel has not been compensated for any time or expense since this case began in May 2012. Since that time, Plaintiff's Counsel have expended 4,517.25 hours in the prosecution of this Action with a resulting lodestar of $2,660,617.50 and incurred $155,197.23 in litigation expenses. Courts have consistently recognized that the risk of receiving little or no recovery is a major factor in considering an award of attorneys' fees. For example, in awarding counsel's attorneys' fees in *In re*

*Prudential-Bache Energy Income P'ships Sec. Litig.*, No. 888, 1994 WL 202394, at *6 (E.D. La. May 18, 1994), the court noted the risks that plaintiffs' counsel had taken:

> Although today it might appear that risk was not great based on Prudential Securities' global settlement with the Securities and Exchange Commission, such was not the case when the action was commenced and throughout most of the litigation. Counsel's contingent fee risk is an important factor in determining the fee award. Success is never guaranteed and counsel faced serious risks since both trial and judicial review are unpredictable. Counsel advanced all of the costs of litigation, a not insubstantial amount, and bore the additional risk of unsuccessful prosecution.

*See also In re Schering-Plough Enhance Erisa Litig.*, No. 08-1432, 2012 WL 1964451, at *7 (D.N.J. May 31, 2012) ("Courts routinely recognize that the risk created by undertaking an action on a contingency fee basis militates in favor of approval."); *In re Merck & Co., Inc. Vytorin ERISA Litig.*, No. 08-CV-285, 2010 WL 547613, at *11 (D.N.J. Feb. 9, 2010) (finding "[t]he risk of little to no recovery weighs in favor of an award of attorneys' fees" where counsel accepted the action on a contingent-fee basis); *Louisiana Mun. Police Emps. Ret. Sys. v.  Sealed Air Corp.*  No. 03-4372, 2009 WL 4730185, at *8 (D.N.J. Dec. 4, 2009) (same); *In re Suprema Specialties, Inc. Sec. Litig.*, No. 02-168, 2008 WL 906254, at *11 (D.N.J. Mar. 31, 2008) (same).

Indeed, the risk of no recovery for a class and counsel in complex cases of this type is very real. There are numerous examples of hard-fought lawsuits where, because of the discovery of facts unknown when the case was commenced, or changes in the law during the pendency of the case, or a decision of a judge or jury following a trial on the merits, excellent professional efforts of members of the plaintiffs' bar produced no fee for counsel. Even plaintiffs who successfully oppose summary judgment and succeed at trial may find a judgment in their favor overturned on appeal or on a post-trial motion. [8] *See, e.g.*, *In re Oracle Corp. Sec. Litig.*, No. C 01-00988 SI, 2009 WL 1709050 (N.D.

---

[8] *See, e.g.*, *Hubbard,* 688 F.3d 713 (affirming judgment as matter of law for defendants after jury verdict for plaintiffs); *Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1448-49 (11th Cir. 1997) (jury verdict after 19 days of trial of $81 million for plaintiffs against an accounting firm reversed on

Cal. June 19, 2009), *aff'd*, 627 F.3d 376 (9th Cir. 2010) (court granted summary judgment to defendants after eight years of litigation, and after plaintiff's counsel incurred over $6 million in expenses, and worked over 100,000 hours, representing a lodestar of approximately $48 million). As the court in *In re Xcel Energy, Inc., Sec. Derivative & Erisa Litig.* 364 F. Supp. 2d 980, 994 (D. Minn. 2005) recognized, "[p]recedent is replete with situations in which attorneys representing a class have devoted substantial resources in terms of time and advanced costs yet have lost the case despite their advocacy." (citation omitted).   Similarly, even the most promising multi-hundred million dollar case can be eviscerated by a sudden change in the law after years of litigation.   *See, e.g., In re Alstom SA Sec. Litig.*, 741 F. Supp. 2d 469, 471-73 (S.D.N.Y. 2010) (after completing significant foreign discovery, 95% of plaintiffs' damages were eliminated by the Supreme Court's reversal of some 40 years of unbroken circuit court precedents in *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247 (2010)).

Because the fee in this matter was entirely contingent, the only certainty was that there would be no fee without a successful result and that such a result would be realized only after considerable and difficult effort.   Lead Counsel committed significant resources of both time and money to the vigorous and successful prosecution of this action.   In view of the skill of Defendants' counsel and the legal and factual difficulties of this Action, the risk of never being compensated was real.   The contingent nature of counsel's representation strongly favors approval of the requested fee.

---

appeal on loss causation grounds and judgment entered for defendant); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215, 1233 (10th Cir. 1996) (Tenth Circuit overturned securities fraud class action jury verdict for plaintiffs in case filed in 1973 and tried in 1988 on the basis of 1994 Supreme Court opinion); *In re Apple Computer Sec. Litig.*, No. C-84-20148(A)-JW, 1991 WL 238298, at *1-2 (N.D. Cal. Sept. 6, 1991) ($100 million verdict against two individual defendants, but court vacated judgment on motion for judgment notwithstanding the verdict).

### E.      The Time Devoted by Plaintiff's Counsel Was Significant

To date, Plaintiff's Counsel and their paraprofessionals have expended 4,517.25 hours investigating, prosecuting, and resolving this Action, resulting in a combined "lodestar" amount of $2,660,617.50 at counsel's regular and current billing rates and have incurred $155,197.23 in expenses prosecuting this Action for the benefit of the Settlement Class.[9] As discussed above and in the Gardner Declaration, this Action has been diligently litigated and vigorously defended for nearly three years.  Defendants fought Lead Plaintiff at nearly every step of the litigation in an effort to defeat Lead Plaintiff's claims.  In short, the successful conclusion of this litigation required Lead Counsel to commit a significant amount of time and expenses to the Action.  This *Gunter* factor favors approval of the fee request.

### F.      Awards in Similar Cases

There is no hard and fast rule as to what percentage of the common fund should be awarded as attorneys' fees.  The Third Circuit has observed that fee awards range from 19% to 45% of the settlement fund.  *GMC Trucks*, 55 F.3d at 822*; see also Ikon*, 194 F.R.D. at 194.  Numerous courts within the Third Circuit have awarded fees of 30% or more of the recovery.  *See Esslinger v. HSBC Bank Nev., N.A.*, No. 10-3213, slip op. at 25 (E.D. Pa. Nov. 20, 2012) ("a fee award of 30% of the [$23.5 million] settlement here is reasonable and in keeping with similar precedent").[10]  Indeed, "awards of thirty percent are commonly awarded in other settlements of securities class actions." *In re Aetna Inc. Sec. Litig.*, No. MDL 1219, 2001 WL 20928, at *14 (E.D. Pa. Jan. 4, 2001) (court

---

[9]      *See* Ex. 7 (Summary Lodestar and Expense Table); Labaton Fee Decl. (Ex. 4); Declaration of Paul J. Scarlato Filed on Behalf of Goldman Scarlato & Penny, P.C. in Support of Application for Award of Attorneys' Fees and Expenses (Ex. 5); and the Declaration of David W. Mitchell Filed on Behalf of Robbins Geller Rudman & Dowd LLP in Support of Application for Award of Attorneys' Fees and Expenses (Ex. 6).

[10]      All slip opinions cited herein are submitted as part of a compendium, *see* Gardner Decl. Ex. 9.

awarded 30% of a $82.5 million settlement); *see also Western Pa. Elec. Emps.' Pension Fund v. Alter*, No. 2:09-cv-04730-CMR, slip op. (E.D. Pa. Aug. 4, 2014) (court awarded 30% of $13.25 million settlement); *In re Advanta Corp. ERISA Litig*, No. 2:09-cv-04974-CMR, slip op. (E.D. Pa. Jan. 9, 2014) (court awarded 30% of a $4.5 million settlement); *In re PAR Pharm. Sec. Litig.*, No. 06-3226, 2013 U.S. Dist. LEXIS 106150, at *30 (D.N.J. July 29, 2013) (court awarded 30% of an $8.1 million settlement to counsel noting that "Lead Counsel's fee request is comparable to fees typically awarded in analogous cases"); *In re Veritas Software Corp. Sec. Litig.*, 396 Fed. App'x. 815 (3d Cir. 2010) (Third Circuit affirmed the 30% award of a $21.5 million settlement by the District Court); *In re Sterling Fin. Corp. Sec. Class Action*, No. MDL 1879, 2009 WL 2914363, at *4 (E.D. Pa. Sept. 10, 2009) ("After weighing the factors above, it is apparent that a thirty percent attorneys' fee award is reasonable.")

The requested fee is also consistent with the median fee award for securities cases based on a recent analysis of fee awards conducted in 2014 by NERA.  Using data from securities class actions from 1996 through 2014, the study found that for settlements between $5 million and $10 million, where this Settlement falls, the median fee award was 30% of the settlement amount.  Dr. Renzo Comolli & Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2014 Full-Year Review* (NERA Jan. 2015) at 34, Figure 29 (Ex. 2).  Moreover, the requested fee is within the range of three studies relied on by the district court in *Rite Aid*, 396 F.3d at 294.  As the Third Circuit noted in *Rite Aid*:

> In comparing this fee request to awards in similar cases, the District Court found persuasive three studies referenced by Professor Coffee: one study of securities class action settlements over $10 million that found an average percentage fee recovery of 31%; a second study by the Federal Judicial Center of all class actions resolved or settled over a four-year period that found a median percentage recovery range of 27-30%; and a third study of class action settlements between $100 million and $200 million that found recoveries in the 25-30% range were "fairly standard."  We see no abuse of discretion in the District Court's reliance on these studies.

396 F.3d at 303 (citation omitted).  Accordingly, the requested fee is comparable to those awarded in similar cases and this *Gunter* factor supports approval.[11]

## IV.   THE REQUESTED FEE IS REASONABLE UNDER A LODESTAR CROSS-CHECK

Although courts in this Circuit almost uniformly apply the percentage approach to determine attorneys' fees in common fund cases like this one, a court may also use a lodestar "cross-check" to confirm the reasonableness of the requested fee.  In this case, if the cross-check is applied, the requested fee of 30% is clearly fair and reasonable.

The lodestar method, as set forth in the seminal cases *Lindy I* and *Lindy II*, is a two-step process.  The first step requires that the court ascertain the "lodestar" figure by multiplying the number of hours reasonably worked by the reasonable normal hourly rate of counsel.  The second step permits the court to adjust the lodestar by applying a multiple to take into account the contingent nature and risks of the litigation, the results obtained and the quality of the services rendered by counsel.  *See Lindy I*, 487 F.2d at 167-68; *accord Hensley*, 461 U.S. at 424.

### A.   Hours Reasonably Expended by Counsel

Under the *Lindy* cases, a court's determination of a reasonable fee begins with the number of hours expended in the prosecution of the action.  Plaintiff's Counsel here have spent, in the aggregate, 4,517.25 hours in the prosecution of this Action.  For the convenience of the Court and in conformity with practice, the hours of counsel and their paraprofessionals have been submitted in a

---

[11]      If this were a non-class action litigation, the customary contingent fee would likely range between 30 and 40 percent of the recovery.  *See, e.g., Ikon*, 194 F.R.D. at 194 ("[I]n private contingency fee cases, particularly in tort matters, plaintiffs' counsel routinely negotiate agreements providing for between thirty and forty percent of any recovery.").

summarized form in the accompanying declarations of Plaintiff's Counsel.[12]  *See* Gardner Decl. Exs. 4 – A, 5 – A, 6 – A, 7 (summary table).

### B.    Calculating the "Base" Lodestar

To arrive at the lodestar, the hours expended are typically multiplied by each attorney's respective hourly rate.  The hourly rate to be applied in calculating the lodestar is that which is normally charged in the community where the attorney practices.  *See Blum*, 465 U.S. at 895; *In re Fine Paper Antitrust Litig.*, 751 F.2d 562, 590-91 (3d Cir. 1984).  In addition, the United States Supreme Court and other courts have held that the use of current rates is proper since such rates compensate for inflation and the loss of use of funds.  *See Missouri v. Jenkins*, 491 U.S. 274, 283-84 (1989); *Ikon*, 194 F.R.D. at 195.

In determining whether the rates are reasonable, a court should take into account the attorneys' legal reputation, experience, and status.  The accompanying declarations of counsel include resumes that provide the background and experience of the firms who worked on this case.  Applying counsel's current rates to the hours committed to the litigation results in a lodestar of $2,660,617.50.  The hourly billing rates of Plaintiff's Counsel here range from $610 to $925 for partners, $475 to $750 for of counsels, and $350 to $700 for other attorneys.  *See* Gardner Decl. ¶91.  Exhibit 8, submitted herewith, is a table of billing rates for defense firms compiled by Labaton Sucharow from fee applications submitted by such firms nationwide in bankruptcy proceedings in 2014.  The analysis shows that across all types of attorneys, Plaintiff's Counsel's rates here are consistent with, or lower than, the firms surveyed.

---

[12]    *See Rite Aid*, 396 F.3d at 306-07 ("The lodestar cross-check calculation need entail neither mathematical precision nor bean-counting.  The district courts may rely on summaries submitted by the attorneys and need not review actual billing records.") (footnote omitted).

### C.       The Lodestar "Multiplier"

"Calculation of the lodestar, however, is simply the beginning of the analysis." *Warner Commc'ns*, 618 F. Supp. at 747.  In the second step of the analysis, the court adjusts the lodestar to take into account, among other things, the result achieved, the quality of representation, the complexity and magnitude of the litigation, and public policy considerations.  *Rite Aid*, 396 F.3d at 305-06; *Fine Paper*, 751 F.2d at 583; *Prudential II*, 148 F.3d at 341.  The court then applies an appropriate enhancement or multiplier to the lodestar number to account for these additional factors.

### D.       Performing the Lodestar Cross-Check

The lodestar cross-check compares counsel's actual lodestar with the gross amount of the requested fee to determine if the resulting multiplier is reasonable or so unreasonable as to warrant a downward adjustment.  As noted, the cumulative lodestar for the services performed by Plaintiff's Counsel in this Action is $2,660,617.50.  Lead Counsel is seeking an award of 30% of the Settlement Fund, which equals $2,400,000.  Therefore, the requested fee actually represents a *negative* multiplier of 0.90.  This "multiplier" is substantially lower than those that have been approved in many in other securities cases.  *See Esslinger*, slip op. at 28-29 (a 1.7 multiplier was acceptable "because of the high risk of non-recovery shouldered by Plaintiff's counsel, who worked on a contingency basis, for more than two years").  Multipliers of 3, 4, 5 or even more times the lodestar have been awarded to reflect the contingency fee risk and other relevant factors.  *See In re Rite Aid Corp. Sec. Litig*., 362 F. Supp. 2d 587 (E.D. Pa. 2005) (6.96 multiplier); *In re Aetna Inc*., 2001 WL 20928, at *15 (3.6 multiplier).  Indeed, a negative multiplier indicates that the requested fee is reasonable.  *See In re Auto. Refinishing Paint Antitrust Litig.*, No. 1426, 2008 WL 63269, at *4 (E.D. Pa. Jan. 3, 2008) (observing that fee awards based on negative multipliers are indicative of the reasonableness of the award); *In re Bear Stearns Cos. Sec. Derivative & ERISA Litig.*, 909 F. Supp. 2d 259, 271 (S.D.N.Y. 2012) (noting that the negative multiplier was a "strong indication of the

reasonableness of the [requested] fee") (citation omitted).  Thus, a 30% fee award would readily pass

a lodestar cross-check and would be reasonable.

## V.  LEAD COUNSEL'S APPLICATION FOR REASONABLY INCURRED LITIGATION EXPENSES SHOULD BE APPROVED

Lead Counsel also requests payment of $155,197.23 in expenses incurred in connection with

the prosecution of this litigation.  This is less than was requested in the Notice.  Counsel's individual

fee declarations attest to the amount and accuracy of their expenses.  Gardner Decl. Exs. 4 - 6.

The appropriate analysis to apply in deciding which expenses are compensable in a common

fund case of this type is whether the particular costs are of the type typically billed by attorneys to

paying clients in the marketplace.  *See In re Safety Components, Inc. Sec. Litig.*, 166 F. Supp. 2d 72,

108 (D.N.J. 2001) ("[c]ounsel for a class action is entitled to reimbursement of expenses that were

adequately documented and reasonably and appropriately incurred in the prosecution of the class

action" (citing *Abrams v. Lightolier, Inc.*, 50 F.3d 1204, 1225 (3d Cir. 1995)); *Hall*, 2010 WL

4053547, at *23 ("Courts have generally approved expenses arising from photocopying, use of the

telephone and fax, postage, witness fees, and hiring of consultants.").  The categories of expenses for

which counsel seek payment here are the type of expenses routinely charged to hourly clients and,

therefore, should be paid out of the common fund.

A significant component of Plaintiff's Counsel's expenses are the costs of experts, which

total $72,468 or approximately 45% of the total expenses.  Due to the complexity and specialized

nature of the factual issues in this case, it was necessary for Lead Plaintiff to consult two highly

qualified experts in the area of damages and FDA regulation.  These experts were critical to

developing Lead Plaintiff's claims.  Lead Counsel worked extensively with Forensic Economics

Inc., a firm specializing in market damages and loss causation.  Forensic Economics assisted Lead

Plaintiff with analyzing the economic materiality of Defendants' alleged misrepresentations and

omissions, tying Defendants' alleged fraud to the losses allegedly suffered by the Settlement Class, and evaluating the artificial inflation (or true value) of ViroPharma securities during the Class Period. Lead Counsel also worked extensively with regulatory expert David B. Ross, M.D., Ph.D., who was responsible for the oversight of Vancocin at the FDA from 1996-2004. Because ViroPharma operates in a complex regulatory environment, Lead Plaintiff's allegations concerning the Company's misrepresentations and omissions related to the FDA's approval of exclusivity for Vancocin were refined through extensive consultation with Dr. Ross. Gardner Decl. ¶¶42-45.

Additionally, Plaintiff's Counsel paid $31,208.33 in mediation fees assessed by the mediator in this matter, Judge Phillips. Gardner Decl. ¶102. Plaintiff's Counsel were also required to travel in connection with this litigation and thus incurred the related costs of meals, lodging, and transportation. Lead Counsel also incurred costs related to computerized research. These are charges for computerized factual and legal research services such as, ALM Media Service, Courtlink, LexisNexis, Westlaw, Pacer, and Thomson Financial. It is standard practice for attorneys to use these services to assist them in researching legal and factual issues. Such services allowed counsel to access ViroPharma's SEC filings, perform media searches about Defendants, obtain analysts' reports on ViroPharma, and allowed the investigators to locate and obtain information on witnesses and Defendants.

Other expenses that were necessarily incurred in the prosecution of this Action include: court reporting; photocopying; filing fees; postage and overnight delivery charges; and telephone and telecopier expenses. Because these were all necessary expenses incurred by Lead Counsel, they should be paid from the Settlement Fund.

**CONCLUSION**

For all of the foregoing reasons, Lead Counsel respectfully requests that the Court award attorneys' fees of 30% of the Settlement Fund and expenses in the amount of $155,197.23, plus

interest at the same rate as earned by the Settlement Fund.  A proposed order will be submitted after

the October 8, 2015 deadline for objections has passed.

DATED:  September 24, 2015     LABATON SUCHAROW LLP
              JONATHAN GARDNER
              CAROL C. VILLEGAS


               */s/ Jonathan Gardner*
              JONATHAN GARDNER

         140 Broadway, 34th Floor
         New York, NY  10005
         Telephone:  212/907-0700
         212/818-0477 (fax)
         Email:  jgardner@labaton.com
         Email:  cvillegas@labaton.com

         *Attorneys for Lead Plaintiff Carpenters' Local 27*
         *Defined Benefit Trust Fund*

         ROBBINS GELLER RUDMAN & DOWD LLP
         DAVID W. MITCHELL
         CHRISTOPHER D. STEWART
         LONNIE A. BROWNE
         655 West Broadway, Suite 1900
         San Diego, CA  92101
         Telephone:  619/231-1058
         619/231-7423 (fax)
         Email:  davidm@rgrdlaw.com
         Email:  cstewart@rgrdlaw.com
         Email:  lbrowne@rgrdlaw.com

         *Additional Plaintiff's Counsel*

         GOLDMAN SCARLATO & PENNY, P.C.
         PAUL J. SCARLATO (47155)
         BRIAN D. PENNY (86805)
         101 East Lancaster Avenue, Suite 204
         Wayne, PA  19087
         Telephone:  484/342-0700
         484/580-8729 (fax)
         Email:  scarlato@gskplaw.com
         Email:  penny@gskplaw.com

         *Liaison Counsel for the Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 24, 2015,  I caused the foregoing Memorandum of

Law In Support of Lead Counsel's Motion For An Award of Attorneys' Fees and Expenses to be

served electronically on all ECF participants. The following is the list of attorneys who are **not**

on the list to receive e-mail notices for this case (who therefore require manual noticing).

**Carole A. Broderick**
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA  19103-6365

<u>/s/ *Jonathan Gardner*</u>
Jonathan Gardner