IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| | : | |
| | : | |
| IN RE VIROPHARMA INC. | : | CIVIL ACTION |
| SECURITIES LITIGATION | : | NO. 12-2714 |
| | : | |
| | : | |

**Jones, II    J.**                                                          **January 25, 2016**

## MEMORANDUM

Presently before the Court is the unopposed Motion filed by Carpenters' Local 27 Benefit Trust Funds ("Lead Plaintiff") for Settlement, (Dkt No. 91), including a Memorandum of Law in Support thereof, (Dkt No. 91-1 [hereinafter Settlement Mot.]), and Lead Plaintiff's Motion for Attorneys' Fees and Expenses, (Dkt No. 92), and Memorandum of Law in Support thereof. (Dkt No. 92-1 [hereinafter Attorneys' Fees Mot.].) The Court heard oral argument on both Motions on December 17, 2015. For the following reasons, both Motions are GRANTED.

### I.      Background
#### a.  Underlying Claim

On May 17, 2012, Pete Castro filed the initial complaint in this Court. (Dkt No. 1.) On July 23, 2012, Mr. Castro moved for appointment as lead plaintiff and the appointment of Pomerantz Haudek Grossman & Gross LLP and Berger & Montague as co-lead counsel. (Dkt No. 17.) Also on July 23, 2012, Carpenters Local 27 Benefit Trust Funds moved to be appointed as Lead Plaintiff, with Labaton Sucharow LLP as Lead Counsel and Goldman Scarlato & Penny, P.C. as liaison counsel. (Dkt No. 20.) On August 8, 2012, Mr. Castro submitted his non-opposition to Carpenters' Local 27 Defined Benefit Trust Fund's Motion. (Dkt No. 22.) Carpenters' Local 27 Defined Benefit is a pension fund for active and retired members of Local 27, including more than 9,000 beneficiaries. (Carpenters' Local 27 Defined Benefit Trust Fund Declaration, Dkt No. 91, Ex. 1 [hereinafter Carpenters' Decl.] ¶ 1.) Pursuant to provisions of the

Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u-4, the Court appointed Carpenters' Local 27 Defined Benefit Fund as Lead Plaintiff in this action and approved its selection of Labaton Sucharow LLP as Lead Counsel. (Dkt No. 24.) Lead Counsel worked with liaison counsel Goldman Scarlato & Penny, P.C., and additional counsel Robbins Geller Rudman & Dowd LLP (collectively "Plaintiff's Counsel"). Defendants were represented by counsel from Morgan, Lewis & Bockius LLP (collectively "Defendants' Counsel").

On October 19, 2012, Lead Plaintiff filed its Amended Class Complaint against ViroPharma, Vincent J. Milano (Chief Executive Officer), Charles A. Rowland, Jr. (Chief Financial Officer), Thomas F. Doyle (Vice President Strategic Initiatives), and J. Peter Wolf (General Counsel) (collectively "Defendants") for violations of Section 10(b) and 20(a) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78a *et seq.*, due to Defendants' alleged misrepresentations to the market regarding Vancocin, an antibiotic drug indicated to treat *Clostridium Difficile* Associated Diarrhea ("CDAD"). (Dkt No. 35 [hereinafter AC]; Johnathan Gardner Declaration,[1] Dkt No. 91-2 [hereinafter Gardner Decl.] ¶¶ 13-14.)[2] This action was brought on behalf of investors who between December 14, 2011 and April 9, 2012, inclusive (the "Class Period"), acquired ViroPharma Securities[3] (collectively the "Settlement Class"). (AC ¶ 1.) Lead Plaintiff had purchased ViroPharma Securities during the Class Period. (AC ¶ 30.)

---

[1] Jonathan Gardner is a Member of Labaton Sucharow (Lead Counsel). His declaration was submitted pursuant to Fed. R. Civ. P. 23.

[2] To prepare the Amended Class Complaint, Lead Counsel conducted a pre-filing investigation that included interviewing 35 former ViroPharma employees, and contacting 73 additional potential witnesses. (Gardner Decl. ¶¶ 3, 24.) In addition, in preparing the Amended Class Complaint, Lead Counsel reviewed and analyzed documents filed by ViroPharma with the SEC, press releases, news articles, research reports by financial analysts, and other publications concerning Vancocin. (Gardner Decl. ¶ 24.) Lead Counsel also consulted with an expert regarding federal regulation of drug development. (Gardner Decl. ¶ 25.)

[3] "ViroPharma Securities" refers to ViroPharma's publicly traded common stock, its 2.0% Senior Convertible Notes due 2017, and its exchange-traded call and put options. (Gardner Decl. ¶ 13 n. 4; Notice at 11.)

Lead Plaintiff's Amended Complaint contained three counts. Counts I and II alleged violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. (AC ¶¶ 196-218.) Count III alleged violations of Section 20(a) of the Exchange Act. (AC ¶¶ 219-25.)

The Amended Complaint contained the following allegations. During the Class Period, Vancocin was the only drug approved by the Food and Drug Administration (the "FDA") to treat CDAD. (AC ¶ 2.) The patent for Vancocin expired in 1996. (AC ¶ 4.) However, generics were generally barred from entering the market because the FDA had a bioequivalence requirement requiring human testing. (AC ¶¶ 4, 42, 44-49.) Thus, ViroPharma had a virtual monopoly on the market for treating CDAD. (AC ¶ 2.) Moreover, during the Class Period, ViroPharma made an incredible 97% profit margin on its sales of Vancocin. (AC ¶ 3.) Vancocin represented over half of ViroPharma's 2011 revenues. (AC ¶¶ 3, 39.)

However, in 2006, the FDA changed its position regarding the proof necessary to establish bioequivalence, allowing for laboratory testing instead of testing on human subjects, thereby substantially lowering the barriers to entry for generics. (AC ¶¶ 5, 50-51, 65-66.) At the time, ViroPharma estimated that it could lose as much as 60-90% of the Vancocin market within months if generics were approved by the FDA. (AC ¶¶ 5, 43.) On March 17, 2006, ViroPharma filed a Citizen's Petition with the FDA requesting a stay of the FDA's action. (AC ¶¶ 6, 52-53.) In 2007, three competitor pharmaceutical companies submitted applications to the FDA for approval of generic versions of Vancocin. (AC ¶¶ 8, 55.) The pending Citizen's Petition blocked approval of generic Vancocin applications by ViroPharma's competitors until the Citizen's Petition was resolved. (AC ¶ 7.)

In 2008, Congress passed the QI Program Supplemental Funding Act of 2008 (the "QI Act"), Pub. L. 110-379, 122 Stat. 4075 § 3560, which permitted the FDA to grant an additional

three years of marketing exclusivity for "old antibiotics," such as Vancocin, under the Hatch-

Waxman Act, Pub. L. 98-417, 98 Stat. 1585, if the drug company could demonstrate that the "old

antibiotic" could be administered for a "new condition of use." (AC ¶¶ 9, 57-64.) ViroPharma,

submitted a supplemental New Drug Application ("sNDA") for a label change to the FDA which

attempted to show that Vaconcin had a new condition of use due to a study ViroPharma licensed

from Genzyme (the "Genzyme Study"). (AC ¶¶ 10-11, 68-70; Gardner Decl. ¶ 16.) ViroPharma

also amended its Citizen's Petition requesting three additional years of marketing exclusivity

under the QI Act. (AC ¶ 12.)

   In February 2011, the FDA rejected the sNDA. (AC ¶¶ 71, 75-77.) Along with the

rejection, the FDA allegedly sent a letter to ViroPharma explaining that the Genzyme Study

could not be used to compare Vancocin to what was studied in the Genzyme Study. (AC ¶ 76.) A

new efficacy claim must be supported by an adequate and well-controlled trial, pursuant to 21

C.F.R. § 314.126. Thus, argues Lead Plaintiff, as early as February 2011, Defendants knew that

their Citizen's Petition to have Vancocin affirmed for a new condition of use would fail, as the

FDA had warned ViroPharma that the Genzyme Study did not constitute an adequate and well-

controlled trial as to Vancocin's purported new condition of use. (AC ¶ 77.) Lead Plaintiff

further alleges that the FDA told ViroPharma again on May 20, 2011, and May 24, 2011 that the

Genzyme Study was not designed to show Vancocin's efficacy and that the Study could not be

used to support a claim for efficacy of a new condition of use. (AC ¶ 157.)

   ViroPharma amended the sNDA and resubmitted it in June 2011. (AC ¶ 71.) On

December 14, 2011, the FDA approved the sNDA and label change. (AC ¶¶ 72, 87.) Lead

Plaintiff alleges that in the letter approving the label change, the FDA explained that Vancocin's

new label did not support a finding of a new condition of use. (AC ¶¶ 88-90, 159.) Regardless,

4

Lead Plaintiff alleges, Defendant released a press release announcing that "[a]s a result of today's sNDA approval, ViroPharma believes Vancocin meets the requirements for, and thus has, three years of [marketing] exclusivity, and that generic vancomycin capsules will not be approved during this period." (AC ¶¶ 17-18, 91, 95-99.) ViroPharma's stock increased roughly seventeen percent (17%) on the day of the announcement. (AC ¶¶ 19, 100.) This date marks the beginning of the Class Period.

On December 22, 2011, ViroPharma filed a supplement to its Citizen's Petition. (AC ¶¶ 107-12.) The supplement stated that "Vancocin's labeling was fundamentally and extensively changed in the new sNDA with numerous new conditions of use." (AC ¶ 110.) On January 5, 2012, ViroPharma issued a press release stating that "as a result of our sNDA approval, we believe Vancocin…meets the requirements for, and thus has, three years of exclusivity and that generic vancomycin capsules will not be approved during this period…" (AC ¶ 113.) On January 11, 2012, Mr. Milano made a presentation at the J.P. Morgan Global Healthcare Conference where he stated "we believe we've gotten three years of exclusivity by taking advantage of the legislation that provides all the antibiotics three years of exclusivity, if you can update the label with meaning safety and efficacy data, which we did through the licensing of data from a study that Genzyme had done…" (AC ¶ 118.) On February 28, 2012, ViroPharma issued a press release announcing their 2011 year-end results, announcing "the approval of our Vancocin sNDA leading to modernized labeling and, we believe, three years of exclusivity." (AC ¶ 125.) On February 28, 2012, Mr. Milano stated that ViroPharma "received the sNDA approval for Vancocin, which we believe merits three years of additional exclusivity." (AC ¶ 128.) That same day, ViroPharma submitted its Annual Report on Form 10-K with the Securities and Exchange Commission (the "SEC") and included similar statements about ViroPharma's belief that

Vancocin would retain its marketing exclusivity. (AC ¶ 131.) In total, Lead Plaintiff alleges that Defendants made at least eight material misrepresentations and omissions in press releases, SEC filings, conference calls, public statements, and letters. (AC ¶¶ 75-96, 98-99, 110-11, 113-15, 118-20, 122, 125-26, 128, 132-33.) Lead Plaintiff alleges that all of these statements were false and misleading because ViroPharma knew that the FDA would not approve Vancocin for a new condition of use solely on the basis of the Genzyme Study.

On April 9, 2012, the FDA denied ViroPharma's Citizen's Petition, which terminated ViroPharma's market exclusivity over Vancocin. (AC ¶¶ 22, 92, 134; Gardner ¶ 20.) In its denial letter, the FDA wrote that ViroPharma's failure to conduct an assessment of the safety and effectiveness of the product for the claimed new condition of use in pediatric patients, as required by the Pediatric Research Equity Act, clearly showed that ViroPharma "did not believe [its] labeling changes constituted a new indication…" (AC ¶ 93.) That same day, the FDA approved three generic versions of Vancocin produced by ViroPharma competitors. (AC ¶ 94.) ViroPharma shares declined by roughly twenty two percent (22%). (AC ¶¶ 22-23, 147.) This date marks the end of the Class Period.

### b. Procedural History

On December 20, 2012, Defendant filed a Motion to Dismiss. (Dkt No. 41.) Following extensive briefing and oral argument, the Court denied the Motion to Dismiss. (Dkt Nos. 60, 61.) On July 15, 2014, Defendants answered the Amended Complaint. (Dkt No. 72.) Following another period of extensive briefing, on September 5, 2014, the Court denied Defendants' request for certification for interlocutory appeal of the Court's denial of the Motion to Dismiss. (Dkt No. 78.)

At the Federal Rule of Civil Procedure 16 conference, the parties requested mediation. The parties conducted expedited discovery in preparation for mediation. (Gardner Decl. ¶ 3.)

During this process, Lead Counsel reviewed almost five thousand documents (totaling over 39,000 pages). (Gardner Decl. ¶¶ 3, 35-39.) Lead Counsel served document subpoenas on the FDA and ANI Pharmaceuticals, Inc. ("ANI"), the current owner of Vancocin. (Gardner Decl. ¶ 40.) Lead Counsel reviewed thousands of pages of documents produced in response to these subpoenas. (Gardner Decl. ¶ 40.) In response to a subpoena form ANI, Lead Counsel produced roughly 3,500 pages. (Gardner Decl. ¶ 41.) Lead Counsel also hired Forensic Economics, Inc. to conduct an expert analysis of the damages at issue in the case. (Gardner Decl. ¶¶ 42-43.) Finally, prior to the mediation, Lead Counsel also consulted a regulatory expert, David B. Ross, M.D., Ph.D. (Gardner Decl. ¶¶ 44-45.) Dr. Ross was responsible for regulatory oversight of Vancocin at the FDA from 1996-2004. (Gardner Decl. ¶ 44.)

On January 5, 2015, all parties participated in an arm's-length mediation session facilitated by the Honorable Layn R. Phillips, United States District Court Judge (Ret.). (Gardner Decl. ¶¶ 5, 60-61.) Between January 5, 2015 and February 5, 2015, the parties continued to participate in mediation communications with Judge Phillips's assistance. (Gardner Decl. ¶¶ 60-61.) On February 5, 2015, the parties reached an agreement to settle the dispute. (Settlement Agreement, Dkt No. 87-3 [hereinafter SA]; Gardner Decl. ¶ 63.)

### c.  The Settlement Agreement

On April 29, 2015, Lead Plaintiff filed an Unopposed Motion for Preliminary Approval of Settlement and Approval of Notice to the Settlement Class, (Dkt No. 87), which the Court granted on May 7, 2015. (Dkt No. 88.) Pursuant to that Order, members of the Settlement Class received Notice of the terms of the Settlement (the "Notice"). (Dkt No. 91, Ex. 3-A [hereinafter Notice].) No members of the Settlement Class filed objections.

On September 24, 2015, Lead Plaintiff filed an Unopposed Motion for Settlement, (Dkt No. 91), and Memorandum of Law in support thereof. (Settlement Mot.) On October 22, 2015, Lead Plaintiff filed an Unopposed Response in Support of the Motion. (Resp.)

Defendants admit no wrongdoing. (SA at 4 ¶ O, 32-33 ¶¶ 47-48.) While admitting no underlying liability, Defendants executed the Settlement Agreement after concluding "that continuation of the Action would be protracted and expensive, and [that they] have taken into account the uncertainty and risks inherent in any litigation, especially a complex case like this Action, and believe that the Settlement set forth in this Settlement Agreement is in their best interests." (SA at 4 ¶ O.)

Similarly, while maintaining that their claims are meritorious and supported by evidence, Lead Plaintiff executed the Settlement Agreement because they "are mindful of the inherent problems of proof and the possible defenses to the claims alleged in the Action," and, therefore, "believe that the Settlement set forth in this Settlement Agreement confers substantial monetary benefits upon the Settlement Class and is in the best interest of the Settlement Class." (SA at 4 ¶ N.)

The Settlement Agreement has three main points. First, the parties agree to certification of the following class for the purposes of settlement only:

> [A]ll Persons that purchased or otherwise acquired ViroPharma Securities between December 14, 2011 and April 9, 2012, inclusive, and were damaged thereby.

(SA at 12 ¶ 1mm, 15 ¶ 3.)[4] The parties further agreed to the certification of the Lead Plaintiff as Class Representative for the Settlement Class and the appointment of Lead Counsel as Class Counsel for the Settlement Class. (SA at 15 ¶ 3.)

---

[4] The Settlement Agreement clarifies that the following persons are excluded from the Settlement Class: "Defendants; the Company's officers, directors, and employees during the Class Period; the Company's successors, and assigns; any person, entity, firm, trust, corporation or other entity related to, affiliated with, or controlled by any of the Defendants, as well as the Immediate Families of the Individual

Second, Lead Plaintiff and every member of the Settlement Class agreed to release all claims against settling Defendants and dismiss such claims with prejudice. (SA at 15 ¶¶ 4-5.)

Third, the parties agreed to a settlement amount of eight million dollars ($8,000,000.00) in cash, to be placed in a Settlement Fund. (SA at 12 ¶ 1ll, 16 ¶ 6.) This represents an average recovery before reduction for litigation fees and expenses of approximately $0.49 per allegedly damaged common share and approximately $2.13 per allegedly damaged note. (Notice at 2.) After deducting attorneys' fees and expenses, notice and relevant administration costs, banking fees, and applicable taxes, the balance will go to the members of the Settlement Class (the "Net Settlement Fund"). (SA at 17 ¶ 9.) After expected deductions, this recovery reflects approximately $0.33 per share and $1.42 per note. (Notice at 2.) A clear process is outlined for how putative class members can become "Authorized Claimants" in the "Plan of Allocation." (SA at 24-26 ¶ 30.)

## II.    Notice

Notice to members of a putative class action pending settlement must be directed in a "reasonable manner to all class members who would be bound by the proposal, Fed. R. Civ. P. 23(e)(1)," and be "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). Class members must "have certain due process protections in order to be bound by a class settlement agreement." *In re Diet Drugs Prods. Liab. Litig.*, 431 F.3d 141, 145 (3d Cir. 2005) ("*Diet Drugs*").

In the Court's Preliminary Approval Order, the Court appointed the Garden City Group, LLC as Claims Administrator. (Dkt No. 88.) The Claims Administrator was instructed to

Defendants. Also excluded from the Settlement Class are those Persons who submit valid and timely requests for exclusion from the Settlement Class in accordance with the requirements set forth in the Notice." (SA at "Certain Definitions" ¶ 1mm.)

disseminate copies of the Notice of Pendency of Class Action and Proposed Settlement and

Motion for Attorneys' Fees and Expenses and the Proof of Claim. (Dkt No. 88; Dkt No. 91, Ex.

3 [hereinafter Mailing Decl.].) The Notice contained information about (1) the nature and

procedural history of the case, (2) the material terms of the Settlement, including (a) the recovery

under the Settlement, (b) the Plan of Allocation, (c) a description of the claims that will be

released in the Settlement; (d) explanation of the right and the mechanism by which Settlement

Class members could exclude themselves from the Settlement; (e) the Fee Application; (f) and an

explanation of the right and the mechanism by which Settlement Class members could object to

the Settlement, the Plan of Allocation, and/or the Fee Application. (Notice.) The Notice

explained that someone would be an Authorized Claimant if he or she purchased or otherwise

acquired ViroPharma Securities during the Class Period. (Notice at 3, 5.) The following actions

were taken to provide the Notice to the Settlement Class:

> (1) 18,618 copies of the Notice were mailed to potential Settlement Class members and
> their nominees;

> (2) a summary of the Notice was published in *Investor's Business Daily* on June 3, 2015;

> (3) a summary of the Notice was published over the *PR Newswire* on June 5, 2015;

> (4) the Notice, the Proof of Claim form, the Settlement Agreement and its exhibits, and
> the Preliminary Approval Order were all posted on a case-specific website identified
> in the Notice;

> (5) relevant Settlement documents were posted on Lead Counsel's firm website.

(Mailing Decl. ¶¶ 3-8; Gardner Decl. ¶¶ 64-69.) To date, no objections have been filed.

The Court finds that the Notice met the requirements of Federal Rule of Civil Procedure

23. *See, e.g.*, *Zimmer Paper Prods., Inc. v. Berger & Montague, P.C.*, 758 F.2d 86, 91 (3d Cir.

1985). ("[F]irst-class mail and publication regularly have been deemed adequate under the

stricter notice requirements...of Rule 23(c)(2).").

III.     **Class Certification**

a.   **Legal Standard**

The Court is permitted to certify a class for settlement purposes only so long as the Court

finds that the Settlement Class satisfies the Federal Rule of Civil Procedure 23 requirements. *In*

*re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 778 (3d Cir.

1995) ("*GMC*"). Plaintiffs must satisfy the four prerequisites of Federal Rule of Civil Procedure

23(a):

> One or more members of a class may sue or be sued as representative parties on behalf of
> all members only if:
>
> > (1) the class is so numerous that joinder of all members is impracticable;
> >
> > (2) there are questions of law or fact common to the class;
> >
> > (3) the claims or defenses of the representative parties are typical of the claims or
> > defenses of the class; and
> >
> > (4) the representative parties will fairly and adequately protect the interests of the
> > class.

Fed. R. Civ. P. 23(a). If the prerequisites of Rule 23(a) are met, plaintiffs then must prove that

"the action is maintainable under Rule 23(b)(1), (2), or (3)." *Amchem Prods., Inc. v. Windsor*,

521 U.S. 591, 614 (1997). Under Rule 23(b)(3), class certification "is permissible when the court

'finds that the questions of law or fact common to class members predominate over any

questions affecting only individual members, and that a class action is superior to other available

methods for fairly and efficiently adjudicating the controversy.'" *In re Hydrogen Peroxide*, 552

F.3d 305, 310 (3d Cir. 2008) ("*Hydrogen Peroxide*") (quoting Fed. R. Civ. P. 23(b)(3)). The two

requirements of Rule 23(b)(3) are commonly referred to as "predominance" and "superiority."

*Hydrogen Peroxide*, 552 F.3d at 310.

"The requirements set out in Rule 23 are not mere pleading rules." *Id.* at 311. A request

for class certification "may be [granted] only if the court is "satisfied, after a rigorous analysis,

that the prerequisites of Rule 23(a) have been satisfied." *Beck v. Maximus, Inc.*, 457 F.3d 291, 297 (3d Cir. 2006) (quoting *General Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 161 (1982) (internal quotations omitted)). A court must "assess all of the relevant evidence admitted at the class certification stage." *In re Constar Int'l Inc. Sec. Litig.*, 585 F.3d 774, 779 (3d Cir. 2009) (quoting *Hydrogen Peroxide*, 552 F.3d at 317, 323) (internal quotations omitted)).

### b.  Rule 23(a) Factors

#### i.  Numerosity

The Court must find that the class is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1); *see generally In re Prudential Ins. Co. Amer. Sales Practices Litig.*, 148 F.3d 283, 309 (3d Cir. 1998) ("*Prudential*"). Although no minimum number is required to maintain a class action suit, the Third Circuit has held that "classes in excess of forty members" will generally satisfy the numerosity requirement. *Vista Healthplan, Inc. v. Cephalon, Inc.*, 2015 WL 3623005, at *13 (E.D. Pa. 2015); *see also Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001)).

During the Class Period, there were approximately seventy million shares of issued and outstanding ViroPharma Securities. (AC ¶ 172.) Notice was mailed to 18,618 potential Settlement Class members and their nominees. (Mailing Decl. ¶¶ 3-6.) The Court finds that the Settlement Class is sufficiently numerous.

#### ii.  Commonality

To find commonality, Lead Plaintiff must "share at least one question of fact or law with the grievances of the prospective class." *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994). "A finding of commonality does not require that all class members share identical claims." *Prudential*, 148 F.3d at 310.

Common questions dominate the Class, including whether Defendants' statements to the investing public during the Class Period caused the price of ViroPharma's securities during the Class Period to artificially inflate. The Court finds that the putative class shares commonality.

### iii. Typicality

"Rule 23(a)(3) requires that the claims or defenses of the representative parties be typical of the claims or defenses of the class." *Weiss v. York Hosp.*, 745 F.2d 786, 809 (3d Cir. 1984). "The heart of this requirement is that the plaintiff and each member of the represented group have an interest in prevailing on similar legal claims." *Seidman v. Am. Mobile Sys., Inc.*, 157 F.R.D 354, 360 (E.D. Pa. 1994). "[C]ases challenging the same unlawful conduct which affects both the named plaintiffs and the putative class usually satisfy the typicality requirement irrespective of the varying fact patterns underlying the individual claims." *Baby Neal*, 43 F.3d at 58; *see also In re Cmty. Bank of N. Va.*, 418 F.3d 277, 303 (3d Cir. 2005).

Lead Plaintiff's claims are typical of the claims of the members of the Class. Lead Plaintiff and all Settlement Class members allege violations of the federal securities laws stemming from Defendants' same course of conduct.

### iv. Adequacy of Representation

Adequacy of representation is met by a two-fold showing: "that (1) class counsel is competent and qualified to conduct the litigation; and (2) class representatives have no conflicts of interests." *Hawk Valley, Inc. v. Taylor*, 301 F.R.D. 169, 183 (E.D. Pa. 2014) (citing *New Directions Treatment Services v. City of Reading*, 490 F.3d 293, 313 (3d Cir. 2007)).

Both are met here. First, Plaintiff's Counsel was appointed precisely because of their expertise and ability to represent the class in this matter. (*See, e.g.*, Labaton Sacharow LLP Firm Resume, Securities Class Action Litigation, Dkt No. 91, Ex. 4-A [hereinafter Labaton Resume]; Goldman Scarlato & Penny, P.C. Firm Resume, Dkt No. 91, Ex. 5-A [hereinafter Goldman

Resume]; Robbins Gellar Rudman & Dowd LLP Firm Resume, Dkt No. 91, Ex. 6-A [hereinafter Robbins Resume].) Second, no conflicts of interests have been identified between either Lead Plaintiff and the Settlement Class members, or Lead Counsel and the Settlement Class members. Finally, Notice was sent to 18,000 prospective Settlement Class members and nominees and no Settlement Class member has filed an objection to Lead Counsel, or the amount that they seek in their fee petition.

### c.   Rule 23(b)(3) Factors

The parties seek certification of the class under Rule 23(b)(3), which requires common questions of law or fact to predominate over individual questions, and that the class action structure is the superior method of litigating the claims.

### i.   Predominance

The predominance factor is "readily met" in many securities fraud actions. *Amchem Prods., Inc.*, 521 U.S. at 625. The central issues for Lead Plaintiff and for the putative class members are whether or not Defendants' statements to investors during the Class Period violated securities law, and whether such violations artificially inflated the cost of ViroPharma Securities during the Class Period. The only issues that would be distinct for Lead Plaintiff and each Settlement Class member would be the amount of damages owed. However, "[a]lthough individual damage claims will differ depending on when and what type of stock was acquired, these issues cast no doubt on the finding of predominance." *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 178 (E.D. Pa. 2000) ("*Ikon*") (citing *Eisenberg v. Gagnon*, 766 F.2d 770, 786 (3d Cir. 1985) and *In re Data Access Sys. Sec. Litig.*, 103 F.R.D. 130, 138-40, 42 (D.N.J. 1984)). The Court finds predominance.

### ii. Superiority

Under the superiority factor analysis, the Court considers "the class members' interest in individually controlling the prosecution or defense of separate actions...the desirability...or concentrating the litigations of the claims in the particular forum," whether there is already any litigation filed by class members, and any difficulties in managing the class action. Fed. R. Civ. P. 23(b)(3). Class certification is the superior way to manage a case with this many Settlement Class members, all complaining of the same behavior by Defendants. The alternative would produce individual suits throughout the country, redundantly wasting judicial resources to litigate the same claims over and over.

### d. Conclusion

The Court grants Lead Plaintiff's Motion to certify the class for the purposes of Settlement.

### IV. Settlement

A federal class action may be settled only with the approval of a court. Fed. R. Civ. P. 23(e). "[T]he district court acts as a fiduciary who must serve as a guardian of the rights of absent class members." *GMC*, 55 F.3d at 785 (quoting *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 123 (8th Cir. 1975) (internal quotations omitted)).

### a. The Court finds that the Settlement deserves an initial presumption of fairness.

The Court may apply an "initial presumption of fairness when the Court finds that: (1) the negotiations occurred at arm's-length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." *Id.*; *see also In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004) ("*Warfarin*"); *In re Cendant Corp. Litig.*, 264 F.3d 201, 232 n. 18 (3d Cir. 2001) ("*Cendant*").

First, the parties negotiated the Settlement at arm's-length, with the assistance of an experienced

mediator, Judge Phillips. (Gardner Decl. ¶¶ 60-62.) "[T]he participation of an independent mediator in settlement negotiations virtually insures [*sic*] that the negotiations were conducted at arm's length and without collusion between the parties." *Hall v. AT&T Mobility LLC*, 2010 WL 4053547, at *7 (D.N.J. 2010) (quoting *Bert v. AK Steel Corp.*, 2008 WL 4693747) (internal quotations omitted)). Second, substantial expedited discovery occurred. (Gardner Decl. ¶¶ 3, 35-39.)  Third, as discussed in greater detail *supra* in the Court's analysis of the class certification requirement for adequacy of representation, Plaintiff's Counsel are experienced with securities litigation class actions. (*See, e.g.*, Labaton Resume; Goldman Resume; Robbins Resume.) Fourth, no member of the Settlement Class objected. (Gardner Decl. ¶¶ 3, 5, 35-45, 60-62.) The Court finds that an initial presumption of fairness applies to the Settlement.

### b. The Settlement is fair, adequate and reasonable under the *Girsh* factors and the *Prudential* considerations.

"The decision of whether to approve a proposed settlement of a class action is left to the sound discretion of the district court." *Girsh v. Jepson,* 521 F.2d 153, 156 (3d Cir.1975). District courts must conduct independent analysis into the settlement to ensure its fairness. Final approval of a class action settlement requires the district court to determine whether "the settlement is fair, adequate, and reasonable." *Stoetzner v. U.S. Steel Corp.,* 897 F.2d 115,118 (3d Cir. 1990) (*quoting Walsh v. Great Atlantic & Pacific Tea Co., Inc.,* 726 F.2d 956, 965 (3d Cir. 1983) (internal quotations omitted)); *see also Cendant,* 264 F.3d at 231. Even where there is a presumption of fairness, the Third Circuit advises courts to consider the following factors (the "*Girsh* factors") in deciding whether to approve a settlement of a class action under Rule 23(e), including:

(1) the complexity, expense and likely duration of the litigation;

(2) the reaction of the class to the settlement;

(3) the stage of the proceedings and the amount of the discovery completed;

(4) the risks of establishing liability;

(5) the risks of establishing damages;

(6) the risks of maintaining the class action through trial;

(7) the ability of the defendants to withstand a greater judgment;

(8) the range of reasonableness of the settlement fund in light of the best possible recovery; and

(9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Girsh*, 521 F.2d at 157 (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974)). The Circuit also advises the Court to address the following considerations (the "*Prudential* considerations"):

> the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other facts that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved—or likely to be achieved—for other claimants; whether class or subclass members are accorded the right to opt out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable.

*Prudential*, 148 F.3d at 323. District courts "must make findings as to each of the *Girsh* factors, and the *Prudential* factors where appropriate" in an "independent analysis of the settlement terms." *In re Pet Foods Prods. Liab. Litig.*, 629 F.3d 333, 350-51 (3d Cir. 2010). Finally, the Circuit advises district courts to conduct "a thorough analysis of settlement terms" to determine "the degree of direct benefit provided to the class," including whether "the number of individual awards compared to both the number of claims and the estimated number of class members, the size of the individual awards compared to claimants' estimated damages, and the claims process used to determine individual awards." *In re Baby Products Antitrust Litig.*, 708 F.3d 163, 174 (3d Cir. 2013).

### i.  The *Girsh* factors

#### 1.  Complexity, expense and likely duration of litigation

This factor is intended to capture "the probable costs, in both time and money, of continued litigation." *GMC*, 55 F.3d at 812 (internal citations omitted). Settlement was roughly two and half years after the case was first filed. As of this date, the case has been ongoing for almost four years. In total, Plaintiff's Counsel invested 4,517.25 hours of time to this case. (Gardner Decl. ¶¶ 11, 83.) As described in greater detail *infra*, under the Court's lodestar analysis, such work would cost $2,660,617.50 in attorneys' fees, with an additional $155,197.23 in expenses. (Gardner Decl. ¶¶ 83-92.) If this case were to continue, through motions for class certification, summary judgment, trial, and appeals, that number would grow many millions greater.

If this case were to proceed to trial, it would likely take years. The projected length of the case arises from the complexity of the case. In order for the Settlement Class to succeed at trial, they would likely have to show that Defendants knowingly made materially false and misleading statements to the market that omitted material information that the FDA had told Defendants regarding the success of their Citizen's Petition. They would then have to show that ViroPharma Securities traded at artificially inflated prices during the Class Period due to Defendants' material omissions. This is a complicated matter necessarily requiring extensive briefing.

By way of example, Defendants' Motion to Dismiss took nearly seventeen months to resolve. The Court heard oral argument, and the parties submitted supplemental memoranda of law. Like the Motion to Dismiss, for any motions for class certification or summary judgment, the Court would expect that oral argument and an extensive briefing schedule would be required. Moreover, both a motion for class certification and a motion for summary judgment would be heavily reliant on experts; leading to potential *Daubert* challenges and battles between

competing expert reports. Given the length of time to resolve the arguably simpler Motion to Dismiss, the projected schedule for resolution of class certification and summary judgment would require a significant number of months.

Further, if the Court were to grant the class certification motion, Defendants would likely seek reconsideration or seek permission to appeal the class certification decision. Even after resolving class certification, and summary judgment, trial would be another massive undertaking. "This is partly due to the inherently complicated nature of large class actions alleging securities fraud: there are literally thousands of shareholders, and any trial on these claims would rely heavily on the development of a paper trial [*sic*] through numerous public and private documents." *Ikon*, 194 F.R.D. at 179.

When considering the class certification process, interlocutory appeal of the class certification, summary judgment motion practice, trial, post-trial motions, and the likely appeal of the trial by the losing party, this matter could take years to resolve. This factor weighs heavily in favor of approving the Settlement.

### 2.   The reaction of the class to the settlement

No member of the class has filed any objections to the Settlement. In addition, no member of the Settlement Class opted out. Lead Plaintiff supports the Settlement. (Carpenters' Decl. ¶ 5.) The fact that no one objected weighs heavily in favor of Settlement.

### 3.   The stage of the proceedings and the amount of the discovery completed

Under the third factor, the Court considers "the degree to which the litigation has developed prior to settlement." *In re Rent-Way*, 305 F.Supp.2d 491, 502 (W.D. Pa. 2003). The Court determines "whether counsel had an adequate appreciation of the merits of the case before negotiating." *GMC*, 55 F.3d at 813. "This factor captures the degree of case development that class counsel have accomplished prior to settlement. Through this lens, courts can determine

whether counsel had an adequate appreciation of the merits of the case before negotiating."
*Cendant*, 264 F.3d at 235.

This case reached Settlement after the parties fully briefed Defendants' Motion to Dismiss, and after expedited discovery. There was extensive briefing regarding the Motion to Dismiss. (Gardner Decl. ¶¶ 27-30.) Further, extensive briefing followed a motion for certification of interlocutory appeal. (Gardner Decl. ¶¶ 32-33.) This briefing procedure allowed the parties to grapple with the relative strengths and weaknesses of their positions.

Further, the parties met and conferred multiple times pursuant to Federal Rule of Civil Procedure 26(f). (Gardner Decl. ¶¶ 34-35.) The parties also proposed a confidentiality agreement and a proposed Federal Rule of Evidence 502(d) Order. (Gardner Decl. ¶ 34.) During expedited discovery in preparation for mediation, Defendants produced approximately five thousand core documents. (Gardner Decl. ¶¶ 3, 36-39.) Lead Counsel served document subpoenas on the FDA and ANI, and reviewed thousands of pages of documents produced in response to these subpoenas. (Gardner Decl. ¶¶ 40-41.) In response to a subpoena from ANI, Lead Counsel produced roughly 3,500 pages. (Gardner Decl. ¶ 41.) Lead Counsel also hired Forensic Economics, Inc. to conduct an expert analysis of the damages at issue in the case. (Gardner Decl. ¶¶ 42-43.) Finally, prior to the mediation, Lead Counsel also consulted a regulatory expert. (Gardner Decl. ¶¶ 44-45.)

The case settled following this expedited discovery process. Thus, the case settled prior to the class certification stage, prior to any motions for summary judgment, and even prior to full discovery. However, though expedited, the discovery was merits-based. (Gardner Decl. ¶ 40.) The parties produced a substantial amount of discovery. (Gardner Decl. ¶ 40.)

In short, the Court finds that this case settled at a time in which Lead Plaintiff, and Lead Counsel, had developed a significant appreciation for the merits of the case. They had fully briefed the main issues in the case and conducted merits-based expedited discovery. *Cf. Cendant*, 264 F.3d at 236 (affirming settlement where "Lead Counsel mainly engaged in only informal discovery"). Lead Plaintiff has accumulated sufficient information and understanding to negotiate the Settlement.

Moreover, when the settlement results from arm's-length negotiations, the Court "affords considerable weight to the views of experienced counsel regarding the merits of the settlement." *McAlarnen v. Swift Transp. Co., Inc.*, 2010 WL 365823, at *8 (E.D. Pa. 2010); *see also In re General Instrument Sec. Litig.*, 209 F.Supp.2d 423, 430 (E.D. Pa. 2001) ("*General Instrument*") ("Significant weight should be attributed to the belief of experienced counsel that the settlement is in the best interests of the class."). This case settled after an arm's-length negotiation mediated by Judge Phillips.

In conclusion, both in deference to Plaintiff's Counsel's support of the Settlement, and upon the Court's independent review that Lead Plaintiff was in an appropriate stance to evaluate the relative merits of the claims, the Court finds that this factor weighs in favor of approving the Settlement.

### 4.  The risks of establishing liability and damages.

"By evaluating the risks of establishing liability, the district court can examine what the potential rewards (or downside) of litigation might have been had class counsel elected to litigate the claims rather than settle them." *GMC*, 55 F.3d at 814. Class action securities litigation cases are notoriously difficult cases to prove. *See, e.g.*, *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 235 (5th Cir. 2009) ("To be successful, a securities class-action plaintiff must

thread the eye of a needle made smaller and smaller over the years by judicial decree and congressional action.").

Section 10(b) of the Exchange Act makes it unlawful for any person, through the use of "any means of interstate commerce, the mails, or any national securities exchange, to employ…any manipulative or deceptive devise or contrivance in contravention of rules" promulgated by the SEC. 15 U.S.C. § 78j. Rule 10b-5 prohibits the making of "any untrue statement of a material fact" or the omission of "a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading" connected to the purchase or sale of securities. 17 C.F.R. § 240.10B-5 (1951). Lead Plaintiff's allegations concern omissions of material fact. To state a claim for omissions under Section 10(b) of the Exchange Act and Rule 10b-5, a plaintiff must allege: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005) (internal citations omitted); *see also In re Merck & Co. Sec. Litig.*, 432 F.3d 261, 268 (3d Cir. 2005) ("[A] plaintiff must show that (1) the defendant made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading; (2) the defendant acted with scienter; and (3) the plaintiff's reliance on the defendant's misstatement caused him or her injury.") (internal quotations omitted).

Section 20(a) provides that:

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t. Section 20(a) is a derivative cause of action, predicated upon § 10(b) liability.

Liability in this type of case will be difficult to prove. The Court notes that two aspects of this case would be particularly difficult to prove: (1) scienter and (2) loss causation. First, proving that Defendants acted with knowledge or recklessness[5] as to the alleged falsity of their omissions would present difficulties. "Since stockholders normally have 'little more than circumstantial and accretive evidence to establish the requisite scienter,' proving scienter is an 'uncertain and difficult necessity for plaintiffs.'" *Smith v. Dominion Bridge Corp.*, 2007 WL 1101272, at *5 (E.D. Pa. 2007) (quoting *General Instrument*, 209 F.Supp.2d at 430). One of Lead Plaintiff's strongest arguments would be that Defendants Doyle and Rowland sold some of their ViroPharma Securities during the Class Period. (Gardner Decl. ¶ 49.) However, as Lead Plaintiff admits, Defendants Doyle and Rowland also retained significant ViroPharma Securities. (Gardner Decl. ¶ 49.) Moreover, Defendants Milano and Wolf did not sell stock during the Class Period. (Gardner Decl. ¶ 49.) Further, internal communications from the Class Period could show that the Defendants genuinely believed that they would succeed in netting three additional years of marketing exclusivity for Vancocin. (Gardner Decl. ¶ 50.)

In addition, scienter could likely only be shown by proving that the communications from the FDA to ViroPharma disclosed the FDA's clear intent to reject Defendants' Citizen's Petition. Lead Plaintiff correctly theorizes that Defendants would have had strong defenses regarding whether these communications in fact showed the FDA's intent given that the FDA's interim communications are not binding as agency actions and the FDA's own documents from that time may have showed that they had not yet decided the Citizen's Petition. (Gardner Decl. ¶ 40.)

---

[5] Actual knowledge, rather than recklessness, would be required if the Court determined that the safe harbor provisions of the PSLRA were triggered. 15 U.S.C. § 78U-5(c).

Overall, the Court agrees with Lead Plaintiff that proving scienter would be a risky proposition. (Gardner Decl. ¶¶ 48-55.)

Second, proving loss causation and damages would be equally difficult. Lead Plaintiff would need to show that Defendants' omissions caused the drop in the ViroPharma Securities' prices following the corrective disclosure. Such proof would necessitate a battle of the experts. Lead Plaintiff would be permitted to present expert testimony on their theory of loss causation, and Defendants would be permitted to submit a rebuttal expert report arguing that the omissions had no impact on the value of ViroPharma Securities. *See, e.g.*, *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S.Ct. 2398, 2425 n. 8 (2014). Of note, Lead Plaintiff points the Court to the fact that at the end of the Class Period, ViroPharma promulgated three separate disclosures pertaining to Vancocin, only one of which allegedly contained material misstatements or omissions. (Gardner Decl. ¶ 57.) As such, to prove causation, Lead Plaintiff would need to show that the fraudulent disclosure was the cause of the drop in stock price, not the information contained in the non-fraudulent disclosures released around the same time. (Gardner Decl. ¶ 57.)

Further, this issue of causation directly impacts the difficulty in proving damages. "The conflicting damage theories of defendants and plaintiffs would likely have resulted in an expensive battle of the experts and it is impossible to predict how a jury would have responded." *In re Corel Corp. Inc. Sec. Litig.*, 293 F.Supp.2d 484, 492 (E.D. Pa. 2003).

Lead Plaintiff and Lead Counsel considered such issues and determined that the Settlement was in the best interest of the Settlement Class. (Gardner Decl. ¶¶ 8-9.) The Court agrees. This factor weighs heavily in favor of the Settlement.

### 5.   The risks of maintaining the class action through trial.

With any class action, the Court may decertify or modify the class during the litigation should the class prove unmanageable. Fed. R. Civ. P. 23(c)(1). Even if the Court certified the

class, there is always a risk that the class would be modified or decertified. However, there is nothing specific to the record to suggest that a putative certification of the Settlement Class would be particularly vulnerable to decertification. As such, this factor weighs neither in favor nor against approving the Settlement.

### 6.   The ability of the defendants to withstand a greater judgment.

The Court must consider whether the Defendants "could withstand a judgment for an amount significantly greater than the Settlement." *Cendant*, 264 F.3d at 240. This factor is not alone dispositive. "[I]n any class action against a large corporation, the defendant entity is likely to be able to withstand a more substantial judgment, and, against the weight of the remaining factors, this fact alone does not undermine the reasonableness of the instant settlement." *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 323 (3d Cir. 2011). In this case, the Court finds that Defendants could likely pay more; however, this factor is not dispositive.

### 7.   The range of reasonableness of the settlement fund in light of the best possible recovery and in light of the attendant risks of litigation.

The last two factors analyze "the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing...compared with the amount of the proposed settlement." *Prudential*, 148 F.3d at 322 (quoting *GMC*, 55 F.3d at 806)). These factors ask "whether the settlement represents a good value for a weak case or a poor value for a strong case." *Warfarin*, 391 F.3d at 538. "The touchstone of this examination is the 'economic valuation of the proposed Settlement.'" *Erie County Retirees Ass'n*, 192 F.Supp.2d 369, 376 (W.D. Pa. 2002) (quoting *In re Safety Components, Inc. Sec. Litig.*, 166 F.Supp.2d 72, 92 (D.N.J. 2001)). However, there is no specific formula, threshold, or equation that a Court must use to determine whether a settlement amount is reasonable. Even a settlement

that is only a "fraction of the potential recovery" can be deemed appropriate. *In re Sunrise Sec. Litig.*, 131 F.R.D. 450, 457 n. 13 (E.D. Pa. 1990).

The proposed Settlement is reasonable considering the best possible recovery for the Settlement Class and the risks of further litigation. The Settlement is reasonable both in contrast to other settlements of its ilk, and to the maximum potential recovery in this case. First, the Settlement is larger than the median reported settlement amount of $6-6.5 million in 2014. *Compare* Renzo Comolli & Svetlana Starykh, Recent Trends in Securities Class Action Litigation: 2014 Full-Year Review [hereinafter NERA Rpt], NERA Economic Research Associates, Inc., 28 (Jan. 20 2015), *available at* http://www.nera.com/content/dam/nera/publications/2015/PUB_2014_Trends_0115.pdf (reporting $6.5 million as the median) *with* Laarni T. Bulan, Ellen M. Ryan & Laura E. Simmons, Securities Class Action Settlements: 2014 Review and Analysis [hereinafter Cornerstone Rpt], Cornerstone Research, at 6 (2015), *available at* https://www.cornerstone.com/GetAttachment/701f936e-ab1d-425b-8304-8a3e063abae8/Securities-Class-Action-Settlements-2014-Review-and-Analysis.pdf (reporting $6.0 million as the median).[6]

Second, the Settlement is a healthy percentage of the total possible recovery. Lead Plaintiff retained an expert to analyze the alleged damages. (Gardner Decl. ¶ 6.) Lead Plaintiff's expert estimated that the Settlement Class sustained damages ranging from approximately $78.5 million (representing the one-day drop following the corrective disclosure) to $90 million (representing the two-day drop following the corrective disclosure). (Gardner Decl. ¶ 6.) Thus,

---

[6] The NERA and Cornerstone Research studies provide the Court with comprehensive reporting on nationwide trends in securities class actions. *C.f. In re Omnivision Techs, Inc.*, 559 F.Supp. 2d 1036, 1042 (N.D. Cal. 2007) (relying on a 2005 NERA report); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 2007 WL 313474, at *10 (S.D.N.Y. 2007) (relying on a 2005 Cornerstone Research report); *In re Linerboard Antitrust Litig.*, 2004 WL 1221350, at *14 (E.D. Pa. 2004) (citing a 1996 NERA study).

the settlement of $8 million reflects roughly 9-10% of the maximum estimated losses. Across the last ten years, in cases where the estimated recovery was roughly the same as this case, the median settlement as a percentage of estimated recovery was about 5%. *See* CORNERSTONE RPT, *supra*, 8 (reporting that in cases between 2005 and 2013, where the estimated damages ranged between $50-124 million, the median settlement as a percentage of estimated damages was 5.0%); NERA RPT, *supra*, 32 (reporting that in cases between 1996 and 2014, where the estimated damages ranged between $50-99 million, the median settlement as a percentage of projected investor losses was 4.8%); *see also Ikon*, 194 F.R.D. at 183-84 (approving 5.2-8.7% recovery of estimated maximum losses).

Moreover, this estimated damages range represents the maximum estimated losses if a jury found that ViroPharma Securities prices dropped entirely due to Defendants' material misrepresentations or omissions. As previously addressed, around the time ViroPharma made its last allegedly fraudulent statement, ViroPharma also made two non-fraudulent disclosures. In proving causation, Lead Plaintiff faced a real risk that a jury would find that the other disclosures were at least partly responsible for the drops in prices. Thus, while the recovery is only 9-10% of the maximum estimated losses, it likely reflects an even higher percentage of the estimated losses Lead Plaintiff could have foreseeably recovered. This factor weighs in favor of approving the Settlement.

### ii.   The *Prudential* considerations

None of the *Prudential* considerations weighs against Settlement: (1) following extensive briefing on substantive issues, expedited discovery, and an arm's-length mediation process, Lead Plaintiff, and Lead Counsel, appropriately understood the merits of the case such that they could knowingly enter into the Settlement; (2) given that there were no objections by the Settlement Class and that no persons opted out of the Settlement Class, there are no claims by other classes

or subclasses related to the underlying facts of this case; (3) there are no known other claimants beyond those represented by the Settlement Class; (4) Settlement Class members were accorded the right to opt out of the Settlement, and none chose to do so; (5) as discussed in greater detail *infra*, the demand for attorneys' fees is reasonable; and (6) the Plan of Allocation is fair and reasonable.

As to the sixth factor, "[t]he court's principal obligation is simply to ensure that the fund distribution is fair and reasonable as to all participants in the fund." *Walsh*, 726 F.2d at 964. Pursuant to the Notice, any Settlement Class members who wished to participate in the distribution of the Settlement had to submit a valid proof of claim no later than September 21, 2015. (Notice at 6-8; Dkt No. 88.) As the Notice outlines, after deducting attorneys' fees and expenses, Notice and relevant administration costs, banking fees, and taxes, the remaining fund amount (the "Net Settlement Fund") will be distributed according to the Plan of Allocation. (Notice at 6-7, 10; SA at 17 ¶ 9; Gardner Decl. ¶ 70.) The Plan of Allocation outlines that the Net Settlement Fund will be distributed on a *pro rata* basis among Authorized Claimants. (Notice at 11.) The Notice explains that the maximum recovery available for call options and put options is three percent of the Net Settlement Fund. (Notice at 11.)

The Plan of Allocation describes formulas for determining the Total Inflation Loss[7] and the Net Trading Loss,[8] disaggregated by the type of ViroPharma Security and the date of sale.

---

[7] An Inflation Loss is the amount of loss calculated based on the amount of inflation in the price of ViroPharma common stock, notes or call options, or deflation in the price of ViroPharma put options based on methodology described in the Plan of Allocation. (Notice at 11.) The Total Inflation Loss is the sum of all Inflation Losses for all transactions in all ViroPharma Securities. (Notice at 13.)

[8] A Trading Loss is the amount by which the amount paid for ViroPharma Securities purchased or acquired during the Class Period, excluding all fees, taxes, and commissions,  (the "Purchase Amount") exceeds the amount received for sales of ViroPharma Securities sold during the Class Period, excluding all fees, taxes, and commissions (the "Sales Proceeds"). (Notice at 11.) A Trading Gain means the amount by which the Sales Proceeds exceeds the Purchase Amount for each transaction.  An Authorized Claimant

(Notice at 11-13.) The Plan of Allocation explains that the Authorized Claimant will recover the Total Inflation Loss, or the Net Trading Loss, whichever is lesser. (Notice at 14.) These formulas were developed with Lead Plaintiff's expert. (Gardner Decl. ¶ 72.) Only Authorized Claimants whose prorated shares will be greater than $10.00 will receive payment. (Notice at 14.) The Garden City Group, under Lead Counsel's oversight, will determine each Authorized Claimant's *pro rata* share. (Gardner Decl. ¶ 73.)

If there is any balance remaining in the Net Settlement Fund six months after all litigation fees and expenses, taxes, and payments to Authorized Claimants have been made, and enough balance remains, Lead Counsel shall reallocate such remaining balance to the Authorized Claimants. (Notice at 14.) If any amount remains after reallocation, but such amount is too small for further reallocation, the remaining balance shall go to the Council of Institutional Investors, a non-profit organization. (Notice at 14.) The Court finds that this procedure is fair and reasonable.

### iii.   Conclusion

In sum, all of the *Girsh* and *Prudential* factors are either neutral or weigh in favor of the Settlement, with the sole exception that Defendants could likely withstand a greater judgment. Given that the Settlement came two and half years into a well-litigated case, after an arm's-length negotiation process mediated by the Honorable Layn R. Phillips, United States District Court Judge (Ret.), with no objections coming from the over 18,000 member Settlement Class, and with the Settlement Fund reflecting an above-average recovery, this Court approves the Settlement. Further, the Court approves the Plan of Allocation.

### V.   Attorneys' Fees

"In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h).

---

has a Net Trading Gain when his or her total Trading Gains exceed or are equal to his or her Total Trading Losses. (Notice at 13.)

"The common fund doctrine provides that a private plaintiff, or plaintiff's attorney, whose efforts create, discover, increase, or preserve a fund to which others also have a claim, is entitled to recover from the fund the costs of his litigation, including attorneys' fees." *GMC*, 55 F.3d at 820 n. 39 (citing *Vincent v. Hughes Air West, Inc.*, 557 F.2d 759 (9th Cir. 1977)). This Court must conduct a "thorough judicial review" to determine whether and how much of an award counsel is due. *Prudential*, 148 F.3d at 333; *GMC*, 55 F.3d at 819. The determination rests with the discretion of the Court. *Id.* at 821.

Plaintiff's Counsel requests an award of 30% of the Settlement Fund. In support of this Motion, Lead Counsel submitted a declaration related to fees and expenses. (Jonathan Gardner on behalf of Labaton Sucharow LLP Declaration, Dkt No. 91, Ex. 4 [hereinafter Labaton Decl.].)

### a.  Legal Standard

The percentage-of-recovery method is "generally favored" in cases involving a settlement that creates a common fund. *Sullivan*, 667 F.3d at 330; *In re. AT&T Corp. Sec. Litig.*, 455 F.3d 160, 164 (3d Cir. 2006) ("*AT&T*"); *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 300 (3d Cir. 2005) ("*Rite Aid*"); *Cendant*, 243 F.3d at 734. Where the Lead Plaintiff approves the Lead Plaintiff's counsel's request fee award – as Lead Plaintiff does here – the Court should afford the fee requested a presumption of reasonableness. *Cendant*, 264 F.3d at 220.

The Court should also consider:

(1) The size of the fund created and the number of persons benefitted;

(2) The presence or absence of substantial objections by members of the Class to the settlement terms and/or fees requested by counsel;

(3) The skill and efficiency of the attorneys involved;

(4) The complexity and duration of the litigation;

(5) The risk of nonpayment;

(6) The amount of time devoted to the case by plaintiffs' counsel; and

(7) The awards in similar cases.

*Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n. 1 (3d Cir. 2000). The factors "need not be applied in a formulaic way...and in certain cases, one factor may outweigh the rest." *Diet Drugs*, 582 F.3d at 541.

Second, the Court should compare the proposed percentage against the lodestar cross-check. The lodestar cross-check is performed by calculating the "lodestar multiplier." *AT&T,* 455 F.3d at 164. The multiplier is determined by dividing the requested fee award, determined from the percentage-of-recovery method, by the lodestar. *Id.* To determine the lodestar method's suggested total, the court multiplies "the number of hours reasonably worked on a client's case by a reasonable hourly billing rate for such services based on the given geographical area, the nature of the services provided, and the experience of the attorneys." *Rite Aid,* 396 F.3d at 305. To determine the number of hours used in calculating the lodestar, courts must exclude hours that are "excessive, redundant, or otherwise unnecessary." *McKenna v. City of Phila.,* 582 F.3d 447, 455 (3d Cir. 2009) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)).

### b. Analysis

In this case, Plaintiff's Counsel requests 30% of the Settlement Fund. Because Lead Plaintiff approves of the Attorneys' Fees, the Court affords the attorneys' fees requested a presumption of reasonableness. *Cendant*, 264 F.3d at 220. The Court determines that the fees are appropriate under the required factors as well.

#### i. *Gunter* Factors

##### 1. The size of the fund created and the number of persons benefitted

The "most critical factor" for the Court to weigh is "the degree of success obtained." *Hensley*, 461 U.S. at 436 The Settlement established a common fund of $8,000,000, intended for roughly 18,000 Settlement Class members. (Gardner Decl. ¶ 79.) As discussed in greater detail *supra* during the Court's analysis of the *Girsh* factors, the Court finds that 9-10% recovery of the

total estimated maximum losses is a higher than average recovery for cases of this type. This factor weighs in favor of the award of attorneys' fees.

### 2. The presence or absence of substantial objections by members of the Class to the settlement terms and/or fees requested by counsel

No Settlement Class member filed any objections. (Gardner Decl. ¶ 95.) Lead Plaintiff supports the request for attorneys' fees. (Carpenters' Decl. ¶ 6.) This factor weighs in favor of the award of attorneys' fees.

### 3. The skill and efficiency of the attorneys involved

The skill and efficiency of the attorneys involved are measured by the "quality of the result achieved, the difficulties faced, the speed and efficiency of the recovery, the standing, experience and expertise of counsel, the skill and professionalism with which counsel prosecuted the case and the performance and quality of opposing counsel." *In re Computron Software, Inc.*, 6 F.Supp.2d 313, 323 (D.N.J. 1998).

First, as described *supra* during the Court's analysis of the *Girsh* factors regarding risks, this outcome is an extremely favorable resolution for the Settlement Class given the risks attendant with securities litigation. Second, as discussed *supra* during the Court's analysis of the class certification requirement for adequacy of representation, Plaintiff's Counsel is highly experienced in this area of litigation and was chosen specifically due to their expertise in these matters. (*See* Labaton Resume, Goldman Resume, Robbins Resume.) Third, opposing counsel in this case is as highly regarded as Plaintiff's Counsel. Both sides litigated this case aggressively and professionally. The submissions from the parties were consistently well-researched, of high-quality, and timely submitted. The Court notes with appreciation that the parties conducted expedited discovery without any Court intervention. This factor weighs in favor of the award of attorneys' fees.

### 4.  The complexity and duration of the litigation

As addressed *supra* in the Court's analysis of the *Girsh* factor on the stage of the proceedings, this case settled fairly early in the life of the case. However, this posture reflects the comprehensive and substantial briefing the parties completed for Defendants' Motion to Dismiss and motion to certify for interlocutory appeal. In addition, in preparation for mediation, the parties conduct expedited discovery. Throughout this process, Plaintiff's Counsel zealously represented the Lead Plaintiff and Settlement Class.

Moreover, even if the Settlement Class could recover a larger judgment at trial, such recovery would be postponed for years. The Settlement secures a lesser, but actual, payment for the Settlement Class now, rather than the speculative promise of a larger payment years from now. "Here, the trial, as...all securities fraud trials, will be long and complex...Thus, the complexity, expense and duration of the litigation weigh in favor of settlement." *Hoffman Elec., Inc. v. Emerson Elec., Co.*, 800 F.Supp. 1279, 1285 (W.D. Pa. 1992). This factor weighs in favor of the award of attorneys' fees.

### 5.  The risk of nonpayment

Plaintiff's Counsel worked on an entirely contingent basis. (Gardner Decl. ¶ 11.) "Courts routinely recognize that the risk created by undertaking an action on a contingency fee basis militates in favor of approval." *In re Schering-Plough Corp. Enhance ERISA Litig.*, 2012 WL 1964451, at *7 (D.N.J. 2012). In litigating this case for nearly four years now, without pay, shouldering all expenses, Plaintiff's Counsel took on significant risk of non-payment. Given the length and complexity of this case, this factor weighs in favor of the award of attorneys' fees.

### 6.   The amount of time devoted to the case by Plaintiff's Counsel

Plaintiff's Counsel estimates that they invested more than 4,500 hours of attorney and other professional and paraprofessional time on this case. (Gardner Decl. ¶ 11.) This factor weighs in favor of the award of attorneys' fees.

### 7.   The awards in similar cases

"In common fund cases, fee awards generally range from anywhere from nineteen percent (19%) to forty-five percent (45%) of the settlement fund." *Bredbenner v. Liberty Travel, Inc.*, 2011 WL 1344745, at *21 (D.N.J. 2011). The median award for attorneys' fees for securities class action settlements of this size is roughly twenty five percent (25%). *See NERA Rpt*, *supra*, at 34 (reporting that between 2012-2014, settlements worth between $25-100 million awarded a median percentage of 25%). In this Circuit, "awards of thirty percent are not uncommon in securities class actions." *Ikon*, 194 F.R.D at 194; *see also Esslinger v. HSBC Bank Nev., N.A.*, 2012 WL 5866074, at *12 (E.D. Pa. 2012) (approving 30% of the settlement amount); *In re Sterling Financial Corp. Sec. Class* Action, 2009 WL 2914363, at *3 (E.D. Pa. 2009) (approving thirty percent award); *Smith v. Dominion Bridge Corp.*, 2007 WL 1101272, at *9 (E.D. Pa. 2007) (awarding one-third); *In re Ravisent Technologies, Inc. Sec. Litig.*, 2005 WL 906361, at *11 (E.D. Pa. 2005) ("[C]ourts within this Circuit have typically awarded attorneys' fees of 30% to 35% of the recovery, plus expenses."); *In re Corel Corp. Inc. Sec. Litig.*, 293 F.Supp.2d 484, 497 (E.D. Pa. 2003) (awarding one-third); *In re Aetna Inc. Sec. Litig.*, 2001 WL 20928, at *14 (E.D. Pa. 2001) ("[A]wards of thirty percent are commonly awarded in other settlements of securities fraud cases."). The Court finds that the thirty percent recovery is appropriate given the size of the recovery.

### ii.  Lodestar cross-check

To conduct the lodestar cross-check, the Court will compute the hours worked by all Plaintiff's Counsel and multiply such amounts against the appropriate hourly rates. Lead Counsel spent 2,952.90 hours on the case. (Labaton Decl., Ex. B [hereinafter Labaton Lodestar Rpt.]; Summary of Lodestars, Dkt No. 91, Ex. 7 [hereinafter Lodestar Summary]; Labaton Decl. ¶ 6.) Based on Lead Counsel's current billing rates, the total lodestar amount for attorney and professional time for Lead Counsel was $1,807,603.50. (Labaton Lodestar Rpt.; Lodestar Summary; Labaton Decl. ¶ 6.) Liaison counsel spent 542.10 hours on the case. (Paul J. Scarlato on behalf of Goldman Scarlato & Penny, P.C., Dkt No. 91, Ex. 5 [hereinafter Goldman Decl.] ¶ 7; Lodestar Summary.) Based on liaison counsel's billable rates, the lodestar analysis totals $376,759.50. (Goldman Decl. ¶ 7; Goldman Decl., Ex. B [hereinafter Goldman Lodestar Rpt.]; Lodestar Summary.) Additional plaintiff's counsel spent 1,022.25 hours on the case. (David W. Mitchell on behalf of Robbins Geller Rudman & Dowd LLP, Dkt No. 91, Ex. 6 [hereinafter Robbins Decl.] ¶ 6; Lodestar Summary.) Based on additional plaintiff's counsel's billable rates, the lodestar analysis totals $476,254.50. (Robbins Decl. ¶ 6; Robbins Decl., Ex. B [hereinafter Robbins Lodestar Rpt.]; Lodestar Summary.)

Plaintiff's Counsel, and relevant staff, in total, incurred 4,517.25 billable hours. (Lodestar Summary; Gardner Decl. ¶ 92.) The hourly billing rates of all of Plaintiff's Counsel range from $610 to $925 for partners, $475 to $750 for of counsels, and $350 to $700 for other attorneys. (Gardner Decl. ¶ 91.) The total lodestar amount is $2,660,617.50. (Lodestar Summary; Labaton Lodestar Rpt.; Goldman Lodestar Rpt.; Robbins Lodestar Rpt.; Gardner Decl. ¶¶ 83, 92.)

Given that 30% of the Settlement Fund reflects $2,400,000, the lodestar multiplier here is negative 0.90. (Gardner Decl. ¶ 92.) The lodestar cross-check confirms that the percentage-of-

recovery method produces an appropriate recovery. The Court grants the Motion for Attorneys' Fees.

### VI.    Expenses

Counsel in a class action are entitled to reimbursement of expenses that were "adequately documented and reasonable and appropriately incurred in the prosecution of the class action." *Abrams v. Lightolier, Inc.*, 50 F.3d 1204, 1225 (3d Cir. 1995).

Lead Counsel requests $89,650.74 in expenses, including costs for meals/hotels/transportation, duplicating, postage, telephone/facsimile, messenger/overnight delivery, filing, witness and other court fees, court reporting and transcripts, online legal and financial research fees, experts, and contributions to Litigation Expense Fund. (Lodestar Summary; Labaton Decl. ¶¶ 8-9.) Liaison counsel requests $751.73 in expenses including duplicating, postage, messenger/overnight delivery, and online legal and financial research fees. (Lodestar Summary; Goldman Decl. ¶ 9.) Additional plaintiff's counsel requests $64,794.76 in expenses including filing, witness and other fees, transportation, hotels and meals, telephone, messenger/overnight delivery, expert report, photocopies, online legal and financial research services. (Lodestar Summary; Robbins Decl. ¶¶ 8-9.)

In total, Plaintiff's Counsel requests $155,197.23 in expenses. (Lodestar Summary; Gardner Decl. ¶¶ 11, 75, 83, 98, 100.) This amount includes $72,468 related to investigation of the claims and expert analysis, and $31,208.33 in mediation fees assessed by Judge Phillips. (Gardner Decl. ¶ 102.) Lead Plaintiff supports the application for expenses.

The Court finds the expenses reasonable and grants all expenses requested.

BY THE COURT:

/s/ C. Darnell Jones, II

_____

C. Darnell Jones, II    J.

36